

FILED by _____ D.C.
INTAKE

**DEC 2 8 2009**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. MIAMI

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

JEROME SHAFFER AND
SHARON SHAFFER,

**09 ‑ 62027**

Plaintiffs,

v.

**CIV ‑ SEITZ**   MAGISTRATE JUDGE
O'SULLIVAN

SB HOTEL ASSOCIATES, LLC;
BAYROCK GROUP, LLC,
DONALD J. TRUMP; ROY STILLMAN;
and FEDERAL DEPOSIT INSURANCE COMPANY,
as Receiver for Corus Bank, N.A.

Defendants.

_____/

## NOTICE OF REMOVAL

Pursuant to 12 U.S.C. § 1819(b)(2)(B) and 28 U.S.C. § 1441, the Federal Deposit Insurance Corporation, as Receiver for Corus Bank, N.A. ("FDIC-R"), hereby removes the above-captioned lawsuit from the Circuit Court, Seventeenth Judicial Circuit, in and for Broward County, Florida, in which it is currently pending, to the United States District Court for the Southern District of Florida. As grounds for the removal, the FDIC-R states as follows:

### Background

1.     On December 18, 2008, Jerome Shaffer and Sharon Shaffer ("Shaffer") filed a Complaint and Demand for Jury Trial initiating this case in the Circuit Court, Seventeenth Judicial Circuit, in and for Broward County, Florida; Case No.: 08-062209 CA CE (02) (the "State Court Action"). The State Court Action seeks damages against the Defendants related to Shaffer's purchase of a hotel condominium unit.

2.     On September 11, 2009, the Office of the Comptroller of the Currency declared Corus insolvent and appointed the FDIC its Receiver that same day. A copy of the Receivership

Determination and Appointment of Receiver is attached as Exhibit **A**.   The FDIC accepted its appointment as Receiver that same day pursuant to 12 U.S.C. § 1821(c).  A copy of the FDIC's acceptance letter is attached as Exhibit **B**.

3.      The FDIC-R, by operation of law, has succeeded to all rights, titles, powers, and privileges of Corus Bank pursuant to 12 U.S.C. § 1821(d)(2).  As such, the FDIC-R stands in the shoes of Corus Bank with respect to all matters, including litigation against Corus Bank. *Id.*

4.      On September 15, 2009, the FDIC-R filed a Motion to Substitute Party and Motion for Stay Pursuant to 12 USC § 1821(d)(12)(A)(ii) in this case seeking to be substituted in place of Corus Bank, N.A., which was granted on October 13, 2009.  *See* Agreed Order Substituting Party and Staying Proceedings ("Order of Substitution"; copy attached as Exhibit **C**).

**Basis for Removal**

5.      The case is removable at this time pursuant to 28 U.S.C. § 1441(b) and 12 U.S.C. § 1819(b)(2)(B). Section 1441(b) provides, in relevant part:

> Any civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties.

6.      Any civil suit in which the FDIC, in any capacity, is a party is "deemed to arise under the laws of the United States." 12 U.S.C. § 1819(b)(2)(A); *see also Bullion Services, Inc. v. Valley State Bank*, 50 F.3d 705, 707 (9th Cir. 1995).  When the FDIC is a party, the entire action is deemed to arise under the laws of the United States. *Buchner v. FDIC*, 981 F.2d 816, 819 (5th Cir. 1993).  Therefore, this action arises under the laws of the United States, and is subject to removal as provided by § 1441(b).

7.      The FDIC has a statutory right to remove cases in which it is a party from state court to federal court pursuant to the Financial Institution Reform, Recovery, and Enforcement

Act of 1989, Pub. L. No. 101-73, § 209, 103 Stat. 183 *et seq.* Specifically, 12 U.S.C. § 1819(b)(2)(B) provides in pertinent part:

> Except as provided in subparagraph (D), the [FDIC] may, without bond or security, remove any action, suit, or proceeding from a State court to the appropriate United States district court before the end of the 90-day period beginning on the date of the action, suit, or proceeding is filed against the Corporation or the Corporation is substituted as a party.

8.    The Order of Substitution was entered on October 13, 2009. Therefore, this Notice of Removal is filed within the 90-day period from the date FDIC-R was substituted as a party in the action.

9.    Because the FDIC-R is now a party to the State Court Action, the entire action is properly removed to the United States District Court for the Southern District of Florida.

10.    The FDIC-R will promptly file and serve a Notice of Filing Notice of Removal on all parties of record in the State Court action and the Clerk of the Circuit Court of the Seventeenth Judicial Circuit, Broward County, Florida, pursuant to 28 U.S.C. § 1446(d).

11.    Venue properly lies with this Court pursuant to 28 U.S.C. § 1441(a) and 1446(a), as this action is presently pending in the Circuit Court of Broward County, Florida.

12.    A copy of all process, pleadings and orders served by or upon the FDIC-R is attached to this Notice of Removal as required by 28 U.S.C. § 1446(a) as Exhibits C through L consisting of the Complaint and Demand for Jury Trial (Exhibit **D**), Defendants' Motion to Dismiss Plaintiffs' Complaint (Exhibit **E**), Russomanno & Borrello, P.A.'s Motion for Leave to Withdraw as Counsel for Defendants (Exhibit **F**), Notice of Appearance (Exhibit **G**), Order on Stipulation for Substitution of Counsel for Donald J. Trump (Exhibit **H**), Order on Stipulation for Substitution of Counsel for Defendants SB Hotel Associates, LLC, Bayrock Group, LLC and Roy Stillman (Exhibit **I**), Motion to Substitute Party and Motion for Stay Pursuant to 12 USC §

1821(d)(12)(A)(ii) (Exhibit **J**),  Notice of Hearing (Exhibit **K**), and Notice of Cancellation of Hearing (Exhibit **L**).

WHEREFORE, the Defendant Federal Deposit Insurance Corporation, as Receiver for Corus Bank, N.A., removes this action from the Circuit Court, Seventeenth Judicial Circuit, in and for Broward County, Florida, to the United States District Court for the Southern District of Florida.

Respectfully submitted,

Date: December 28, 2009

**AKERMAN SENTERFITT**
One S.E. Third Avenue — 25th Floor
Miami, FL 33131-1714
Tel.: 305-374-5600
Fax: 305-374-5095

By: s/
 CHRISTOPHER S. CARVER, ESQ.
 Florida Bar No. 993580
 E-mail: christopher.carver@akerman.com
 DAVID E. OTERO, ESQ.
 Florida Bar No. 651370
 E-mail: david.otero@akerman.com

*Attorneys for the Federal Deposit Insurance Corporation, as Receiver for Corus Bank, N.A.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that copies of this *Notice of Removal* were served by United States Mail this 28th day of December, 2009, on:

David W. Trench, Esq.
Bilzin Sumberg Baena Price & Axelrod LLP
200 South Biscayne Blvd.
Suite 2500
Miami, Florida 33131

Jonathan Kline, Esq.
Jonathan Kline, P.A.
2761 Executive Park Drive
Weston, FL 33331

Lynette Ebeoglu McGuinness, Esq.
Murai Wald Biondo & Moreno, P.A.
1200 Ponce de Leon Blvd.
Coral Gables, FL  33134

Stephen B. Gillman, Esq.
Shutts & Bowen LLP
1500 Miami Center
201 S. Biscayne Blvd.
Miami, FL  33131

_____
Attorney

# EXHIBIT A

# UNITED STATES OF AMERICA
## OFFICE OF THE COMPTROLLER OF THE CURRENCY
### WASHINGTON, D.C.

### Receivership Determination and Appointment of Receiver

Corus Bank, National Association
Chicago, Illinois
Charter Number 23005

**WHEREAS**, the Comptroller of the Currency has delegated to me the authority to appoint a receiver for a national bank under 12 U.S.C. §§ 191 and 1821(c)(5);

**WHEREAS**, the above captioned bank ("Bank") is insured by the Federal Deposit Insurance Corporation;

**WHEREAS**, from information available to the Office of the Comptroller of the Currency ("OCC") and pursuant to 12 U.S.C. § 191, I have determined that the following grounds exist for the appointment of a receiver for the Bank:

(1)  The Bank's assets are less than its obligations to its creditors and others, including members of the institution.  12 U.S.C. § 1821(c)(5)(A).

(2)  The Bank has experienced substantial dissipation of assets or earnings due to any unsafe or unsound practice.  12 U.S.C. § 1821(c)(5)(B)(ii).

(3)  The Bank is in an unsafe or unsound condition to transact business.  12 U.S.C. § 1821(c)(5)(C).

(4)  The Bank has incurred or is likely to incur losses that will deplete all or substantially all of its capital, and there is no reasonable prospect for the institution to become adequately capitalized (as defined in 12 U.S.C. § 1831o(b)) without Federal assistance. 12 U.S.C. § 1821(c)(5)(G).

(5)  The Bank's unsafe or unsound practices or condition are likely to cause insolvency or substantial dissipation of assets or earnings.  12 U.S.C. § 1821(c)(5)(H)(i).

(6)  The Bank's unsafe or unsound practices or condition are likely to weaken its condition. 12 U.S.C. § 1821(c)(5)(H)(ii).

EXHIBIT "A"

(7)   The Bank's unsafe or unsound practices or condition are likely to seriously prejudice the interests of its depositors or the Deposit Insurance Fund.  12 U.S.C. § 1821(c)(5)(H)(iii).

(8)   The Bank is undercapitalized (as defined in 12 U.S.C. § 1831o(b)) and has no reasonable prospect of becoming adequately capitalized.  12 U.S.C. § 1821(c)(5)(K)(i).

(9)   The Bank is undercapitalized (as defined in 12 U.S.C. § 1831o(b)) and has failed to submit a capital restoration plan acceptable to the OCC within the time prescribed under 12 U.S.C. § 1831o(e)(2)(D).  12 U.S.C. § 1821(c)(5)(K)(iii).

(10)  The Bank is critically undercapitalized, as defined in 12 U.S.C. § 1831o(b).  12 U.S.C. § 1821(c)(5)(L)(i).

WHEREAS, in my discretion, I have determined that the Federal Deposit Insurance Corporation should be appointed Receiver for the Bank;

NOW THEREFORE, pursuant to 12 U.S.C. §§ 191 and 1821(c) and the power, duty, and authority vested in me by law, I do hereby appoint the Federal Deposit Insurance Corporation as Receiver for the Bank, with all of the powers, duties, and responsibilities given to or imposed upon a receiver under the provisions of the laws of the United States which authorize and direct the appointment of such receiver.

Jennifer C. Kelly
Senior Deputy Comptroller
Midsize/Community Bank Supervision

Dated: September 11, 2009

1



Comptroller of the Currency
Administrator of National Banks

Washington, DC 20219

September 11, 2009

The Federal Deposit Insurance Corporation
550 17ᵗʰ Street, N.W.
Washington, D.C. 20429-9990

Re:    Corus Bank, National Association, Charter Number 23005

To Whom It May Concern:

You have been appointed Receiver for the above captioned bank ("Bank") effective as of the date of this letter. A copy of the *Receivership Determination and Appointment of Receiver* for the Bank is enclosed.

Please send the Office of the Comptroller of the Currency a copy of any verification of assets prepared by the Federal Deposit Insurance Corporation.

Very truly yours,

Jennifer C. Kelly
Senior Deputy Comptroller
Midsize/Community Bank Supervision

Enclosure

*l*

# EXHIBIT B

 **FDIC**
**Division of Resolutions and Receiverships**
**Dallas Regional Office**
1601 Bryan Street
Dallas, Texas 75201

Telephone (214) 754-0098

September 11, 2009

Office of the Comptroller of the Currency
Washington, D.C.

Subject:   **Corus Bank, National Association**
**Chicago, Illinois – In Receivership**
<u>**Acceptance of Appointment as Receiver**</u>

Dear Sir or Madam:

Please be advised that the Federal Deposit Insurance Corporation accepts its appointment as Receiver of the captioned depository institution, in accordance with the Federal Deposit Insurance Act, as amended.

Sincerely,

FEDERAL DEPOSIT INSURANCE CORPORATION

By: _Daniel M. Bell_
Name: Daniel M. Bell
Title:  Receiver-in-Charge

# EXHIBIT C

DOCKETED

Forwarded for Legal Key Imaging

Docket ent.
OCT 1 9 2008
Bilzin Sumberg Baena
Price & Axelrod LLP

IN THE CIRCUIT COURT OF THE
SEVENTEEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY,
FLORIDA

CIVIL DIVISION

CASE NO. 08-062209 CACE (02)

JEROME SHAFFER and
SHARON SHAFFER,

    Plaintiffs,

vs.

SB HOTEL ASSOCIATES, LLC,
BAYROCK GROUP, LLC, DONALD
TRUMP, ROY STILLMAN and CORUS
BANK, N.A.,

    Defendants.

_____/

## AGREED ORDER SUBSTITUTING PARTY AND STAYING PROCEEDINGS

THIS CAUSE came before the Court on Federal Deposit Insurance Corporation ("FDIC"), as Receiver of Corus Bank, N.A.'s Motion to Substitute Party and Motion for Stay Pursuant to 12 USC § 1821 (d) (12) (A) (ii), and the Court, having reviewed the file, and having been advised of the agreement of counsel, and being otherwise duly advised in the premises, it is hereby:

**ORDERED** and **ADJUDGED** that the Motion is GRANTED, as follows:

1.    The FDIC's motion to substitute itself as a real party in interest and to stay proceedings is GRANTED.

2.    Pursuant to 12 U.S.C. § 1821 (c) & (d), the FDIC as receiver is substituted as a party for Corus Bank, and all proceedings in this case including, without limitation, pleadings, motions, discovery and status conferences, are stayed until December 28,

2009.  Any discovery responses, pleadings, motions, or filings that would otherwise be due during this period shall instead be filed on December 28, 2009.

      3.    In the event any party believes there is a basis to lift the stay before December 28, it may seek such relief.  The stay shall remain in effect until December 28, 2009, unless it is terminated by an order of this Court prior to that date.

      DONE AND ORDERED in Chambers at Ft. Lauderdale, Florida on this _____ day of _____, 2009.

JOHN B. BOWMAN

OCT 1 3 2009

A TRUE COPY

_____
Honorable Robert B. Carney
Circuit Court Judge

Copies furnished to:

Jonathan Kline, Esq.
Lynette Ebeoglu McGuinness, Esq.
Stephen B. Gillman, Esq.
David W. Trench

# EXHIBIT D

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA 0 8 0 6 2 2 0 9

CASE NO.:
DIVISION: AI

JEROME SHAFFER AND
SHARON SHAFFER

    Plaintiff(s),

    vs.



SB HOTEL ASSOCIATES, LLC,
BAYROCK GROUP, LLC,
DONALD TRUMP, ROY STILLMAN
and CORUS BANK, N.A.

    Defendant(s).

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

## JURISDICTION, VENUE, AND PARTIES

Plaintiff(s), JEROME AND SHARON SHAFFER (hereinafter may be referred to as
"Buyer(s)") sues Defendant(s), SB HOTEL ASSOCIATES, LLC, BAYROCK GROUP,
LLC, DONALD TRUMP, ROY STILLMAN and CORUS BANK, (hereinafter may be
referred to as "Developer(s)" and states:

1.    This is an action to enforce the return of an earnest money deposit in excess of

$15,000.00 or more plus interest.

2.    Jurisdiction is appropriate pursuant to Florida Statute §47.051.

3.    Plaintiff(s), JEROME SHAFFER is over 18 years of age residing in Palm Beach

County, Florida and is otherwise *sui juris* thereof.

4.    Plaintiff(s), SHARON SHAFFER is over 18 years of age residing in Palm Beach

County, Florida and is otherwise *sui juris* thereof.

5.    Defendant SB Hotel Associates LLC ("SB" Associates) is a Delaware limited

liability company with its principal place of business in New York and doing business in

Page 1 of 28

Broward County, Florida and is otherwise *sui juris*. SB Associates is both the seller and one of the developers of the residential and resort condominium known as "SB Fort Lauderdale Hotel & Condominium" located in Fort Lauderdale, FL(hereafter "the Property).

6. Defendant "Bayrock Group, LLC." ("Bayrock") is a foreign corporation doing business in Broward County, Florida and is otherwise *sui juris*. Bayrock is one of the developers of the Property.

7. Defendant Roy Stillman ("Stillman") is an individual over eighteen years of age, who upon information and belief, is a resident of New York, and is otherwise *sui juris*. Stillman is one of the developers of the Property.

8. Defendant Donald Trump ("Trump") is an individual over eighteen years of age, who upon information and belief, is a resident of New York, and is otherwise *sui juris*. Trump is one of the developers of the Property.

9. Defendant Corus Bank, N.A. ("Corus Bank") is a foreign corporation doing business in Broward County, Florida, and is otherwise *sui juris*.

10. The cause of action accrued in Broward County, Florida, pursuant to Florida Statute §47.051, and the Defendant(s) and are legal entities or natural persons subject to jurisdiction in Broward County, Florida.

11. The real property which is the subject matter of this litigation is located in Broward County, Florida as set forth in Florida Statute §47.051 and the Defendant(s) maintain an office in Broward County, Florida where it transacts its customary business.

Jonathan Kline, P.A. • Attorney at Law
2761 Executive Park Drive • Weston, Florida 33331 • TEL (954) 659-1919 • FAX (954) 659-9937

## GENERAL ALLEGATIONS

12.     On or about December 19, 2005, Plaintiff(s), executed a contract (see Exhibit "1")

for the purchase and sale of real property bearing the following legal description

(hereinafter the "Unit(s)"):

> Unit 1410 of SB FORT LAUDERDALE HOTEL & CONDOMINIUM,
> a Condominium, according to the Declaration of Condominium
> thereof, as recorded in Official Records Book _____, at Page
> _____, of the Public Records of Broward County, Florida, as
> amended and or supplemented from time to time, together with an
> undivided interest in the common elements appurtenant thereto. [1]

13.     The Unit's legal description only partially describes the interest purchased by the

Plaintiff(s).

14.     The Plaintiff(s) also purchased an undivided interest in the common elements of

the condominium.  The common elements of the condominium are situated within the

following legal description (herein after "underlying legal"):

> Lot 1 though Lot 8 "A RESUBDIVISION OF BLOCK "8" BIRCH
> OCEAN FRONT SUBDIVISION", according to the plat thereof, as
> recorded in Plat Book 26, Page 34 of the Public Records of
> Broward County, Florida and containing 79,904 square feet (1.834
> acres) more or less.

15.     The Developer(s) described in the sale and purchase agreement attached as

Exhibit "A" are "Developer(s)" as defined by 15 U.S.C. §1701(5) of Interstate Land Sales

Full Disclosure Act.

---

[1] The Declaration of Condominium has not been recorded in the Official Records of Broward County,
Florida. When the Declaration is recorded the Plaintiff(s) will file an Amended Complaint with this Court in
accordance with the Florida Rules of Civil Procedure.

Jonathan Kline, P.A. ● Attorney at Law
2761 Executive Park Drive ● Weston, Florida  33331 ● TEL (954) 659-1919 ● FAX (954) 659-9937

16.    The Unit(s) and Condominium as described in the sale and purchase agreement fall under and are inclusive in the definition of a "subdivision" as set forth in 15 U.S.C. §1701(3).

17.    The Developer(s) described in the sale and purchase agreement attached as Exhibit "A" are "Developer(s)" as defined by Florida Statute §718.103(16).

18.    The Plaintiff(s) described in the sale and purchase agreement attached as Exhibit "A" are "purchaser(s)" as defined by 15 U.S.C. §1701(10) of Interstate Land Sales Full Disclosure Act.

19.    The Plaintiff(s) described in the sale and purchase agreement attached as Exhibit "A" are "Buyer(s)" as defined by Florida Statute §718.103(5).

20.    The Unit(s) described in the sale and purchase agreement attached as Exhibit "A" are "unit(s)" as defined by Florida Statute §718.103(27).

21.    The Declaration or Declaration of Condominium as set forth in the sale and purchase agreement attached as Exhibit "A" is a "declaration" or a "declaration of condominium" as defined by Florida Statute §718.103(15).

22.    The Unit(s) described in the sale and purchase agreements attached as Exhibit "A" are part of a "residential condominium" as defined by Florida Statute §718.103(23).

23.    The Unit(s) described in the sale and purchase agreements attached as Exhibit "A" are intended to be conveyed as real property by the Developer(s) in a real property interest consistent with a "condominium" as defined under Florida Statute §718.103(11).

24.    The condominium unit described in the sale and purchase agreement attached as Exhibit "A" are "condominium parcel(s)" as defined under Florida Statute §718.103(12).

Jonathan Kline, P.A. ● Attorney at Law
2761 Executive Park Drive ● Weston, Florida  33331 ● TEL (954) 659-1919 ● FAX (954) 659-9937

25.    The condominium unit described in the sale and purchase agreements attached as Exhibit "A" are within the meaning of "condominium property" as defined under Florida Statute §718.103(13).

26.    In connection with the sale and purchase agreement attached as Exhibit "1", the Plaintiff(s), made total deposits with the Developer(s) escrow agent of $129,000.00 representing twenty percent (20%) of the contract price.

27.    The undersigned law firm has been retained by the Plaintiff(s) to represent them in this action and the Plaintiff(s) has agreed to pay the undersigned law firm a reasonable fee for its services and to reimburse the undersigned law firm for all costs advanced in connection with this action.

28.    All conditions precedent to the filing of litigation in this matter have been met by the Plaintiff(s) or have been waived.

29.    During the year of 2005, Defendants began actively marketing the Property for sale as "Trump International Hotel & Tower," a luxury hotel and condominium. In letters to the Plaintiffs, Defendant Trump represented himself to be the developer of the Property. A copy of a sample letter from Defendant Trump to Plaintiff Nugent is attached hereto as Exhibit "B."

30.    Additionally, the internet website for the project promotes the Project as "Trump International Hotel and Tower," and states that "the Team" responsible for the development of the Property includes Donald Trump, Roy Stillman and the Bayrock Group, amongst others. A copy of a page from the Trump International Hotel and Tower website is attached hereto as Exhibit "C."

31.    The project was marketed to potential buyers with a strong emphasis on the

Page 5 of 28

Jonathan Kline, P.A. • Attorney at Law
2761 Executive Park Drive • Weston, Florida  33331 • TEL (954) 659-1919 • FAX (954) 659-9937

overall investment potential, rental and management program, payment stream purchasers could anticipate from the rental of their units, and the increase in equity for purchasers in the project. The brochures and promotional materials emphasize the Trump Organization's "solid management practices" and that "[c]ompared to other projects, Trump International Hotel & tower has a more favorable income share." These materials go as far as to virtually guarantee purchasers "significant equity" as a result of their investments in the project.

32.    The Defendants promotional materials further reinforced Donald Trump's responsibility for the development of the project and the investment potential associated with purchasing a unit by including purported purchaser testimonials making statements such as the following:

> **Sandra Lunden** is a New Yorker who feels that *"Buying a condo hotel unit in Donald Trump's building means that I am getting more than a place in a luxury building. It means that I'm getting the best of everything...."*

> **Timothy Duval** is a local real estate investor hoping to be the next "Apprentice." Mr. Duval heard about other trump projects through friends. *"Anything Mr. Trump does proves to be great!"* He says *"Compared to other projects, Trump International Hotel & Tower has a more favorable income share...."*

> **James Shin**...."*Buying at Trump is a privilege. It offers an opportunity to own something that...promises significant equity because of its location...."*

33.    According to at least one real estate industry expert, naming this project to include the "Trump" name increased the value of the Property by at least $200.00 per square foot.

34.    Contrary to the promotional materials and representations made to the Plaintiffs, however, the real name of the Property is actually SB Fort Lauderdale Hotel

**Page 6 of 28**

and Condominium, and not "Trump International Hotel and Tower," "Trump Tower," nor any derivation using the "Trump" name.

35.    Defendant Developers also represented, through their sales literature and promotional materials, that the Property would be completed in 2007.

36.    To date, the Property has not been completed and delivered to Plaintiffs as promised in the Agreement, nor will it be completed by December 31, 2008, as required by the contracts with Plaintiffs and the property report for the project.

### Count I – ILSA (§1703(a))
(Against All Defendants)

37.    Plaintiffs reallege paragraphs 1-36 as if set forth herein.

38.    SB Fort Lauderdale Hotel & Condominium is a subdivision as defined by 15 U.S.C. § 1701(3). SB Fort Lauderdale Hotel & Condominium consists of more than 100 units offered, marketed, promoted and sold to the public through the U.S. Mail, U.S. telephone lines, and other instrumentalities of interstate commerce as part of a common promotional plan as defined in 15 U.S.C. § 1701(4).

39.    Defendants SB Associates, Stillman, Bayrock and Trump are the developers of the Property known as SB Fort Lauderdale Hotel & Condominium and may be collectively referred to as "Developer."

40.    Developer is a developer as defined in 15 U.S.C. § 1701(5) in that Developer is a person who, directly or indirectly, sells, offers to sell, and advertises for sale units in a condominium subdivision.

41.    Defendants did not provide Plaintiffs with a printed property report, as prescribed in 15 U.S.C. §§ 1703(a)(1)(B) and 1707, in advance of Plaintiffs entering into

Page 7 of 28

the Agreement, as required by 15 U.S.C. §§ 1703(a)(1)(B). Instead, contrary to ILSA, Defendants did not provide Plaintiffs with the required property report until the time of their entry into the Agreement. While prior versions of ILSA permitted delivery of the property report to purchasers either "in advance or at the time of his signing of any contract," the version of ILSA in effect when Plaintiffs entered into the Agreements did not include the language "at the time of his signing...," and instead required that the property reports be provided "in advance of the signing of any contract..." 15 U.S.C. § 1703(a)(1)(B).

42.   Developer also violated 15 U.S.C. § 1703(a)(1)(B) on November 14, 2005, by representing that the Secretary of Housing and Urban Development had approved the Condominium documents registered by the Developer.   15 U.S.C. § 1703(a)(1)(B) requires that the property report meet the requirements of 15 U.S.C. § 1707, which prohibits the developer from advertising or promoting that the Secretary approves or recommends the subdivision or the sale or lease of lots therein.

43.   Additionally, Developer violated 24 C.F.R. § 1710.29, which states: "nor shall anything in these regulations be construed to authorize or permit any representation that the Property Report is... approved by the Secretary..."

44.   Similarly, the manner in which the property report was given to the Plaintiffs fails to comply with ILSA's implementing regulations, specifically 24 C.F.R. § 1715.20(a), because Defendants gave the property report to Plaintiffs "along with other materials" in "such a manner so as to conceal the Property Report from the Plaintiffs.

45.   Developer violated 24 C.F.R. § 1715.50(a) by failing to provide a disclaimer in its sales and promotional materials advising purchasers to " Obtain the Property Report

Jonathan Kline, P.A. ● Attorney at Law
2761 Executive Park Drive ● Weston, Florida 33331 ● TEL (954) 659-1919 ● FAX (954) 659-9937

required by Federal Law and read it before signing anything."

46.     Developer violated 24 C.F.R. § 1715.2(h) by using as a sales inducement that the lots being sold to Plaintiffs had good investment potential without establishing that (1) comparable lots in the subdivision had been resold on the open market at a profit, (2) there is a factual basis for the represented future increase in value and the factual basis is certain and (3) the sales price of the lot does not already reflect the anticipated increase in value due to any promised facilities or amenities.

47.     Defendants also violated 24 C.F.R. 1715.20(b) by giving contracts to Plaintiffs, and encouraging them to sign them, before delivery of the property reports to Plaintiffs.

48.     Developer represented to Plaintiffs that it was going to provide and complete roads, sewers, water, electrical service and recreational facilities for the Development. Notwithstanding these representations, Developer failed to stipulate in the Agreement that the foregoing amenities would be provided or completed, as required by 15 U.S.C. § 1703(a)(2)(D).

49.     Additionally, federal regulations promulgated under ILSA require the property report to identify when the deed for the property will be delivered to the purchasers, including an estimated schedule for completion of improvements. The property report fails to give even an estimated date of closing, instead merely stating that the unit would be completed "by a date no later than December 31, 2008,..."

50.     Developer further violated ILSA by failing to fill-out most of the required financial information in the section of the property report titled "cost sheet, signature of senior executive officer." Without the required financial disclosure, the property report is of no legal effect as a matter of law.

Jonathan Kline, P.A. ● Attorney at Law
2761 Executive Park Drive ● Weston, Florida  33331 ● TEL (954) 659-1919 ● FAX (954) 659-9937

51.     Developer violated 15 U.S.C. § 1703(a)(1)(D) by delivering advertising and promotional material which were inconsistent with information required to be in the property report. Specifically, Developer's advertising and promotional materials refer to the Condominium as "Trump International" and suggest to a reasonable person that the name of the Condominium being offered is Trump Hotel and Tower. To the contrary, the legal name of the condominium is SB Fort Lauderdale Hotel & Condominium, as evidenced in the property report and the Agreement.

52.     Developer violated 15 U.S.C. § 1703(a)(2)(b), in making omissions and misrepresentations in its advertising and promotional materials. Specifically, purchasers were led to believe that the Property was an elite "Trump Property" being developed by Donald Trump. Defendants' promotional materials even refer to the Property as "Trump International." While the non-party Hotel Owner has a limited licensing agreement with Donald Trump to use the Trump name in relation to the Hotel, neither the Condominium Association, nor the unit owners have been granted any such license.

53.     Defendants' sales materials fail to disclose that if the licensing agreement between Donald Trump and the third party Hotel owner is terminated for any reason, all indicia of the Trump name will be removed from the building. Plaintiffs therefore, have absolutely no guarantee that they have purchased a unit which will continue to carry an affiliation with Donald Trump, even though sales materials lead them to that conclusion, and they have paid a premium for a condominium unit with the Trump name purportedly attached to it.

54.     Defendants further violated 15 U.S.C. § 1703(a)(1)(D) by representing in their

Jonathan Kline, P.A. ● Attorney at Law
2761 Executive Park Drive ● Weston, Florida 33331 ● TEL (954) 659-1919 ● FAX (954) 659-9937

promotional materials that the Condominium would be completed in 2007, in contrast to the December 2008 estimated completion date of the Condominium, furnished in the property report.

55.     Defendants violated 24 CFR 1710.105(d)(2), which provides that where a deed is not delivered within 180 days, or the necessary provisions( a recordable legal description, 20 days from the receipt of notice of default to cure such default) are not included in the Agreement, then the cover page of the property report shall include the following rescission language in place of any other:

> UNDER FEDERAL LAW YOU MAY CANCEL YOUR CONTRACT OR AGREEMENT OF SALE ANY TIME WITHIN TWO YEARS FROM THE DATE OF SIGNING

56.     As a deed was not delivered to Plaintiffs within 180 days, nor were the required provisions in the Agreement, Defendants should have disclosed to the Plaintiffs that they had two years to revoke the Agreement for any reason.

57.     Plaintiffs are entitled to damages and equitable relief as a result of Defendants' violation of ILSA and the aforementioned federal regulations:

58.     Corus Bank, as assignee of the Agreement, is responsible for all of the Developer's duties, liabilities, burdens and obligations pursuant to the Agreement, including the obligation and duty to return Plaintiffs' earnest money deposits to them.

WHEREFORE, Plaintiffs demand judgment for damages and equitable relief pursuant to § 1709(a) against Defendant(s) SB Associates, Stillman, Trump and Corus Bank, together with attorneys' fees pursuant to 15 U.S.C. § 1709(c) and such further relief as the Court may deem just and proper.

Jonathan Kline, P.A. • Attorney at Law
2761 Executive Park Drive • Weston, Florida  33331 • TEL (954) 659-1919 • FAX (954) 659-9937

## COUNT II- 15 U.S.C § 1703(d)
(Against Defendant SB Associates and Corus Bank Only)

Plaintiffs reallege paragraphs 1-58 as set forth herein.

59.     Defendant SB Associates violated ILSA by failing to provide Plaintiffs, in the Agreement, with a legal description of the Property in recordable form, as required by § 1703(d)(1).

60.     Developer violated 15 USC § 1703(d)(2) by failing to include a provision in the Agreement requiring the Seller to give the Purchaser notice of any default or breach of contract by Plaintiff, and the opportunity to cure the default or breach "within 20 days after the date of receipt of such notice" by Plaintiff.

61.     Contrary to this requirement, paragraph 13 of the Agreement provides that "if Buyer is still in default twenty (20) days after Seller sends Buyer notice thereof, Seller shall be entitled to the remedies provided herein."

62.     Defendant has shortened the Plaintiffs' cure period from 20 days after Plaintiffs receive notice, to 20 days after Defendant sends notice of default, which could significantly reduce Plaintiffs' time to cure any default from 20 days to as little as 12 or 13 days, contrary to ILSA.

63.     Plaintiffs have been damaged by Defendant's violation of ILSA.

64.     Corus Bank, as assignee of the Agreement, is responsible for all of the Developer's duties, liabilities, burdens and obligations pursuant to the Agreement, including the obligation and duty to return Plaintiffs' earnest money deposits to them.

        WHEREFORE, Plaintiffs Jerome Shaffer and Sharon Shaffer demand judgment

Jonathan Kline, P.A. • Attorney at Law
2761 Executive Park Drive • Weston, Florida  33331 • TEL (954) 659-1919 • FAX (954) 659-9937

rescinding and revoking the Agreement along with the return of their earnest money deposits pursuant to § 1703(d)and (e). All remaining Plantiffs demand judgment for damages and equitable relief pursuant to § 1709(a) against Defendant SB Associates and Corus Bank, together with attorneys' fees pursuant to 15 U.S.C. § 1709(c) and such further relief as the Court may deem just and proper.

## COUNT III –ACTION TO VOID AGREEMENT PURSUANT TO CHAPTER 718, F.S.
### (Against SB Associates and Corus Bank)

Plaintiffs reallege paragraphs 1-36 as if set forth herein.

65. Defendant SB Associates is one of the developers for purposes of Florida Statutes, Chapter 718, in that a developer is defined in F.S. § 718.103(16) as any person who creates a condominium or offers condominium parcels for sale or lease in the ordinary course of business. The Defendants in this paragraph may be referred to collectively as "Developer" for the purposes of Florida Statutes, Chapter 718.

66. At the time Plaintiffs signed the Agreement, Developer gave them a bound set of documents that included a prospectus, declaration of condominium, survey, site plan, floor plans, and other documents (collectively the "Draft Documents") that condominium developers are required to give to condominium purchasers in Florida.

67. The documents given to Plaintiffs, however, were drafts, and not final documents approved by the Division of Florida Land Sales, Condominiums and Mobile Homes (the "Division").

68. The Draft Documents were subsequently modified by the Developer, and thereafter the modified documents were not approved by the Division until September 22, 2006.

Jonathan Kline, P.A. • Attorney at Law
2761 Executive Park Drive • Weston, Florida 33331 • TEL (954) 659-1919 • FAX (954) 659-9937

69.     Florida law requires the Developer to deliver the final approved documents to the purchaser, and to obtain from the purchaser a receipt acknowledging that he has been provided the required documents by the Developer.   Moreover, the purchaser's 15 day cancellation period does not begin to run until he or she receives the approved documents, and thereafter signs the receipt for documents approved by the Division and required by Florida law.

70.     Defendants never provided to Plaintiffs the final documents approved by the Division, nor did Developer ever have Plaintiffs sign a receipt of documents after the final version of the documents were accepted by the Division, as required by Florida law.

71.     Because Developer never provided Plaintiffs with the documents approved by the Division, nor provided Plaintiffs with a "receipt of documents" approved by the Division after the offering documents were approved, Plaintiffs' 15 day cancellation period never began to run.

72.     Plaintiffs have notified Defendants of their cancellation of the Agreement and demanded the return of their Earnest Money Deposits, with interest.

73.     Defendants have refused to return Plaintiffs' Earnest Money Deposits.

74.     Plaintiffs are entitled to the immediate return of their Earnest Money Deposits.

75.     Corus Bank, as assignee of the Agreement, is responsible for all of the Developer's duties, liabilities, burdens and obligations pursuant to the Agreement, including the obligation and duty to return Plaintiffs' earnest money deposits to them.

WHEREFORE, Plaintiffs demand judgment against Defendants voiding and canceling the Agreement, and for costs, interest, the return of their Earnest Money

Jonathan Kline, P.A. • Attorney at Law
2761 Executive Park Drive • Weston, Florida  33331 • TEL (954) 659-1919 • FAX (954) 659-9937

Deposits, attorneys' fees pursuant to F.S. § 718.303(1), and such further relief as this Court may deem just and proper.

## COUNT IV – RESCISSION BASED ON F.S. § 718.506
### (Against SB Associates, Stillman and Corus Bank)

Plaintiffs reallege paragraphs 1-36 as if set forth herein.

76.     Defendant SB Associates and Stillman are developers for purposes of Florida Statutes, Chapter 718, in that a developer is defined in F.S. § 718.103(16) as any person who creates a condominium or offers condominium parcels for sale or lease in the ordinary course of business.  The Defendants in this paragraph may be referred to collectively as "Developer" for the purposes of Florida Statutes, Chapter 718.

77.     F.S. § 718.506(1) provides that any person who in reasonable reliance upon any material statement or information that is false and misleading and published under the authority of the developer, pays anything of value towards the purchase of a condominium, has a cause of action to rescind the Contract prior to closing.

78.     Advertising and promotional materials published under the authority of the Defendants contained material statements and information that were false and misleading.

79.     Defendants' promotional materials referred to the Property as "Trump International," and otherwise represented that the Condominium had the Trump name attached to it.

80.     The legal name of the Condominium, as evidenced in the Agreement and the Property Report, is SB Hotel & Condominium, and does not include the Trump name.

81.     Moreover, the Prospectus approved by the Division, contrary to other

Page 15 of 28

Jonathan Kline, P.A. • Attorney at Law
2761 Executive Park Drive • Weston, Florida  33331 • TEL (954) 659-1919 • FAX (954) 659-9937

promotional and advertising materials, does not identify Donald Trump as a developer of the project.

82.     While the current Hotel owner has a temporary licensing agreement to use the Trump name in relation to the Hotel, neither the condominium association nor the Unit owners have such right.

83.     If the licensing agreement between the third party Hotel owner and Donald Trump is terminated for any reason, all indicia of the Trump name will be removed from the Hotel.

84.     Plaintiffs reasonably relied on Defendants' misrepresentations.

85.     Plaintiffs paid a premium to be owners of units in "Trump International."

86.     Plaintiffs have not in fact purchased condominium units in "Trump International," as represented, but have instead purchased units SB Fort Lauderdale Hotel & Condominium.

87.     Defendants also represented in their promotional materials that Donald Trump and the Trump organization were the developers of the project.  Should the Court determine that Trump and his entities were not developers of the project, then all representations to the contrary constituted false and misleading advertising.

88.     Defendants also made a material misrepresentation as to the completion date of the project.  While the sales and promotional materials promised completion in 2007, as of this date, the project has not been completed, and will not be completed until 2009.

89.     Plaintiffs have been damaged by the Developer's misrepresentations.

90.     Corus Bank, as assignee of the Agreement, is responsible for all of the

Jonathan Kline, P.A. • Attorney at Law
2761 Executive Park Drive • Weston, Florida  33331 • TEL (954) 659-1919 • FAX (954) 659-9937

Developer's duties, liabilities, burdens and obligations pursuant to the Agreement, including the obligation and duty to return Plaintiffs' Earnest Money Deposits to them.

WHEREFORE Plaintiffs demand judgment against SB Associates and Corus Bank rescinding and revoking the Agreement, or in the alternative against Stillman for damages, together with costs, interest, attorneys' fees pursuant to the Agreement, and such further relief as this Court may deem just and proper.

## COUNT V – 15 U.S.C. 77e (SECURITIES ACT OF 1933)

Plaintiffs reallege paragraphs 1-36 as if set forth herein.

91.     Count VI is brought by Plaintiffs pursuant to Section 12(a)(1) of the Securities Act, 15 U.S.C. § 77*l*(a)(1) against all Defendants.

92.     The Hotel Unit, combined with the Condominium Hotel's rental and management program, is an "investment contract" and otherwise falls within the definition of a "security" in 15 U.S.C. § 77b(a)(1), because, among other facts:

(a) Both the substance and economic reality of the investment in the Condominium Hotel offered to Plaintiff is a "security."

(b) Plaintiff purchased the Hotel Unit primarily and exclusively for investment purposes, and not primarily for his own use. Indeed, the Purchase Agreement and the disclosure documents for the Condominium Hotel severely restrict the Plaintiffs' use of the Hotel Unit, including precluding him from establishing a permanent residence at the Condominium Hotel.

(c) Plaintiffs invested in the Hotel Unit with the expectation of profits derived primarily from the efforts of Defendant and its affiliates, agents, and representatives.

(d) Plaintiffs invested in a common enterprise in which expenses would be shared and revenue would be apportioned among the hotel units

Page 17 of 28

by Defendant by rotating the occupancy of hotel units according to a plan which would attempt to equalize utilization of the hotel units.

(e) Defendant offered Plaintiffs an opportunity to invest his money in a common enterprise managed by Defendant. A common enterprise managed and staffed with adequate trained personnel is essential to the paramount aim of Plaintiff, which is to achieve a return on his investment.

(f) Th e success of the investment by Plaintiffs depends upon the expertise or experience of Defendant and its agents, and not Plaintiff, in planning, developing, and managing a hotel.

(g) Individual management of the hotel units would not be economically feasible.

(h) In economic substance, Plaintiffs and the other hotel unit purchasers provided the investment capital for the Condominium Hotel and management, control and operation of the hotel as a common enterprise. The managerial efforts of Defendant are essential, and affect the financial success or failure of the common enterprise.

97.     Defendant is a "person" as defined by 15 U.S.C. § 77b(a)(2) of the Securities Act.

98.     Interstate offerings of securities to the public must be registered with the Securities & Exchange Commission (SEC) pursuant to 15 U.S.C. § 77e.

99.     The failure to register a public securities offering is a violation of 15 U.S.C. § 77e, entitling a purchaser to rescind the transaction and other relief.

100.    Defendant offered and sold securities, which it failed to register pursuant to 15 U.S.C. § 77e, and Defendant used the U.S. Mails or a facility of interstate commerce in connection with the offer and sale of securities.

101.    By reason of the conduct alleged herein, Defendant violated and/or controlled a person who violated, 15 U.S.C. § 77l, and is liable to Plaintiff as provided by the applicable law. Accordingly, Plaintiff has the right to rescind and recover the full

Page 18 of 28

consideration paid for the Hotel Unit, and he hereby elects to rescind and tender this security to Defendant and recover all monies and consideration paid for this security, with interest.

WHEREFORE, Plaintiffs seek rescission and/or damages, prejudgment and post judgment interest, attorneys' fees, costs, and such other relief that the Court deems just and proper.

## COUNT IV – VIOLATION OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT, CHAPTER 517 FLORIDA STATUTES

Plaintiffs reallege paragraphs 1-36 as if set forth herein.

102.   Count VII is brought by Plaintiffs pursuant to the Florida Securities and Investor Protection Act, (FSIPA), section 517.021(21)(q), Florida Statutes against Defendants.

103.   The Agreement is a "security" as defined by section 517.021(21)(q), Florida Statutes.

104.   Defendant is a "person" for purposes of FSIPA.

105.   Defendant is an "issuer" for purposes of FSIPA

106.   Pursuant to §517.07, Florida Statues, a security shall not be sold or offered for sale within the State of Florida unless it is exempt from the statute or registered.

107.   Pursuant to §517.07, Florida Statutes, a security shall not be sold or offered for sale within the State of Florida unless it is exempt from the statute or a prospectus meeting the requirements of FSIPA and the regulations adopted thereunder is furnished to the purchaser prior to the sale.

108.   The Agreement is not exempt from FSIPA.

Jonathan Kline, P.A. • Attorney at Law
2761 Executive Park Drive • Weston, Florida  33331 • TEL (954) 659-1919 • FAX (954) 659-9937

109.    Defendant failed to register the Agreement pursuant to FSIPA.

110.    Defendant failed to provide a prospectus in compliance with FSIPA to Plaintiff.

111.    Defendant failed to secure a permit to sell securities as required by FSIPA.

112.    Pursuant to §517.211, Florida Statutes, every sale made in violation of §§ 517.07 or 517.12(1) may be rescinded at the election of the purchaser, and each person making the sale and every director, officer, partner, or agent of or for each person making the sale may be held jointly and severally liable to the purchaser in an action for rescission.

113.    Defendant has violated the foregoing provisions of FSIPA.

114.    The Hotel Unit, combined with the Condominium Hotel's rental and management program, is an "investment contract" and otherwise falls within the definition of a "security" in U.S.C. § 77b(a)(1), because, among other facts:

> a. Both the substance and economic reality of the investment in the Condominium Hotel offered to Plaintiff is a "security."
>
> b. Plaintiff purchased the Hotel Unit primarily and exclusively for investment purposes, and not primarily for his own use. Indeed, the Purchase Agreement and the disclosure documents for the Condominium Hotel severely restrict the Plaintiff's use of the Hotel Unit, including precluding him from establishing a permanent residence at the Condominium Hotel.
>
> c. Plaintiff invested in the Hotel Unit with the expectation of profits derived primarily from the efforts of Defendant and its affiliates, agents, and representatives.
>
> d. Plaintiff invested in a common enterprise in which expenses would be shared and revenue would be apportioned among the hotel units by Defendant by rotating the occupancy of hotel units according to a plan which would attempt to equalize utilization of the hotel units.

Page 20 of 28

e. Defendant offered Plaintiff an opportunity to invest his money in a common enterprise managed by Defendant. A common enterprise managed and staffed with adequate trained personnel is essential to the paramount aim of Plaintiff, which is to achieve a return on his investment.

f. The success of the investment by Plaintiff depends upon the expertise or experience of Defendant and its agents, and not Plaintiff, in planning, developing, and managing a hotel.

g. Individual management of the hotel units would not be economically feasible.

h. In economic substance, Plaintiff and the other hotel unit purchasers provided the investment capital for the Condominium Hotel and management, control and operation of the hotel as a common enterprise. The managerial efforts of Defendant are essential, and affect the financial success or failure of the common enterprise.

115.    Plaintiffs are entitled to an award of their reasonable attorneys' fees, pursuant to section 517.211(g), Florida Statutes.

116.    Plaintiffs are entitled to the same civil remedies provided by the United States for the purchasers of securities, including an award of interest, pursuant to section 517.241(3), Florida Statues.

WHEREFORE, Plaintiffs seek rescission and/or damages, prejudgment and post-judgment interest, attorneys' fees, costs, and such other relief that the Court deems necessary or proper.

## COUNT VII – FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### (Against SB Associates)

Plaintiffs reallege paragraphs 1-116 as if set forth herein.

134.    Chapter 501, Florida Statutes, known as the Florida Deceptive and

Jonathan Kline, P.A. ● Attorney at Law
2761 Executive Park Drive ● Weston, Florida  33331 ● TEL (954) 659-1919 ● FAX (954) 659-9937

Unfair Trade Practices Act ("FDUTPA") is to be liberally construed to protect the consuming public, such as the Plaintiffs in this case, from those who engage in unfair methods of competition, or unconscionable, deceptive or unfair acts or practices in the conduct of any trade or commerce.

135. The aforementioned violations of ILSA, federal and state securities laws and Chapter 718, Florida Statutes, combined with Developer's refusal to return Plaintiffs' Earnest Money Deposit to them, constitute unfair and/or deceptive trade practices:

136. The violations described in the preceding paragraph and in this complaint constitute *per se* violations of FDUTPA pursuant to section 501.203(3).

137. The actions set forth in the preceding paragraph are likely to deceive a consumer, and have deceived the Plaintiffs/ consumers in this case. This conduct constitutes a violation of FDUTPA.

138. Plaintiffs have been damaged by Defendant's unfair and/or deceptive trade practices, including monetary losses, interest on their deposits, loss of use of the deposits, loss of business opportunities, inconvenience, frustration, and other incidental and consequential damages.

WHEREFORE, Plaintiffs demand judgment against SB Associates for all damages and equitable relief available under applicable law, including but not limited to, compensatory damages, incidental and consequential damages, attorneys' fees pursuant to the Florida Deceptive and Unfair Trade Practices Act, costs, interest, and such further relief as the Court may deem just and proper.

Jonathan Kline, P.A. • Attorney at Law
2761 Executive Park Drive • Weston, Florida 33331 • TEL (954) 659-1919 • FAX (954) 659-9937

## COUNT VIII- BREACH OF CONTRACT
(Against Defendants SB Associates and Corus Bank Only)

Plaintiffs reallege paragraphs 1-36 as if set forth herein.

139.    Plaintiffs and Defendant entered into the Agreement.

140.    The Agreement required the Developer to complete construction by December 31, 2008, subject only to extensions resulting from force majeure.

141.    The Developer breached the Agreement by failing to complete construction of the Property by December 31, 2008.

142.    Developer's failure to complete construction by December 31, 2008 was not caused by any condition cognizable as force majeure.

143.    Plaintiffs have been damages by Defendant's breach of the Agreement.

144.    Corus Bank, as assignee of the Agreement, is responsible for all of the Developer's duties, liabilities, burdens and obligations pursuant to the Agreement, including the obligation and duty to return Plaintiffs' Earnest Money Deposits to them.

Wherefore Plaintiffs demands judgment against Defendant for breach of contract and seek the remedies of cancellation and rescission of the Agreement, the return of their earnest money deposit, and in the alternative for damages, together with interest, costs, attorneys' fees pursuant to the Agreement and such further relief as this Court. deems just and proper.

## COUNT IX – RESCISSION
(Against Defendants SB Associates and Corus Bank Only)

145.    Plaintiffs reallege paragraphs 1-36 as if set forth herein.

146.    Plaintiffs and Defendant entered into the Agreement.

147.    Paragraph 13 of the Agreement precludes Plaintiff from seeking specific

Page 23 of 28

Jonathan Kline, P.A. • Attorney at Law
2761 Executive Park Drive • Weston, Florida  33331 • TEL (954) 659-1919 • FAX (954) 659-9937

performance of the Agreement in the event of default by Seller, other than in the event of an "intentional and willful default" by Seller.

148.    Under Florida law, a contract to build a condominium is illusory unless it provides the purchaser with the right to seek both specific performance and damages.

149.    Where the Agreement so drastically limits Plaintiffs' right of specific performance, Defendants obligation to build the Property is illusory, and therefore the Agreement is void and unenforceable as a matter of law, entitling Plaintiffs to cancel and rescind the Agreement and receive the return of their earnest money deposits.

WHEREFORE Plaintiffs demand judgment against Defendants for rescission and cancellation of the Agreement and / or damages, including the return of all deposits, with interest, and for such further relief as this Court deems just and proper.

### COUNT X – IMPOSITION AND FORECLOSURE OF VENDEES' LIENS
(Against Defendants SB Associates and Corus Bank Only)

Plaintiffs reallege paragraphs 1-149 as if set forth herein.

150.    Plaintiffs and Defendant entered into the Agreement.

151.    Plaintiffs are entitled to the return of their Earnest Money Deposits based on Defendant's breach of contract, violations of ILSA, Chapter 718, Florida Statutes and FDUPTA, as alleged in Counts I-VI above.

152.    Defendant has refused to return the Earnest Money Deposit to Plaintiffs.

153.    Because the Plaintiffs did not receive the return of their Earnest Money Deposits, they continue to have equitable liens on the Property. Plaintiffs own and hold their equitable liens on the Property.

Page 24 of 28

Jonathan Kline, P.A. • Attorney at Law
2761 Executive Park Drive • Weston, Florida 33331 • TEL (954) 659-1919 • FAX (954) 659-9937

154.   Plaintiffs have recorded, or will soon be recording, a *lis pendens* to secure their Earnest Money Deposits and equitable interest in the Properties.

155.   Plaintiffs are entitled to equitable liens on the Properties to secure their Earnest Money Deposits paid to Defendant, as well as to foreclose the equitable liens to satisfy and repay Plaintiffs their Earnest Money Deposit.

156.   Corus Bank, as assignee of the Agreement, is responsible for all of the Developer's duties, liabilities, burdens and obligations pursuant to the Agreement, including the obligation and duty to return Plaintiffs' Earnest Money Deposits to them.

157.   Corus Bank may claim an interest in the Property as a result of its construction loan to Defendants.  Corus Bank's loan and interest in the Property, however, is inferior to Plaintiff's equitable lien rights in the Property.

WHEREFORE Plaintiffs demand judgment imposing equitable vendees' liens on the Properties to the extent of Plaintiffs' deposits disbursed from escrow to which they are entitled and foreclosure of their equitable liens, together with such further relief as this Court deems just and proper.

## COUNT XI
## BILL OF DISCOVERY – IMPROPER USE OF ESCROW FUNDS

The Plaintiff(s), incorporate by reference and allege paragraphs 1 through 36 of this complaint as if fully set forth herein.

157.   The contract between the Plaintiff(s) and Developer(s) provides that the Developer(s) may utilize the amount of the deposits paid in excess of 10% of the purchase price for construction purposes.

Jonathan Kline, P.A. ● Attorney at Law
2761 Executive Park Drive ● Weston, Florida  33331 ● TEL (954) 659-1919 ● FAX (954) 659-9937

158. Florida Statute §718.202(3) provides that if the Developer(s) uses any of the deposit money for the purposes other than construction purposes such as salaries, commissions, or expenses of salespersons or for advertising purposes that Plaintiff(s) is entitled to the return of the deposit together with interest.

159.   Pursuant to Florida Statute §718.202(3), the Plaintiff(s) has the right to the return of their deposit plus interest in the event that the Developer(s) used any of the deposit money for non-construction purposes.

160.   The only way for the Plaintiff(s) to determine if the deposit money was used for a purpose other than construction or was commingled in an account used to pay for anything other than construction is to conduct discovery.

161.   The Plaintiff(s) has a good faith belief that the Developer(s) may have co-mingled the deposit money into accounts used for both construction and the payment of non-construction expenses such as salaries, commissions, advertising or other non-construction uses or purposes.

WHEREFORE, the Plaintiff(s), includes this count in order to pursue its discovery rights and reserves the right to seek a court approved amendment of the complaint should the discovery reveal, as expected, that the escrow deposits were improperly used in violation of the Florida Statutes.

## COUNT XII
## FRUSTRATION OF PURPOSE

The Plaintiff(s), incorporate by reference and allege paragraphs 1 through 36 of this complaint as if fully set forth herein.

Page 26 of 28

162.   That at the time the Plaintiff and Developer contracted for the purchase and sale of the Unit a certain value or worth of the Unit was contemplated between the Plaintiff and Developer.

163.   Both the Plaintiff and the Developer were aware of the contemplated value and worth of the unit and relied upon same when entering into their purchase and sale agreement.

164.   The value of the Unit which is the subject matter of the purchase and sale agreement has significantly declined in value.

165.   This decline in value was not foreseeable.

166.   This decline in value totally or nearly destroys the purpose of the agreement.

167.   The Plaintiff(s) have no adequate remedy at law.

WHEREFORE, Plaintiff(s) respectfully request the following relief:

a.   a judgment requiring the Developer(s) to return their earnest money deposit and interest, court costs, reasonable amounts for attorneys' fees and costs under the terms and conditions of the contract and Florida Statute §57.105;

b.   a judgment declaring that the contract attached as Exhibit A are void and rescinding the contract;

c.   rescission of the contract attached as Exhibit A and that their duties and or obligations be discharged under the terms and conditions of their contract and any addenda thereof; and

d.   such other relief as this Court deems proper.

Jonathan Kline, P.A. • Attorney at Law
2761 Executive Park Drive • Weston, Florida  33331 • TEL (954) 659-1919 • FAX (954) 659-9937

## DEMAND FOR JURY TRIAL

The Plaintiff(s) demands a jury trial for all counts in this action.


JONATHAN KLINE, P.A.
Attorney for Plaintiff
2761 Executive Park Drive
Weston, FL 33331
Telephone: (954) 659-1919
Facsimile: (954) 659-9937


By: Jonathan Kline
Florida Bar No.: 6902

Jonathan Kline, P.A. • Attorney at Law
2761 Executive Park Drive • Weston, Florida  33331 • TEL (954) 659-1919 • FAX (954) 659-9937

# EXHIBIT "A"

NOV-24-2008  15:16     FROM-ALL FLORIDA TITLE CO,              954-566-4960         T-203  P.002    F-650

### SB FORT LAUDERDALE HOTEL & CONDOMINIUM

### PURCHASE AGREEMENT

ORAL REPRESENTATIONS CANNOT BE RELIED UPON AS CORRECTLY STATING THE REPRESENTATIONS OF THE DEVELOPER. FOR CORRECT REPRESENTATIONS, REFERENCE SHOULD BE MADE TO THIS CONTRACT AND THE DOCUMENTS REQUIRED BY SECTION 711.503, FLORIDA STATUTES, TO BE FURNISHED BY A DEVELOPER TO A BUYER OR LESSEE.

ANY PAYMENT IN EXCESS OF 10 PERCENT OF THE PURCHASE PRICE MADE TO DEVELOPER PRIOR TO CLOSING PURSUANT TO THIS CONTRACT MAY BE USED FOR CONSTRUCTION PURPOSES BY THE DEVELOPER.

Additionally, under certain circumstances more particularly described in paragraph 4, and provided that the Developer has posted "Alternative Assurances" with the Division of Florida Land Sales, Condominiums and Mobile Homes, Seller may use all of Buyer's deposits (including those equal to the initial 10% of the purchase price for construction purposes).

In this Agreement, the term "Buyer" and/or "Purchaser" means or refers to the buyer or buyers listed below who have signed this Agreement. The word "Seller" and/or "Developer" means or refers to SB Hotel Associates LLC, a Delaware limited liability company.

If the first letter of a word is capitalized in this Agreement, that word will have the meaning given to it in this Agreement or, if no definition is given in this Agreement, in the Declaration (as defined in paragraph 1 of this Agreement).

| | |
|---|---|
| Buyer(s): | JEROME & SHARON SHAFFER |
| Address: | 3100 N. OCEAN BLVD. APT # 2201 |

| | | | |
|---|---|---|---|
| City: | FT. LAUDERDALE | State: | FL |
| Country: | USA | Zip Code: | 33308 |
| Home Phone: | (954) 564, 8386 | Office Phone: | (    ) |
| Tax I.D. No.: | | Fax. No. | (    ) |
| E-Mail: | | | |

1.  Purchase and Sale. Buyer agrees to buy, and Seller agrees to sell (on the terms and conditions contained in this Agreement), Unit __1410__ (the "Unit") in the proposed SB FORT LAUDERDALE HOTEL & CONDOMINIUM (the "Condominium"). The Unit and the Condominium are described in greater detail in the proposed Declaration of Condominium (the "Declaration") included in the Prospectus and attached exhibits (the "Condominium Documents"). Buyer acknowledges receipt of the Condominium Documents and all documents required by Section 718.503, Florida Statutes, to be furnished by a developer to a Buyer, on or before the date of this Agreement. The foregoing statement shall not, however, be in lieu of the execution of a Receipt for Condominium Documents.

Inasmuch as the Condominium Property is intended to be operated as part of a hotel, Seller reserves the right, in its sole discretion, to rent out the Unit prior to closing. As such, at the time of closing, the Unit may be delivered subject to the possessory rights of any hotel guest then occupying the Unit (and Buyer agrees to accept title to the Unit subject to such possessory rights.) Inasmuch as Seller has reserved the right to rent out the Unit prior to closing, Buyer is hereby advised that, at the time of closing, THE UNIT MAY HAVE BEEN PREVIOUSLY OCCUPIED.

2.  Payment of the Purchase Price. The total purchase price for the Unit is $ __645,000.__ (the "Purchase Price"). Buyer agrees to make the following payments against the Purchase Price:

NOV-24-2009 15:16     FROM-ALL FLORIDA TITLE CO.          954-565-4568          T-293  P.003   F-650

| Payment | Due Date | Amount |
|---|---|---|
| Initial 10% deposit  *5%* | Upon execution of this Agreement | $ 32,250.00 |
| Additional 10% Deposit | 60 days after Buyer's execution of this Agreement | $ 64,500.00 |
| Additional Deposit | *(5% FROM RESERVATION)* | $ 32,250.00 |
| Balance | Closing | $ 516,000.00 |
| Total Purchase Price | | $ 645,000.00 |

Deposits may be made by personal check (subject to clearance), cashier's check or wire transfer of federal funds. The balance due at closing must be paid by bank cashier's check or wire transfer of federal funds. All payments must be made in United States funds and all checks must be payable on a bank located in the Continental United States. Even though Seller is not obligated to do so, if Seller accepts a deposit from Buyer by credit card and/or drawn on a foreign bank and/or payable in a currency other then U.S. currency, Buyer shall be solely responsible for all costs of collection and/or conversion and agrees to pay same to Seller promptly upon demand or, in Seller's sole and absolute discretion, Seller may permit such costs to be charged to Buyer at the time of closing. If Buyer fails to pay any deposit on time, and Seller agrees to accept it on a later date (which Seller is not obligated to do), Buyer will pay a late funding charge equal to interest at the rate of eighteen percent (18%) per annum from the date due until the date received and cleared by Seller.

Buyer also agrees to pay all costs and other sums required to be paid by Buyer in this Agreement (many of which are more particularly described in paragraph 11 below).

3.      How Buyer Pays.  Buyer understands and agrees that Buyer will be obligated to pay "all cash" at closing.  This Agreement and Buyer's obligations under this Agreement to purchase the Unit will not depend on whether or not Buyer qualifies for or obtains a mortgage from any lender.  Buyer will be solely responsible for making Buyer's own financial arrangements.  Seller agrees, however, to cooperate with any lender Buyer chooses and to coordinate closing with such lender, if, but only if, such lender meets Seller's closing schedule and pays Seller the proceeds of its mortgage at closing.  Notwithstanding any cooperation provided by Seller, nothing herein shall be deemed to qualify or otherwise condition Buyer's obligation to close "all cash" on the purchase of the Unit.

Although Seller does not have to do so, if Seller agrees to delay closing until Buyer's lender is ready, or to wait for funding from Buyer's lender until after closing, or to accept a portion of the sums due at closing in the form of a personal check, Buyer agrees (i) that Buyer shall nonetheless be obligated for the payment of all real property taxes, assessments and charges attributable to the Unit from the date that closing is originally scheduled, and (ii) to pay Seller a late funding charge equal to interest, at the rate of eighteen percent (18%) per annum, on all funds due Seller which have not been paid to Seller (and, with regard to personal checks, which have not then cleared) from the date Seller originally scheduled closing to the date of actual payment (and, with regard to personal checks, to the date of final clearance).  This late funding charge may be estimated and charged by Seller at closing.  Seller's estimate will be adjusted after closing based on actual funding and clearance dates upon either Seller's or Buyer's written request.  In the event that Seller does not receive immediately cleared funds at closing, Buyer will not be allowed to take possession of the Unit until Seller actually receives the funds and they have cleared.  The foregoing paragraph will survive (continue to be effective after) closing.

4.      Deposits.  Except as permitted below or by the provisions of the Florida Condominium Act, all of Buyer's deposits will be held in escrow by Chicago Title Insurance Company ("Escrow Agent"), with offices at 2701 Gateway Drive, Pompano Beach, Florida 33069, in accordance with the escrow agreement contained in the Condominium Documents.  The escrow agreement is incorporated into this Agreement as if repeated at length here, and Buyer agrees that the deposits may be held in any depository which meets the requirements of the Act, including, without limitation, a financial institution chartered and located out of the State of Florida.

Buyer agrees that all of Buyer's deposits in excess of ten percent (10%) of the Purchase Price may be used by Seller for construction and development purposes as permitted by law.  Additionally, Seller intends to use Buyer's deposits up to ten percent (10%) of the Purchase Price as and to the extent permitted by applicable law.  Accordingly, if Seller has obtained or obtains the approval of the Director of the Division of Florida Land Sales, Condominiums and Mobile Homes to provide "Alternative Assurances", as permitted by law, in lieu of holding deposits up to ten percent (10%) of the Purchase Price in escrow, Seller may cause the Escrow Agent to disburse such deposits to it for all uses permitted by law.  If Seller has obtained such approval as of the date of this Agreement, a copy of the Escrow Agreement providing the mechanism for such disbursement has been delivered to Buyer.  If such approval is obtained after the date of this Agreement, Buyer will be provided with a copy of the Escrow Agreement, but Buyer agrees that it shall not be deemed a material or adverse change in the offering of the Condominium by reason of the fact that Buyer has already agreed to the use of Buyer's deposits up to ten percent (10%) of the Purchase Price in the manner stated above.



If Buyer so requests, Buyer may obtain a receipt for Buyer's deposits from the Escrow Agent. Seller may change escrow agents (as long as the new escrow agent is authorized to be an escrow agent under applicable Florida law), in which case Buyer's deposits (and any interest actually earned on them) may be transferred to the new escrow agent at Seller's direction.

At closing, all deposits not previously disbursed to Seller will be released to Seller. Except where expressly provided herein to the contrary or otherwise required by law, all interest earned on Buyer's deposits shall accrue solely to the benefit of Seller, and shall not be credited against the Purchase Price of the Unit. Buyer further understands and agrees that to the extent that deposit monies are used as permitted hereby, said monies are not available for investment and accordingly no interest shall be earned or deemed to be earned (even if Seller indirectly benefits from the use of said funds). No interest will be assumed to be earned, unless in fact said sums are invested in an interest bearing account and do in fact earn interest.

5.     **Seller's Financing.** Seller may borrow money from lenders for the acquisition, development and/or construction of the Condominium. Buyer agrees that any lender advancing funds for Seller's use in connection with the Condominium will have a prior mortgage on the Unit and the Condominium until closing. At that time, Seller shall cause the then applicable mortgages to be released as an encumbrance against the Unit and may use Buyer's closing proceeds for such purpose. Neither this Agreement, nor Buyer's payment of deposits, will give Buyer any lien or claim against the Unit, the Condominium or the real property upon which the Condominium is being developed. Without limiting the generality of the foregoing, Buyer's rights under this Agreement will be subordinate to all mortgages (and all modifications made to those mortgages) affecting the Unit, the Condominium or the real property upon which the Condominium is being developed, even if those mortgages (or modifications) are made or recorded after the date of this Agreement.

6.     **Insulation; Energy Efficiency.** Seller has advised Buyer, as required by the rules of the Federal Trade Commission, that it intends, currently, to install in connection with the Unit, insulation achieving, at minimum, the following insulation characteristics: (a) foil backed insulation on the walls, having an R-Value of R-4.2 and a thickness of 1½"; and (b) lightweight concrete insulation on the roof, having an R-Value of R-19 and of varying thickness. This R-value information is based solely on the information given by the appropriate manufacturers and Buyer agrees that Seller is not responsible for the manufacturers' errors.

To the extent required by applicable law, Buyer may have the Condominium building's energy efficiency rating determined. In accordance with the provisions of applicable law, upon the completion and certification of an energy performance level display card for the Condominium building, such card shall be forwarded to the Buyer and deemed incorporated in this Agreement. Buyer acknowledges receipt of the Department of Community Affairs' brochure regarding energy efficiency ratings.

All insulation and energy efficiency rating information is subject to Seller's general right, under paragraphs 14, 28 and 31, to make changes in Seller's Plans and Specifications, and to applicable limitations of Seller's liability to Buyer.

7.     **Completion Date; Presale Contingency.** Seller estimates it will substantially complete construction of the Unit, in the manner specified in this Agreement, by December 31, 2008, subject only to extensions resulting from Force Majeure, (as same may be extended by Force Majeure, the "Outside Date"). The term "Force Majeure" as used in this Agreement shall mean "Acts of God", labor disputes (whether lawful or not), material or labor shortages, restrictions by any governmental or utility authority, civil riots, floods or other causes beyond Seller's control. Notwithstanding the foregoing or any other contrary provision of this Agreement, Seller shall have the right to cancel this Agreement and cause Buyer's deposits to be refunded in the event that Seller does not enter into binding contracts to sell at least seventy five percent (75%) of the units in the Condominium. Seller must, however, notify Buyer of such a termination within one (1) year following the date of this Agreement, otherwise Seller will be required to construct the Condominium and the Unit and otherwise proceed to perform its obligations under this Agreement. The foregoing presale contingency is a provision solely for the benefit of Seller, and may be waived unilaterally by Seller. Accordingly, Seller may elect to proceed with the construction of the Condominium and to remain bound by the terms of this Agreement, whether or not the stated presales threshold has been met. In the event that Seller does elect to proceed without having met the threshold, Buyer will have no right to object thereto and shall remain bound by the terms of this Agreement. This paragraph shall not delay the effectiveness of this Agreement, which shall be immediate, but, rather, shall be deemed a "condition subsequent" to this Agreement. In the event of Seller's termination of this Agreement pursuant to this paragraph, upon such termination and the return of Buyer's deposits, Seller and Buyer will be fully relieved and released from all obligations and liabilities under and in connection with this Agreement. Seller agrees to use its good efforts to meet the foregoing pre-sale requirement.

8.     **Inspection Prior to Closing.** Buyer will be given an opportunity prior to closing, on the date and at the time scheduled by Seller to inspect the Unit with Seller's representative. At that time, Buyer will sign an inspection statement listing any defects in workmanship or materials (only within the boundaries of the Unit itself) which Buyer discovers. If any item listed is actually defective in workmanship or materials in Seller's opinion (keeping in mind the construction standards applicable in Broward County, Florida for similar property), Seller will be obligated to correct those defects at its cost within a reasonable period of time after closing, but Seller's obligation to correct will not be grounds for deferring the closing, nor for imposing any condition on closing. No escrows or holdbacks of closing funds will be permitted. Buyer understands and agrees that Seller's obligation to correct defects in the Unit noted during the pre-closing inspection shall automatically terminate (with Seller having no further



obligations for the repair of such items) upon the earlier of: (i) the date that Buyer obtains a permit for construction and/or improvement of the Unit, or (ii) the date that Buyer commences construction and/or improvement of the Unit, whether or not a permit has been obtained. If Buyer fails to take advantage of the right to a pre-closing inspection on the date and time scheduled, Buyer will not be permitted to submit a punchlist at a subsequent time and Seller will not be obligated to reschedule an inspection prior to closing and Buyer shall be deemed to have accepted the Unit in its AS-IS condition.

From and after the closing, Buyer hereby grants Seller and its agents access to the Unit at reasonable times during normal business hours to complete any necessary repairs to the Unit. If Buyer cannot be present at the time such work is to be performed to facilitate completion of such work, Buyer hereby authorizes Seller, its agents, employees and contractors to enter the Unit for such purposes using a master key or a key maintained by the Association. If Buyer cannot or elects not to be present at the time that Seller performs any such work, Buyer hereby waives and releases Seller (its partners, contractors, subcontractors, employees, agents, designees and assigns) from any and all claims that Buyer may have against Seller (its partners, contractors, subcontractors, employees, agents, designees and assigns) relating to damage to or theft of property from the Unit that is not due to the negligence or intentional act of Seller or its partners, contractors, subcontractors, employees, agents, designees and/or assigns.

Buyer acknowledges that all matters pertaining to the initial construction of the Unit will be handled by Seller and Seller's representatives. Buyer agrees not to interfere with or interrupt any workers at the site of the Unit. No personal inspections (other than the one pre-closing inspection) will be permitted. Buyer may not commence any work on the Unit, other than prepaid options or extras that Seller agrees in writing to provide, until after closing. Buyer recognizes that Seller is not obligated to agree to provide extras or options.

Buyer can examine Seller's Plans and Specifications at Seller's business office, located on site during regular business hours by making an appointment to do so in advance.

9.  Closing Date.  Buyer understands and agrees that Seller has the right to schedule the date, time and place for closing, which shall in no event be later than six (6) months following the Outside Date. Before Seller can require Buyer to close, however, two things must be done:

(a)  Seller must record the Declaration and related documents in the Broward County public records; and

(b)  Seller must obtain a temporary (or permanent) certificate of occupancy for, or covering, the Unit from the proper governmental agency (a certificate of occupancy is the official approval needed before a unit may be lived in), but, subject and subordinate to the provisions of paragraphs 8 and 27 of this Agreement (without limiting the generality of those provisions by this specific reference), the Common Elements, the Shared Components and other portions of the Condominium Property need not then have certificates of occupancy, nor be completed, provided however, that the certification of substantial completion described in Section 719.104(4)(e), Florida Statutes, shall be included as an exhibit to the Declaration, as recorded. Seller does, however, agree to complete those amenities, roads, streets and facilities for water, sewer, gas and electric service within a reasonable time following closing and otherwise in accordance with the terms of the Property Report dated as of October 28, 2005.

Buyer will be given at least ten (10) days' notice of the date, time and place of closing. Seller is authorized to postpone the closing for any reason and Buyer will close on the new date, time and place specified in a notice of postponement (as long as at least three (3) days' notice of the new date, time and place is given). A change of time or place of closing only (one not involving a change of date) will not require any additional notice period. Any formal notice of closing, postponement or rescheduling may be given by Seller orally, by telephone, telegraph, telex, telecopy, mail or other reasonable means of communication at Seller's option. All of these notices will be sent or directed to the address, or given by use of the information specified on Page 1 of this Agreement unless Seller has received written notice from Buyer of any change prior to the date the notice is given. These notices will be effective on the date given or mailed (as appropriate). An affidavit of one of Seller's employees or agents stating that this notice was given or mailed will be conclusive.

After the notice is given or mailed, and if requested in writing by Buyer, Seller will send a written confirmation of the closing, together with a draft closing statement and other pertinent information and instructions. This written confirmation is given merely as a courtesy and is not the formal notice to close. Accordingly, it does not need to be received by any particular date prior to closing. Buyer agrees, however, to follow all instructions given in any formal notice and written confirmation.

If Buyer fails to receive any of these notices or the confirmation because Buyer failed to advise Seller of any change of address or phone, telecopy or telex number, because Buyer has failed to pick up a letter when Buyer has been advised of an attempted delivery or because of any other reason, Buyer will not be relieved of Buyer's obligation to close on the scheduled closing date unless Seller agrees in writing to postpone the scheduled date.

If Seller agrees in writing to reschedule closing at Buyer's request, or if Buyer is a corporation or other entity and Buyer fails to produce the necessary documentation Seller requests and, as a result, closing is delayed, or if closing is delayed for any other reason (except for a delay desired, requested or caused by Seller), Buyer agrees to pay at closing a late funding charge equal to interest, at the rate of eighteen percent (18%) per annum, on that

portion of the purchase price not then paid to Seller (and cleared), from the date Seller originally scheduled closing to the date of actual closing.  Except only as may result from delays desired, requested or caused by Seller, all prorations will be made as of the originally scheduled date.  Buyer understands that Seller is not required to reschedule or to permit a delay in closing at Buyer's request.

10.    Closing.  The term "closing" refers to the time when Seller delivers the deed to the Unit to Buyer and ownership changes hands.  Buyer's ownership is referred to as "title".  Seller promises that the title Buyer will receive at closing will be good, marketable and insurable (subject to the permitted exceptions listed or referred to below).  Notwithstanding that Buyer is obligated to pay "all-cash" hereunder, in the event that Buyer obtains a loan for any portion of the Purchase Price, Buyer shall have the right to obtain a title insurance commitment and policy for the Unit from its own sources rather than to receive same from Seller, or Buyer may elect to have Seller's closing agent issue the title insurance commitment and policy, in accordance with terms set forth in paragraph 11 below.

In the event that Buyer elects to obtain a title insurance commitment and policy for the Unit from its own sources rather than to receive same from Seller, (I) Buyer shall provide Seller with written notice of same five (5) business days prior to the originally scheduled closing date, (II) Seller shall have no obligation to provide a title insurance commitment or policy, or any other evidence of title to Buyer and (III) Buyer shall, no later than five (5) business days prior to closing (the "Objection Deadline"), notify Seller in writing if title is not in the condition required by this Agreement and specify in detail any defect (i.e., any matters which make title other than in the condition pursuant to which same is required to be conveyed to Buyer), provided that if Buyer fails to give Seller written notice of defect(s) before the expiration of the Objection Deadline, the defects shall, anything in this Agreement notwithstanding, be deemed to be waived as title objections to closing this transaction and Seller shall be under no obligation whatsoever to take any corrective action with respect to same, and title to the Unit shall be conveyed subject to same.

Buyer will receive two (2) documents at closing which Buyer agrees to accept as proof that Buyer's title is as represented above:

(a)    A written commitment, whether provided by Seller's closing agent or otherwise, from a title insurance company licensed in Florida agreeing to issue a policy insuring title or the policy itself.  This commitment (or policy) will list any exceptions to title.  Permitted exceptions (exceptions which Buyer agrees to take title subject to) are:

(i)    Liability for all taxes or assessments affecting the Unit starting the year Buyer receives title and continuing thereafter;

(ii)   All laws, and all restrictions, covenants, conditions, limitations, agreements, reservations and easements now or hereafter recorded in the public records, which may include, without limitation, zoning restrictions, property use limitations and obligations, easements (rights-of-way) and agreements relating to telephone lines, water and sewer lines and other utilities;

(iii)  The restrictions, covenants, conditions, easements, terms and other provisions imposed by the documents contained or referred to in the Condominium Documents (and any other documents which Seller, in its sole discretion, believes to be necessary or appropriate), which are recorded, now or at any time after the date of this Agreement, in the public records;

(iv)   Pending governmental liens for public improvements as of closing (Seller will be responsible, however, for certified governmental liens for public improvements as of closing; provided, however, that to the extent that any such certified liens are payable in installments, Seller shall only be responsible for those payments and/or installments due prior to closing, and Buyer hereby assumes all payments and/or installments coming due after closing);

(v)    Standard exceptions for water-front property and artificially filled-in property which once was in navigable waters and all other standard exceptions for similar property;

(vi)   All standard printed exceptions contained in an ALTA Owner's title insurance policy issued in Broward County, Florida (the "gap exceptions" and standard exceptions for parties in possession, and construction liens shall be deleted, however, at closing or otherwise insured over); and

(vii)  Any matters not listed above as long as affirmative title insurance is given for these matters.

(b)    A Special Warranty Deed.  At closing, Seller promises to give Buyer a special warranty deed to the Unit.  The special warranty deed will be subject to (that is, contain exceptions for) all of the matters described above.

Buyer will also receive at closing a bill of sale for any appliances or furnishings included in the Unit and Seller's form of owner's ("no lien") affidavit and FIRPTA (non-foreign) affidavit.  When Buyer receives the special warranty deed at closing, Buyer will sign Seller's closing agreement, a settlement statement and all papers that Seller deems reasonably necessary or appropriate.

If Seller cannot provide the quality of title described above, Seller will have a reasonable period of time (at least sixty (60) days) to correct any defects in title. If Seller cannot, after making reasonable efforts to do so (which shall not require the bringing of lawsuits or the payment or satisfaction of involuntary liens or judgments) correct the title defects, Buyer will have two options:

1.  Buyer can accept title in the condition Seller offers it (with defects) and pay the full Purchase Price for the Unit with exceptions for such title matters to be contained in the special warranty deed for the Unit. Buyer will not make any claims against Seller because of the defects; or

2.  Buyer can cancel this Agreement and receive a full refund of Buyer's deposits. Seller will be relieved of all obligations under this Agreement (and otherwise) when Seller refunds the deposits to Buyer.

At the same time Buyer receives the special warranty deed, Buyer agrees to pay the balance of the Purchase Price and any additional amounts owed under this Agreement. Until all sums have been received and cleared, Seller will be entitled to a vendor's lien on the Unit (which Buyer agrees Seller may unilaterally record in the Public Records of the County). This paragraph shall survive closing.

11.  Costs and Fees.  Buyer understands and agrees that, in addition to the Purchase Price for the Unit, Buyer must pay certain other fees, costs or other sums when the title is delivered to Buyer at closing. These include:

(a)  A "development fee" equal to one and three quarters percent (1.75%) of the Purchase Price (and of any charges for options or extras now or hereafter contracted for which are not included in the Purchase Price). This fee will be used, in part, to pay for the following closing costs: (i) the costs of officially recording the deed in the Public Records of the County (currently, recording fees are $10.00 for the first page of an instrument and $8.50 for each additional page), (ii) the documentary stamp taxes payable in connection with the deed conveying the Unit to Buyer (currently, documentary stamp taxes are $.70 for each $100.00 of consideration), and (iii) for the premium on the owner's title insurance policy, at the minimum promulgated risk rates promulgated by the Florida Insurance Commissioner (taking into account applicable reissue rates and new home credits, if any), whether obtained from Seller's closing agent, or elsewhere. The balance of the "development fee" shall be retained by Seller to provide additional revenue and to offset certain of its construction and development expenses, including without limitation, certain of Seller's administration expenses and Seller's attorneys' fees in connection with development of the Condominium. Accordingly, Buyer understands and agrees that the development fee is not for payment of closing costs or settlement services (other than to the extent expressly provided above), but rather represents additional funds to Seller which are principally intended to provide additional revenue and to cover various out-of-pocket and internal costs and expenses of Seller associated with development of the Condominium. In the event that ( ) any sales tax is imposed in connection with the subject transaction, (ii) there is an increase in either the minimum title insurance rates or in the documentary stamp tax rate, (iii) any interim services fee is imposed by any governmental authority, or (iv) any new governmental tax or charge on deeds is imposed, Buyer agrees to pay all such increases, surcharges or new taxes or charges, in addition to the development fee;

(b)  Working capital contributions in an amount equal to the aggregate of two (2) times the regular monthly assessment for the Unit due the Condominium Association as determined at the time of closing and two (2) times the regular monthly allocated amount for the Unit due the Hotel Unit Owner with respect to the Hotel Shared Costs as determined at the time of closing. These charges will not be credited against regular assessments or charges, with respect to the contribution for the Hotel Shared Costs, shall be payable directly to the Hotel Unit Owner and may be used to pay any deficits or other sums the Hotel Unit Owner or any of its affiliates may be required to pay;

(c)  Any and all sales tax due in connection with the acquisition of any furnishings, finishes and/or equipment;

(d)  A reimbursement to Seller for any utility, cable or interactive communication deposits or hook-up fees which Seller may have advanced prior to closing for the Unit. The amount of this charge is now unknown.

(e)  The remaining balance, if any, of any charges for options or upgrading of standard items included, or to be included, in the Unit as agreed to in writing by both Buyer and Seller.

(f)  Reimbursement to Seller, and/or Seller's closing agents, for charges incurred in connection with coordinating closing with Buyer and/or Buyer's lender, including, without limitation, charges for messenger expenses, long distance telephone calls, photocopying expenses, telecopying charges and others. The amount of these charges is now unknown.



(g)   In the event that Seller allows any delay in closing (which it has no obligation to do) or any other change in closing (which it has no obligation to do), Seller may impose a "redraw fee" to reimburse Seller for any additional costs it incurs as a result of any such rescheduling or change.

(h)   A refundable damage deposit to offset any damages that may be caused during Buyer's move-in.

(i)    The late funding charges provided for elsewhere in this Agreement. The amount of any such charges is now unknown.

In addition, if Buyer obtains a loan for any portion of the Purchase Price, Buyer will be obligated to pay any loan fees, closing costs, escrows, appraisals, credit fees, lender's title insurance premiums, prepayments and all other expenses charged by any lender giving Buyer a mortgage, if applicable. Additionally, if Buyer obtains a loan and elects to have Seller's closing agent act as "loan" closing agent as well, Buyer agrees to pay, in addition to any other sums described in this Agreement, such closing agent an aggregate sum equal to $795.00, for a simultaneously issued mortgagee's title insurance policy, the agent's title examination, title searching and closing services related to acting as "loan closing agent". In addition to that sum, Buyer shall be obligated to pay the premiums (at promulgated rate) for any title endorsements requested by Buyer's lender. Notwithstanding any of the references in this paragraph to coordinating closing with any lender that Buyer may elect to obtain, nothing herein shall be deemed to make the Agreement, or the Buyer's obligations under the Agreement, conditional or contingent in any manner on the Buyer obtaining a loan to finance any portion of the Purchase Price; it being the agreement of the Buyer that the Buyer shall be obligated to close "all cash".

Current expenses of the Unit (for example, taxes and governmental assessments, current monthly assessments of the Association and current monthly charges of the Hotel Shared Costs) will be prorated between Buyer and Seller as of the date of closing. Additionally, at closing, Buyer shall be obligated to prepay the next month's maintenance assessment to the Association and the next month's charge for the Hotel Shared Costs. These prepayments are in addition to Buyer's obligation to pay the working capital contributions, as described above. If taxes for the year of closing are assessed on the Condominium as a whole, Buyer shall pay Seller, at closing, the Unit's allocable share of those taxes (as estimated by Seller and subject to reproration when the actual tax bill is available) for the Unit from the date of closing through the end of the applicable calendar year of closing. Buyer should understand that during the year in which the Declaration of Condominium is recorded, it is likely that real property taxes will be assessed as a whole against the entire Condominium Property (rather than on a unit-by-unit basis, which is how the Condominium Property will be assessed during all years following the year during which the Declaration is recorded). As such, if Buyer is closing in the calendar year during which the Declaration is recorded, Buyer should anticipate having to pay to Seller, at closing, the estimated prorated amount of real property taxes attributable to the Unit for the period from the date of closing through December 31 of the year of closing. Depending upon the value of the Unit, this may be a substantial sum. If taxes for the year of closing are assessed on a unit-by-unit basis, Buyer and Seller shall prorate taxes as of the closing date based upon the actual tax bill, if available, or an estimate by Seller, if not available, with Buyer responsible for paying the full amount of the tax bill and Seller reimbursing Buyer for Seller's prorated share of those taxes. Buyer agrees that Seller's prorated share of the taxes due as of closing need not be paid to Buyer, however, until the actual tax bill is presented to Seller, and any proration based on an estimate of the current year's taxes shall be subject to reproration upon request of either party, provided, however, that (i) the actual amount of taxes is at least 10% higher or lower than the estimate used for proration, and (ii) any request for reproration is made within six (6) months following the issuance of the actual tax bill for the Unit (it being assumed, for purposes hereof, that tax bills are issued on November 1 of each tax year). No request for proration of amounts less than the threshold set forth above or made beyond the six (6) month period shall be valid or enforceable. In addition, Buyer shall pay, or reimburse Seller if then paid, for any interim proprietary and general services fee imposed by any governmental authority having jurisdiction over the Unit. This Subsection shall survive (continue to be effective after) closing.

12.    <u>Adjustments with the Association.</u>  Buyer understands that Seller may advance money to the Association to permit it to pay for certain of its expenses (for example, but without limitation, insurance premiums, common element utility and/or cable or other interactive communication charges and deposits, permit and license fees, charges for service contracts, salaries of employees of the Association and other similar expenses). Seller is entitled to be reimbursed by the Association for all of these sums advanced by Seller. The Association will reimburse Seller out of regular assessments paid by Buyer and other owners as those contributions and assessments are collected, or as otherwise requested by Seller. Seller also, at its election, may receive reimbursement for these payments by way of a credit against any sums it may become obligated to pay to the Association.

13.    <u>Default.</u>  If Buyer fails to perform any of Buyer's obligations under this Agreement (including making scheduled deposits and other payments) Buyer will be in "default". If Buyer is still in default twenty (20) days after Seller sends Buyer notice thereof, Seller shall be entitled to the remedies provided herein.

Upon Buyer's default (and the expiration of any notice period, if applicable), all Buyer's rights under this Agreement will end and Seller can resell the Unit without any accounting to Buyer. Buyer understands that because Seller has taken the Unit off the market for Buyer, has spent money on sales, advertising, promotion and construction and has incurred other costs incident to this sale, Buyer's default will damage Seller. As compensation for such damage, in the event Seller cancels this Agreement because of Buyer's default, Buyer authorizes Seller (subject to the limitation provided below) to keep (or if not then paid by Buyer, Buyer will pay to Seller) all deposits and other pre-closing advance payments (including, without limitation, those on options, extras, upgrades and the like) Buyer



has then made (and which would have been required to have been made had Buyer not defaulted) and all interest which was, or would have been, earned on them, all as liquidated damages (and not as a penalty). If Buyer defaults after fifteen percent (15%) of the Purchase Price, exclusive of interest, has been paid, Seller will refund to the Buyer any amount which remains from the payments Buyer made after subtracting fifteen percent (15%) of the Purchase Price, exclusive of interest. Any damage or loss that occurs to the Property while Buyer is in default will not affect Seller's right to liquidated damages.

If Seller defaults under this Agreement, Buyer will give Seller twenty (20) days' notice of it and if Seller has not cured the default within such period, Buyer will have such rights as may be available in equity and/or under applicable law, provided, however, that absent an intentional and willful default of Seller, Buyer shall not be permitted to seek to specifically enforce the Agreement.

This paragraph will survive (continue to be effective after) closing.

14.    Construction Specifications.  The Unit and the Condominium will be constructed in substantial accordance (in Seller's opinion) with the plans and specifications therefor kept in Seller's construction office, as such plans and specifications are amended from time to time.  Seller may make such changes in the plans and specifications that it deems appropriate at any time, to accommodate its in the field construction needs (as more fully discussed in this paragraph 14) and in response to recommendations or require nents of local, state or federal governmental or quasi-governmental agencies or applicable utility and/or insurance providers.  Such plans and specifications, as they are so amended, are referred to in this Agreement as "Seller's Plans and Specifications".  Without limiting Seller's general right to make changes, Buyer specifically agrees that the changes described above, changes to Units to cause same to be readily accessible for handicapped persons and/or to otherwise comply with applicable disability requirement of City, State or Federal law, and changes in the dimensions of rooms, patios and balconies, in the location of windows, doors, walls, partitions, utility (including, but not limited to, television and telephone) lead-ins and outlets, air-conditioning equipment, ducts and components, lighting fixtures and electric panel boxes, and in the general layout of the Unit and Condominium, may be made by Seller in its discretion. To the extent that the Unit is constructed and finished in a manner to be readily accessible to handicapped persons and/or to otherwise comply with applicable disability requirement of City, State or Federal law, must be maintained in that condition and can not be altered.  Buyer understands and agrees that the Unit must be maintained in that condition and that Buyer shall be precluded from altering those features of the Unit.

Buyer acknowledges and agrees that it is a widely observed construction industry practice for pre-construction plans and specifications for any unit or building to be changed and adjusted from time to time in order to accommodate on-going, "in the field" construction needs.  These changes and adjustments are essential in order to permit all components of the Unit and the Building to be integrated into a well-functioning and aesthetically pleasing product in an expeditious manner.  Because of the foregoing, Buyer acknowledges and agrees that it is to Buyer's benefit to allow Seller the flexibility to make such changes in the Unit and the Condominium.  Buyer further acknowledges and agrees that (i) the plans and specifications for the Unit and the Condominium on file with the applicable governmental authorities may not, initially, be identical in detail to Seller's Plans and Specifications, and (ii) because of the day-to-day nature of the changes described in this paragraph 14, the plans and specifications on file with applicable governmental authorities may not include some or any of these changes (there being no legal requirement to file all changes with such authorities).  As a result of the foregoing, Buyer and Seller both acknowledge and agree: The Unit and the Condominium may not be constructed in accordance with the plans and specifications on file with applicable governmental authorities.  Without limiting the generality of paragraph 31, Seller disclaims and Buyer waives any and all express or implied warranties that construction will be accomplished in compliance with such plans and specifications.  Seller has not given and Buyer has not relied on or bargained for any such warranties.  In furtherance of the foregoing, in the event of any conflict between the actual construction of the Unit and/or the Building, and that which is set forth on the plans, Buyer agrees that the actual construction shall prevail and to accept the Unit and Building as actually constructed (in lieu of what is set forth on the plans).

Without limiting the generality of the foregoing, because of Seller's need to coordinate the appearance and design of the overall development of the Condominium, both in connection with the nature and layout of the land on which construction is to take place and of the street, common areas and other features of the development, Buyer understands and agrees: The Unit may be constructed as a reverse ("mirror image") of that illustrated in the floor and building plan of the applicable model and building (as shown in the condominium documents or in any illustrations of the model and building); and may be "sited" in a position different from that of the applicable model and floor and building plan (or any such illustrations).  Buyer agrees to accept the Unit and the said building as "sited" by Seller and as constructed according to a reverse floor and/or building plan.  This paragraph does not limit the generality of Seller's rights, set out elsewhere in this Agreement, to make other changes in the Unit, the Condominium and the Condominium Documents.

Buyer further understands and agrees that Seller may, in its sole and absolute discretion, determine to build-out certain units in the Condominium in a manner designed to be handicapped accessible, which may include, without limitation, the installation of grab bars and alterations to the standard floor plan for the Unit.  In the event that Seller elects to build-out the Unit in such manner, Buyer shall be deemed to have authorized and agreed to same, and to accept same at closing, without claim against Seller.  Buyer further understands and agrees that Buyer may not make any alteration to the Unit subsequent to closing that may affect its suitability for handicapped persons.



NOV-24-2009  15:18     FROM-ALL FLORIDA TITLE CO.          054-565-4560        T-203  P.010  F-650

Buyer understands and agrees that in designing the Condominium, the stairwells within the Condominium Property were intended primarily for ingress and egress in the event of emergency and, as such may be constructed and left unfinished solely as to be functional for said purpose, without regard to the aesthetic appearance of said stairwells. Similarly, the garage and utility pipes serving the Condominium are intended primarily for functional purposes, and as such may be left unfinished without regard to the aesthetic appearance of same. Further, Buyer hereby acknowledges and agrees that sound and/or odor transmission in a multi-story building such as the Condominium is very difficult to control, and that noises from adjoining or nearby Units, noises and/or vibrations from HVAC and/or mechanical equipment, and/or elevators, plumbing and/or piping installations, and/or noises from activities at the Hotel (including noises from the hotel entry operation) can often be heard in other Units. Without limiting the generality of paragraph 31, Seller does not make any representation or warranty as to the level of sound and/or odor transmission between and among Units and/or vibrations from HVAC and/or mechanical equipment and the other portions of the Condominium Property, and Buyer hereby waives and expressly releases any such warranty and claim for loss or damages resulting from vibration, sound and/or odor transmission. Lastly, Buyer understands and agrees that there are various methods for calculating the square footage of a Unit. Additionally, as a result of in the field construction and other permitted changes to the Unit, as more fully described in this paragraph, actual square footage of the Unit may also be affected. Accordingly, during the pre-closing inspection, Buyer should, among other things, review the size and dimensions of the Unit. By closing, Buyer shall be deemed to have conclusively agreed to accept the size and dimensions of the Unit. Without limiting the generality of any other provision of this Agreement, Seller does not make any representation or warranty as to the actual size, dimensions (including ceiling heights) or square footage of the Unit. Nothing herein shall be deemed to deny or abridge the rights granted under Section 718.506, Florida Statutes. Notwithstanding the above, nothing herein shall waive or release Developer from any of the Developer's obligations under 718.506 (1) F.S.

The agreements and waivers of Buyer contained in this paragraph will survive (continue to be effective after) closing.

15.    Certain Items and Materials.  Buyer understands and agrees that certain items, which may be seen in models (if any) or in illustrations, are not necessarily included with the sale of the Unit, but rather are displayed to provide Buyer with ideas for furnishing and decorating the Unit. Buyer understands and agrees that only those items of personal property which are specifically provided for in a Rider or Schedule to this Agreement signed by both Buyer and Seller are to be included with the Unit.

Buyer further understands and agrees that certain items, if included with the Unit, such as tile, cabinets, wood, stain, grout, wall and ceiling textures, cultured marble, granite, stone, mica and carpeting, are subject to size and color variations, grain and quality variations, and may vary in accordance with price, availability and changes by manufacturer from those shown in the models or in illustrations or included in Seller's Plans and Specifications or in the published list of standard items (if any). If circumstances arise which, in Seller's opinion, warrant changes of suppliers, manufacturers, brand names or items, or if Seller elects to omit certain items, Seller may modify the list of standard features or make substitutions for equipment, material, appliances, etc., with items which in Seller's opinion are of equal or better quality (regardless of cost). Buyer also understands and acknowledges that Seller has the right to substitute or change materials and/or stain colors utilized in wood decor (if any). Buyer recognizes that certain colors as shown in displays or in the models, including, but not limited to, carpeting and wood stain, will weather and fade and may not be duplicated precisely. Buyer further understands and agrees that the underside of each ceiling is not intended to be level, but rather may have a rough, unfinished, unlevel appearance.

If Seller allows Buyer to select certain colors and/or materials in the Unit (which Seller is not obligated to do), Buyer understands and agrees that Buyer must submit Buyer's selections to Seller in writing within fourteen (14) days after the date the list of selections (if any) is made available to Buyer. If these selections (if any) are not delivered to Seller in writing within the time period stated above, then it is agreed and understood that the choices will be made by Seller in Seller's sole discretion.

The agreements and waivers of Buyer contained in this paragraph will survive (continue to be effective after) closing.

16.    Litigation.  In the event of any litigation between the parties under this Agreement, the prevailing party shall be entitled to reasonable attorney's, paralegals and para-professionals fees and court costs at all trial and appellate levels. This paragraph will survive (continue to be effective after) any termination of this Agreement, but shall otherwise be deemed merged into the deed at closing.

17.    Maintenance Fee.  Buyer understands and agrees that the Estimated Operating Budget for the Condominium Association and the costs associated with the operation and maintenance of the Shared Components (the "Budgets") contained in the Condominium Documents provide only an estimate of what it will cost to run the Association and operate and maintain the respective facilities during the period of time stated in the Budgets. The monthly assessments shown in the Condominium Association Budget for the Unit are guaranteed, if at all, in the manner stated in the Condominium Documents. Please note, however, that in addition to the amounts payable to the Condominium Association, each Owner shall be obligated to pay assessments in connection with the operation and maintenance of the Shared Components. These assessments and costs are not guaranteed in any manner. The Budgets, themselves however, as opposed to the levels of assessments payable to the Condominium Association, are not guaranteed, and there may be changes in the applicable Budgets at any time to cover increases or decreases in actual expenses or in estimates. Changes in the applicable Budgets may be made at any time to cover



increases or decreases in actual expenses or in estimates. It is intended that the Seller, as the sole Unit Owner upon the formation of the Condominium, will vote not to provide any reserves for the initial year of the Condominium. Thereafter, on an annual basis, a majority of the Condominium Association's members may vote to continue not to provide any reserves for the Condominium. Reserves are expected to be collected annually with respect to the Shared Components.

18.   **Condominium Association.** This Agreement is also Buyer's application for membership in the Condominium Association, which membership shall automatically take effect at closing. At that time, Buyer agrees to accept the liabilities and obligations of membership.

19.   **Seller's Use of the Condominium Property.** As long as Seller (or any of its affiliates) owns a unit or units or any other portion of Condominium Property and is offering same in the ordinary course of business, it and its agents are hereby given full right and authority to place and maintain on, in and at out the Condominium Property and/or the Association Property (excluding the Unit after closing) model units, sales and leasing offices, administrative offices, signs and lighting related to construction and sales promotion purposes, for such period of time, at such locations and in such forms as shall be determined by Seller in its sole and absolute discretion. Seller, its employees, agents contractors and prospective buyers are also hereby given, for construction and sales promotion purposes, the right of entry upon, ingress to, egress from and other use of the Condominium and/or Association Property (excluding the Unit after closing), and the right to restrict and regulate access to the Common Elements and/or Association Property, subject to Buyer's reasonable access to and from the Unit after closing, for the purposes of completing construction of the Common Elements, Association Property and/or other Units within the Condominium Property. Seller's salespeople can show units, the Association Property and/or the Common Elements, erect advertising signs and do whatever else is necessary in Seller's opinion to help sell, resell or lease Units or other portions of any Improvements to be constructed upon the Condominium Property or develop and manage the Condominium and/or Association Property, or to provide management and administration and/or financial services, but Seller's use of said properties must be reasonable, in Seller's opinion, and can't unreasonably interfere, in Seller's opinion, with Buyer's use and enjoyment of the Unit. This paragraph will survive (continue to be effective after) closing.

20.   **Sales Commissions.** Seller will pay all sales commissions due its in-house sales personnel and/or exclusive listing agent and the co-broker, if any, identified on the last page of this Purchase Agreement (if such space is left blank, it shall mean that Seller has not agreed to pay any co-broker and that Buyer represents that there is no co-broker who can claim by, through or under Buyer, provided that such co-broker has properly registered with Seller as a participating co-broker. By signing this Agreement, Buyer is representing and warranting to Seller that Buyer has not consulted or dealt with any broker, salesperson, agent or finder other than Seller's sales personnel (and the co-broker, if any, named on the last page of this Agreement), nor has the sale been procured by any real estate broker, salesperson, agent or finder other than Seller's sales personnel (and the co-broker, if any, named on the last page of this Agreement). Buyer will indemnify and hold Seller harmless for and from any such person or company claiming otherwise. Buyer's indemnity and agreement to hold Seller harmless includes, without limitation, Buyer's obligation to pay or reimburse Seller for all commissions, damages and other sums for which Seller may be held liable and all attorneys' fees and court costs actually incurred by Seller (including those for appeals), regardless of whether a lawsuit(s) is actually brought or whether Seller ultimately wins or loses.

This paragraph will survive (continue to be effective after) closing.

21.   **Notices.** Whenever Buyer is required or desires to give notice to Seller, the notice must be in writing and it must be sent certified mail, postage prepaid, with a return receipt requested to Seller at 276 5th Avenue, Suite 708, New York, New York 10001, Attn: Legal Department, or such other address as Seller may otherwise direct. Notwithstanding the foregoing, Buyer's notice to cancel pursuant to Paragraph 21 below, may be made in any manner permitted under the Interstate Land Sales Full Disclosure Act and the regulations promulgated thereunder.

Unless this Agreement states other methods of giving notices, whenever Seller is required or desires to give notice to Buyer, the notice must be given either in person, by telephone or in writing and, if in writing, it must be sent either by: (i) certified mail, postage prepaid, with a return receipt requested (unless sent outside of the United States, in which event written notices to Buyer may be sent by regular air mail); (ii) facsimile transmission if Buyer has indicated a telecopy number on Page 1 of this Agreement; or (iii) a recognized overnight courier service (i.e., FedEx, Express Mail, United Parcel Service, etc.), to the address for Buyer set forth on Page 1 of the Agreement.

A change of address notice is effective when it is received. All other written notices are effective on the day they are properly given or mailed, whether or not received (and all permitted non-written notices to Buyer are effective on the date given by Seller) unless receipt is required specifically in portions of this Agreement.

22.   **Transfer of Assignment.** Buyer shall not be entitled to assign this Agreement or its rights hereunder without the prior written consent of Seller, which may be withheld by Seller with or without cause (and even if Seller's refusal to grant consent is unreasonable). To the extent that Seller consents to any such assignment, said consent may be conditioned in any manner whatsoever, including, without limitation, charging an assignment or transfer fee. Any such assignee must fully assume all of the obligations of Buyer hereunder by written agreement for Seller's benefit, a counterpart original executed copy of which shall be delivered to Seller. If Buyer is a corporation, partnership, other business entity, trustee or nominee, a transfer of any direct or indirect stock, voting interest, partnership interest, equity, beneficial or principal interest in Buyer will constitute an assignment of this Agreement

requiring consent. Without limiting the generality of the foregoing, Buyer shall not, prior to closing on title to the Unit, unless first obtaining the prior written consent of Seller (which may be granted or withheld in Seller's sole and absolute discretion) advertise, market and/or list the Unit for sale or resale, whether by placing an advertisement, listing the Unit with a broker, posting signs at the Unit or at the Condominium, allowing the Unit to be listed for sale on the Internet or the Multiple Listing Service or otherwise. Seller may assign or transfer freely all of its rights and obligations under this Agreement (including its rights in and to Buyer's deposits and all other payments made by Buyer).

23.   **Others Bound by this Agreement.** If Buyer dies or in any way loses legal control of Buyer's affairs, this Agreement will bind Buyer's heirs and personal representatives. If Buyer has resolved permission to assign or transfer Buyer's interest in this Agreement, this Agreement will bind anyone receiving such interest. If Buyer is a corporation or other business entity, this Agreement will bind any successor corporation or entity. If more than one person signs this Agreement as buyer, each will be equally liable, on a joint and several basis, for full performance of all Buyer's duties and obligations under it and Seller can enforce it against either as individuals or together.

24.   **Public Records.** Buyer authorizes Seller to record the documents needed to establish and operate the Condominium, as well as all other documents which Seller deems necessary or appropriate, in the Public Records of Broward County, Florida. Neither this Agreement, nor any notice or memorandum hereof (nor any Lis Pendens), may be recorded.

25.   **Buyer's Right to Cancel.** THIS AGREEMENT IS VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF EXECUTION OF THIS AGREEMENT BY THE BUYER, AND RECEIPT BY BUYER OF ALL OF THE ITEMS REQUIRED TO BE DELIVERED TO HIM OR HER BY THE DEVELOPER UNDER SECTION 718.503, FLORIDA STATUTES. THIS AGREEMENT IS ALSO VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF RECEIPT FROM THE DEVELOPER OF ANY AMENDMENT WHICH MATERIALLY ALTERS OR MODIFIES THE OFFERING IN A MANNER THAT IS ADVERSE TO THE BUYER. ANY PURPORTED WAIVER OF THESE VOIDABILITY RIGHTS SHALL BE OF NO EFFECT. BUYER MAY EXTEND THE TIME FOR CLOSING FOR A PERIOD OF NOT MORE THAN 15 DAYS AFTER THE BUYER HAS RECEIVED ALL OF THE ITEMS REQUIRED. BUYER'S RIGHT TO VOID THIS AGREEMENT SHALL TERMINATE AT CLOSING.

If Buyer does not cancel this Agreement during this 15-day period, it means that Buyer ratifies this Agreement and the Condominium Documents and Buyer agrees that their provisions are fair and reasonable in Buyer's opinion.

26.   **Coastal Construction Control Line.** Buyer is aware that the Unit and/or portions of the Condominium may be located in coastal areas partially or totally seaward of the coastal construction control line as defined in Section 161.053, F.S. Buyer is fully apprised of the character of the regulation of property in such coastal areas and Buyer hereby waives and releases any right to receive at closing a survey delineating the location of the coastal construction control line with respect to the Unit and the Condominium in accordance with Section 161.57, F.S.

27.   **Florida Law; Severability.** Any disputes that develop under this Agreement, and any issues that arise regarding the entering into, validity and/or execution of this Agreement, will be settled according to Florida law. If any part of this Agreement violates a provision of applicable law, the applicable law will control. In such case, however, the rest of the Agreement (not in violation) will remain in force.

Without limiting the generality of the foregoing, it is Buyer's and Seller's mutual desire and intention that all provisions of this Agreement be given full effect and be enforceable strictly in accordance with their terms. If, however, any part of this Agreement is not enforceable in accordance with its terms or would render other parts of this Agreement or this Agreement, in its entirety, unenforceable, the unenforceable part or parts are to be judicially modified, if at all possible, to come as close as possible to the expressed intent of such part or parts (and still be enforceable without jeopardy to other parts of this Agreement, or this Agreement in its entirety), and then are to be enforced as so modified. If the unenforceable part or parts cannot be so modified such part or parts will be unenforceable and considered null and void in order that the mutual paramount goal (that this Agreement is to be enforced to the maximum extent possible strictly in accordance with its terms) can be achieved.

28.   **Changes.** Seller may make changes in the Condominium Documents in its sole discretion by providing Buyer with all such amendments that are made, provided that, as to those changes, Buyer will have fifteen (15) days from the date of receipt of such changes from Seller which materially alter or modify the offering of the Condominium in a manner adverse to Buyer in which to cancel this Agreement (by delivering written notice to Seller of such cancellation) and receive a refund of any deposits with applicable interest earned, if any. Seller will be relieved of all obligations under this Agreement when Seller refunds the deposits and interest, if any. Buyer will not be permitted to prevent Seller from making any change if wishes in its sole discretion, nor to pursue any remedy other than the 15-day cancellation remedy described above (and then only for the kind of changes that materially alter or modify the offering in a manner that is adverse to Buyer).

If Buyer has the right to cancel this Agreement by reason of a change which materially alters or modifies the offering of the Condominium in a manner adverse to Buyer, Buyer's failure to request cancellation in writing within the

15-day period will mean that Buyer accepts the change and waives irrevocably Buyer's right so to cancel. All rights of cancellation will terminate, if not sooner, then absolutely at closing. After closing, Buyer will have no remedy for any changes Seller may make or have made.

Without limiting the generality of the foregoing and other provisions of this Agreement, Seller is specifically authorized to: (i) substitute the final legal descriptions and as-built surveys for the projected legal descriptions and plot plans contained in the Condominium Documents even though changes occur in the permitting stage and during construction, and/or (ii) combine and/or subdivide units prior to the recordation of the Declaration (and incorporate divider wall common elements in any such combination units or add common element divider walls in any such subdivision), provided that the percentage share of ownership of common elements of any unit not affected in the combination or subdivision is not affected.

This paragraph will survive (continue to be effective after) closing.

29.    Nearby Construction. Buyer understands and agrees that for some time in the future Buyer may be disturbed by the noise, commotion and other unpleasant effects of activities at the hotel entry and/or from nearby construction activity and Buyer may be impeded in using portions of the Condominium Property by that activity. Because the Condominium is located in an urban area, demolition or construction of buildings and other structures within the immediate area or within the view lines of any particular Unit or of any part of the Condominium (the "Views") may block, obstruct, shadow or otherwise affect Views, which may currently be visible from the Unit or from the Condominium. Therefore, the Buyer hereby agrees to release Seller, its partners and its and their officers, members, directors and employees and every affiliate and person related or affiliated in any way with any of them ("Seller's Affiliates") from and against any and all losses, claims, demands, damages, costs and expenses of whatever nature or kind, including attorney's fees and costs, including those incurred through all arbitration and appellate proceedings, related to or arising out of any claim against the Seller or Seller's Affiliates related to Views or the disruption, noise, commotion, and other unpleasant effects of nearby development or construction. As a result of the foregoing, there is no guarantee of view, security, privacy, location, design, density or any other matter, except as is set forth herein or in the Prospectus.

Additionally, inasmuch as the Hotel Unit and/or Commercial Units may attract customers, patrons and/or guests who are not members of the Association, such additional traffic over and upon the Condominium Property shall not be deemed a nuisance hereunder. Buyer understands and agrees that inasmuch as hotel operations are intended to be conducted from the Condominium Property, including, without limitation, upon the pool deck and on other portions of the Shared Components, noise, inconvenience and/or other disruptions may occur, including, without limitation, noise and/or disruptions resulting from activities at the hotel entry and private events requiring certain portions of the Shared Components to be closed off and/or restricted. By acquiring a Unit, Buyer agrees not to object to the operations of the hotel, and/or any operations from the Hotel Unit and/or any Commercial Unit, which may include, noise, disruption, inconvenience and the playing of music outdoors, and hereby agrees to release Seller, Hotel Manager and the Hotel Unit Owner from any and all claims for damages, liabilities and/or losses suffered as a result of the existence of the hotel and the operations from the Hotel Unit and/or any Commercial Unit, and the noises, inconveniences and disruptions resulting therefrom.

30.    Time of Essence. The performance by Buyer of all obligations on the precise times stated in this Agreement is of absolute importance and failure of Buyer to so perform on time is a default, time being of the essence.

31.    Disclaimer of Implied Warranties. All manufacturers' warranties will be passed through to Buyer at closing. At closing, Buyer will receive the statutory warranties imposed by the Florida Condominium Act.

To the maximum extent lawful, all implied warranties of fitness for a particular purpose, merchantability and habitability, all warranties imposed by statute (except only those imposed by the Florida Condominium Act to the extent they cannot be disclaimed and to the extent they have not expired by their terms) and all other implied or express warranties of any kind or character are specifically disclaimed. Without limiting the generality of the foregoing, Seller hereby disclaims any and all express or implied warranties as to design, construction, view, sound and/or odor transmission, furnishing and equipping of the Condominium Property, the existence of molds, mildew, spores, fungi and/or other toxins within the Condominium Property, except only those set forth in Section 718.203 of the Act, to the extent applicable and to the extent that same have not expired by their terms. Seller has not given and Buyer has not relied on or bargained for any such warranties, either with respect to any portions of the Condominium Property.

As to any implied warranty which cannot be disclaimed entirely, all secondary, incidental and consequential damages are specifically excluded and disclaimed (claims for such secondary, incidental and consequential damages being clearly unavailable in the case of implied warranties which are disclaimed entirely above).

Buyer acknowledges and agrees that Seller does not guarantee, warrant or otherwise assure, and expressly disclaims, any right to view and/or natural light.

Further, given the climate and humid conditions in South Florida, molds, mildew, spores, fungi and/or other toxins may exist and/or develop within the Unit and/or Condominium Property. Buyer is hereby

Purchase Agreement<br />- 12 -



advised that certain molds, mildew, spores, fungi and/or other toxins may be, or if allowed to remain for a sufficient period may become, toxic and potentially pose a health risk. By executing and delivering this Agreement and closing, Buyer shall be deemed to have assumed the risks associated with molds, mildew, spores, fungi and/or other toxins and to have released and indemnified Seller and Seller's Affiliates from and against any and all liability or claims resulting from same, including, without limitation, any liability for incidental or consequential damages (which may result from, without limitation, the inability to possess the Unit, inconvenience, moving costs, hotel costs, storage costs, loss of time, lost wages, lost opportunities and/or personal injury and death to or suffered by any of Buyer's Guests as defined below and any other person or any pets). Without limiting the generality of the foregoing, leaks, leaving exterior doors or windows open, wet flooring and moisture will contribute to the growth of mold, mildew, fungus or spores. Buyer understands and agrees that Seller is not responsible for, and Seller hereby disclaims any responsibility for any illness or allergic reactions which may be experienced by Buyer, its pets, its family members and/or its or their guests, tenants and invitees (collectively "Buyer's Guests") as a result of mold, mildew, fungus or spores. It is solely the Buyer's responsibility to keep the Unit clean, dry, well-ventilated and free of contamination.

Lastly, Buyer understands and agrees that pursuant to applicable City, County and State laws, codes, ordinances and regulations (as all of same may be modified from time to time) there is no assurance that a Unit Owner (or any member of the Unit Owner's family, nor any person legally dependent upon the Unit Owner) may establish a permanent residence at the Unit or any real property contiguous thereto or that the Unit Owner (or any member of the Unit Owner's family, nor any person legally dependent upon the Unit Owner) may utilize the Unit address for the purpose of student or voter registration, obtaining a driver's license or registration of a motor vehicle. As such, under certain circumstances the Unit may not qualify as the homestead of a Unit Owner (or any member of the Unit Owner's family, nor any person legally dependent upon the Unit Owner), and as a result, no Unit Owner shall rely on the ability to file a claim for homestead exemption from ad valorem taxes with respect to such Unit, or rely on the ability to use the Unit address for the purpose of student or voter registration, obtaining a driver's license or registration of a motor vehicle. Buyer shall be deemed to understand and agree that, pursuant to applicable City, County and State laws, codes, ordinances and regulations (as same may be modified from time to time), certain restrictions may exist or be imposed affecting continuous occupancy of the Units.

This paragraph will survive (continue to be effective after) closing.

32.    Return of Condominium Documents.  If this Agreement is canceled for any reason, Buyer will return to Seller all of the Condominium Documents delivered to him in the same condition received, reasonable wear and tear excepted. If Buyer fails to return the Condominium Documents, Buyer agrees to pay Seller $50.00 to defray the costs of preparation, printing and delivery of same.

33.    Roadways.  Access to the Condominium is via Fort Lauderdale Beach Boulevard (a/k/a State Road A1A), which is currently a four (4) lane divided street. The width of Fort Lauderdale Beach Boulevard at that location is approximately seventy-three feet (73') and is asphalt covered. Fort Lauderdale Beach Boulevard is a public road, primarily maintained by the applicable governmental authorities. Private access drives will be constructed by Seller. These private access drives will have at least one lane of traffic in each direction. The cost of road construction will be borne by Seller, however, there is no financial assurance of completion of the private access drives. See the Property Report delivered to you simultaneously herewith for details regarding the maintenance of the private access road.

34.    Waiver.  Seller's waiver of any of its rights or remedies (which can only occur if Seller waives any right or remedy in writing) will not waive any other of Seller's rights or remedies or prevent Seller from later enforcing all of Seller's rights and remedies under other circumstances.

35.    Survival.  Only those provisions and disclaimers in this Agreement which specifically state that they shall have effect after closing will survive (continue to be effective after) closing and delivery of the deed. All other provisions shall be deemed merged into the deed.

36.    Substantial Completion.  Whenever this Agreement requires Seller to complete or substantially complete an item of construction, that item will be understood to be complete or substantially complete when so complete or substantially complete in Seller's reasonable opinion. Notwithstanding the foregoing, however, neither the Unit nor the Building of which the Unit is a part will be considered complete or substantially complete for purposes of this Agreement unless the Unit (and such portion of the Building intended to be used exclusively by Buyer) is physically habitable and usable for the purpose for which the Unit was purchased and the certification of substantial completion described in Section 718.104(4)(e), Florida Statutes, is included as an exhibit to the Declaration, as recorded. The Unit (and such portion of the Building) will be considered so useable if the Unit is ready for occupancy and has all necessary and customary utilities extended to it. Other units (and other portions of the building) may not necessarily be so complete and useable.

37.    Disclosures.  Under the laws of the State of Florida, Buyer is hereby advised as follows:

(a)    RADON GAS: Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over



time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county health department. The foregoing notice is provided in order to comply with state law and is for informational purposes only. Seller does not conduct radon testing with respect to the Units or the Condominium, and specifically disclaims any and all representations or warranties as to the absence of radon gas or radon producing conditions in connection with the Condominium.

(b)   CHAPTER 558, FLORIDA STATUTES CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY BRING ANY LEGAL ACTION FOR AN ALLEGED CONSTRUCTION DEFECT IN YOUR UNIT OR CONDOMINIUM. SIXTY DAYS BEFORE YOU BRING ANY LEGAL ACTION, YOU MUST DELIVER TO THE OTHER PARTY TO THIS AGREEMENT, A WRITTEN NOTICE REFERRING TO CHAPTER 558 OF ANY CONSTRUCTION CONDITIONS YOU ALLEGE ARE DEFECTIVE AND PROVIDE SUCH PERSON THE OPPORTUNITY TO INSPECT THE ALLEGED CONSTRUCTION DEFECTS AND TO CONSIDER MAKING AN OFFER TO REPAIR OR PAY FOR THE ALLEGED CONSTRUCTION DEFECTS. YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER WHICH MAY BE MADE. THERE ARE STRICT DEADLINES AND PROCEDURES UNDER THIS FLORIDA LAW WHICH MUST BE MET AND FOLLOWED TO PROTECT YOUR INTERESTS.

(c)   BUYER SHOULD NOT RELY ON THE SELLER'S CURRENT PROPERTY TAXES AS THE AMOUNT OF PROPERTY TAXES THAT THE BUYER MAY BE OBLIGATED TO PAY IN THE YEAR SUBSEQUENT TO PURCHASE. A CHANGE OF OWNERSHIP OR PROPERTY IMPROVEMENTS TRIGGERS REASSESSMENTS OF THE PROPERTY THAT COULD RESULT IN HIGHER PROPERTY TAXES. IF YOU HAVE ANY QUESTIONS CONCERNING VALUATION, CONTACT THE COUNTY PROPERTY APPRAISER'S OFFICE FOR INFORMATION.

(d)   The Condominium is structured to operate as a hotel. Residential Unit Owners, through the Association, do not exercise the control over the operation of the Condominium normally found in residential condominiums.

38.   Incorporation; Definitions. The explanations, definitions, disclaimers and other provisions set forth in the Condominium Documents are incorporated into this Agreement as if repeated at length here. When the words 'this Agreement' are used, they shall include in their meaning all modifications, riders and addenda to it signed by Buyer and Seller.

39.   Seller's Representations. Buyer acknowledges, warrants, represents and agrees that this Agreement is being entered into by Buyer without reliance upon any representations concerning any potential for future profit, any future appreciation in value, any rental income potential, tax advantages, depreciation or investment potential and without reliance upon any hotel affiliation or any monetary or financial advantage. Further, no statements or representations have been made by Seller, or any of its agents, employees or representatives with respect to (i) the ability or willingness of Seller or its affiliates to assist Buyer in renting or selling the Unit (except only in response to a direct inquiry from Buyer), (ii) the economic or tax benefits to be derived from the managerial efforts of a third party as a result of renting the Unit or other units, or (iii) the economic or tax benefits to be derived from ownership of the Unit. Buyer acknowledges and agrees that no such representations, including representations as to the ability or willingness of Seller or its affiliates to assist Buyer in renting or selling the Unit, have been made by Seller, or any of its agents, employees or representatives. Buyer further represents and warrants to Seller that Buyer is entering into this Agreement with the full intention of complying with each and every of the obligations hereunder, including, without limitation, the obligation to close on the purchase of the Unit. Neither Seller, nor anyone working by, through or under Seller, has made any statement or suggestion that Buyer would not be obligated to fully comply with the terms of this Agreement and to close on the purchase of the Unit. Further, Buyer understands and agrees that neither Seller, nor any brokerage company, in-house sales personnel and/or other persons working by, through or under Seller, are under any obligation whatsoever to assist Buyer with any resale of the Unit.

This Agreement contains the entire understanding between Buyer and Seller, and Buyer hereby acknowledges that the displays, architectural models, artist renderings and other promotional materials contained in the sales office and model suite are for promotional purposes only and may not be relied upon. Buyer warrants that Buyer has not relied upon any verbal representations or promises other than as expressly contained herein and in the Condominium Documents, including, specifically, but without limitation, any representations as to: (a) potential appreciation in or resale value of the Unit, (b) the existence of any "view" from the Unit or that any existing "view" will not be obstructed in the future, (c) traffic conditions in, near or around the Condominium Property, (d) disturbance from nearby properties, (e) disturbance from air or vehicular traffic, or (f) any particular hotel affiliation or maintaining any existing hotel affiliation. The provisions of this paragraph shall survive the closing.

Buyer understands and agrees that the Hotel Unit Owner intends (without creating any obligation) to retain Trump Florida Management LLC (including its affiliates, "Trump Management") as the initial Hotel Manager and to obtain a limited license agreement from Donald J. Trump ("Trump") to operate the hotel under the tradename "Trump International Hotel & Tower Fort Lauderdale". Buyer further understands and agrees that in the event that any agreement between the Hotel Unit Owner, or the affiliates of the Hotel Unit Owner and Trump and/or Trump's Management is terminated for any reason, whether at the expiration of the term or earlier, all use of Trump's

tradename and Trump's trademark or service marks shall cease and all indicia or connection between the Condominium and Trump and/or Trump Management, including signs or other materials bearing any of Trump's trademarks or servicemarks or tradenames shall be removed from the Condominium.  Additionally, Buyer acknowledges and agrees that any use of any of Trump's tradenames and Trump's trademarks or service marks, without proper licensing from Trump, is expressly prohibited.

40.     Offer.  The submission by Seller of this Agreement to Buyer for examination does not constitute an offer by Seller to Buyer, or a reservation of or option for any Unit in the Condominium.  This Agreement shall not become binding until executed and delivered by both Buyer and Seller.  Upon execution by Buyer and Seller, an executed copy of this Agreement shall be sent to Buyer, otherwise the firm offer shall be considered rejected and all funds deposited by Buyer shall be promptly returned to Buyer.

41.     Liability.  The liability of Seller under this Agreement or any amendment or any instrument or document executed in connection with this Agreement shall be limited to and enforceable solely against the interest of Seller in the Condominium, and not against any other assets of Seller or any partner of Seller (or its or their officers, principals, directors, employees, managers, members or agents).

42.     Interpretation; Miscellaneous.  Notwithstanding that this Agreement was prepared by one party hereto, it shall not be construed more strongly against or more favorably for either party; it being known that both parties have had equal bargaining power, have been represented (or have had the opportunity to be represented) by their own independent counsel and have equal business acumen such that any rule of construction that a document is to be construed against the drafting party shall not be applicable.  Buyer acknowledges and agrees that Buyer has had ample opportunity to inspect other similar condominiums and condominium documents, that Seller has clearly disclosed to Buyer the right to cancel this Agreement for any reason whatsoever, including any dissatisfaction Buyer may have with this Agreement or the Condominium Documents, within fifteen (15) days of the date Buyer executes this Agreement or has received the Condominium Documents, whichever is later, and that although Seller's sales agents are not authorized to change the form of this Agreement, they have strict instructions from Seller to communicate any of Buyer's requests for such changes to Seller's management, which has given Buyer the opportunity to discuss and negotiate such changes.  Buyer, by executing this Agreement confirms and agrees that Buyer is of legal age, has legal capacity to enter into binding agreements of this nature and has entered into this Agreement of its own free will, without any duress or coercion by any party whatsoever.

43.     Move-In Date.  Buyer shall be entitled to possession of the Unit as of the Closing Date; however, Buyer's right to move into the Unit shall be subject to a "move-in" schedule for all buyers and the move must be scheduled with the Association, or its manager.  Moving shall only be permitted in accordance with the Rules and Regulations of the Association.

44.     Entire Agreement.  This Agreement is the entire contract for sale and purchase of the Unit and once it is signed, it can only be amended by a written instrument signed by the party against whom enforcement is sought which specifically states that it is amending this Agreement.  Any current or prior agreements, representations, understandings or oral statements of sales representatives or others, if not expressed in this Agreement, the Condominium Documents or in brochures for the Condominium, are void and have no effect.  Buyer has not relied on them.

NOV-24-2009  15:20    FROM-ALL FLORIDA TITLE CO.                    954-566-4560          T-293  P.017/017  F-650

**GENERAL INFORMATION:**

Co-Broker Information:  (See paragraph 20 above; if the space for Co-Broker's name is left blank, it shall mean that Seller has not agreed to pay a ny co-broker)

Co-Broker's Name:  GALLERIA COLLECTION OF FINE HOMES.
Co-Broker's Sales Agent  MICHAEL LICHTENFIELD
Co-Broker's Address  945 E. LAS OLAS BLVD.
                     FT. LAUDERDALE, FL 33710
Phone No.  (954) 229 2222        Fax No.  (954) 229 2223
E-Mail                            License No. SL62455

ANY PAYMENT IN EXCESS OF 10 PERCENT OF THE PURCHASE PRICE MADE TO DEVELOPER PRIOR TO CLOSING PURSUANT TO THIS CONTRACT MAY BE USED FOR CONSTRUCTION PURPOSES BY THE DEVELOPER.

YOU HAVE THE OPTION TO CANCEL YOUR CONTRACT OR AGREEMENT OF SALE BY NOTICE TO THE SELLER UNTIL MIDNIGHT OF THE FIFTEENTH DAY FOLLOWING THE SIGNING OF THE CONTRACT OR AGREEMENT.

IF YOU DID NOT RECEIVE A PROPERTY REPORT PREPARED PURSUANT TO THE RULES AND REGULATIONS OF THE OFFICE OF INTERSTATE LAND SALES REGULATION, U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, IN ADVANCE OF YOUR SIGNING THE CONTRACT OR AGREEMENT, THE CONTRACT OR AGREEMENT MAY BE CANCELED AT YOUR OPTION, FOR TWO YEARS FROM THE DATE OF SIGNING.

Witnesses:
X _____

ROSEMARIE FRIEDMAN

BUYER(S)
X _____
_____
SHARON SHAFFER
Date:  12 / 19 / 2005

SELLER:

SB Hotel Associates LLC, a Delaware limited liability company

By: _____
    Authorized Representative

Date:  1/04/06

# EXHIBIT "B"



**T R U M P**
INTERNATIONAL
HOTEL & TOWER
FORT LAUDERDALE

September 24, 2005

Jerome & Sharon Shaffer
3100 N Ocean Blvd. apt 2201
Ft Lauderdale, FL 33308

Dear Jerome & Sharon,

First and foremost, we would like to take the opportunity to thank you for making Trump International Hotel & Tower the most successful luxury condo/hotel property in Fort Lauderdale. We are also very excited to report that we expect to have our finalized condo documents in the next two weeks which means we will be able to start the conversion process from reservations to purchase agreements in the very near future.

In the interim, we have initiated site excavation on the property and we are excited to announce that your new residence will be built by one of the country's leading builders, Stiles Construction. We invite you to drive by the site and see the activity first hand.

Once again, we thank you for your patience and at the same time remind you that a signature tower bearing the Trump name simply must not be rushed. As they say, all good things come in time!

Rest assured you will hear from us very soon as we begin the conversion process. We thank you for your support and congratulate you on being a visionary. You will be residing on the world renowned Fort Lauderdale Beach in a residence beyond comparison....a dream for many, but a reality for only a few!

Best personal regards,

*Maritza Meza*

Maritza Meza
Director of Sales
Trump International Hotel & Tower

551 N. Fort Lauderdale Beach Blvd., Fort
T 866-TRUMP-01 (866-87867-01)  F 866-TRUMP-01 (8

# EXHIBIT "C"



DONALD J. TRUMP

MICHAEL GRAVES & ASSOCIATES

RON STILLMAN

BAYROCK GROUP

OSCAR J. GARCIA

RAMOLA MOTWANI

Donald J. Trump is the very definition of the American success story. In 1980, he established The Trump Organization as the umbrella company for all of his real estate development and other corporate affiliates. He has continually set new standards of excellence while expanding his interests in luxury residential real estate, world-class hotels, office buildings, championship golf clubs, gaming and entertainment. Mr. Trump is committed to personal and direct involvement in everything that his name represents. This commitment has made him the preeminent developer of quality real



BUILDING   LOCATION   AMENITIES   FAQ   VIEWS   TEAM   CONTACT

TRUMP
INTERNATIONAL
HOTEL & TOWER
will soon present Fort
Lauderdale with an
incredible landmark for
the 21st Century. This
signature development by
Donald J. Trump will
become a destination for
many and a place for the
select few.

◄ BACK

# EXHIBIT E

IN THE CIRCUIT COURT OF THE
SEVENTEENTH JUDICIAL CIRCUIT IN
AND FOR BROWARD COUNTY, FLORIDA

CIVIL DIVISION

CASE NO. 08-062209 CACE (02)

JEROME SHAFFER and
SHARON SHAFFER,

   Plaintiffs,

 v.

SB HOTEL ASSOCIATES, LLC,
BAYROCK GROUP, LLC,
DONALD TRUMP, ROY STILLMAN and
CORUS BANK, N.A.,

   Defendants.

_____/

### DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT

  Defendants, SB Hotel Associates, LLC ("SB Hotel"), Bayrock Group, LLC ("Bayrock"), Donald Trump ("Trump"), Roy Stillman ("Stillman") and Corus Bank, N.A. ("Corus Bank"), (collectively "Defendants"), by and through undersigned counsel, hereby move this Court, pursuant to Florida Rule of Civil Procedure 1.140(b)(6) to Dismiss Plaintiffs' Complaint, and as grounds states the following good cause:

### I. INTRODUCTION & BACKGROUND AS TO PLAINTIFFS' COMPLAINT

  Like many recently-filed state and federal cases in South Florida, this case represents yet another example of a buyer's remorse over a real estate purchase in the face of a dramatically slower real estate market. On December 19, 2005, when the real estate market was sizzling, the Plaintiffs entered into a Purchase and Sale Agreement to purchase condominium unit No. 1410 at the SB Fort Lauderdale Hotel & Condominium. The condominium building is now substantially complete. Because the real estate market has taken a turn for the worse, Plaintiffs are desperately looking for a way out of their contractual obligations.

  The purported Federal and State claims subject to Plaintiffs' Complaint essentially seek the Court's intervention to relieve Plaintiffs from their contractual obligations under a December

CASE NO.: 08-062209 CACE (02)

19, 2005 Purchase Agreement[1] for a condominium hotel located in Fort Lauderdale, Florida.[2] Specifically, Plaintiffs ask that the Court rescind the Purchase Agreement and award them each monetary damages equivalent to the amount of money they provided SB Hotel [over 3 years ago] as a preconstruction deposit for their condominium hotel units. As set forth below, Plaintiffs' Complaint fails to state claims upon which relief may be granted. Accordingly, Plaintiffs' causes of action should be dismissed in their entirety pursuant to Florida Rule of Civil Procedure 1.140(b)(6) and the governing statutes and case law cited herein.

Plaintiffs' Complaint alleges twelve (12) claims: Count I – Violation of Interstate Land Sales Full Disclosure Act ("ILSA") under 15 U.S.C. § 1703(a); Count II – Violation of ILSA under 15 U.S.C. § 1703(d); Count III – Void Purchase Agreement Pursuant to Florida Condominium Statute § 718; Count IV – Rescission Based on Florida Condominium Statute § 718.506; Count V – Violation of Securities Act under 15 U.S.C. § 77e; Count VI – Violation of The Florida Securities and Investor Protection Act under Chapter 517 of the Florida Statutes; Count VII – Violation of Florida Statute § 501 of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"); Count VIII – Breach of Contract; Count IX – Rescission – Illusory Contract; Count X – Imposition and Foreclosure of Vendees' Liens; Count XI – Bill of Discovery – Improper Use of Escrow Funds in Violation of Florida Condominium Statute § 718.202(3); and Count XII – Frustration of Purpose. As set forth below, Plaintiffs' 12 claims each fail to state a cause of action.

Plaintiffs consist of two (2) individuals who reside in Palm Beach County, Florida.[3] Plaintiffs allege that on December 19, 2005, they entered into a Purchase Agreement to purchase condominium hotel unit No. 1410 at the "SB Fort Lauderdale Hotel & Condominium" in Fort Lauderdale, Florida, from SB Hotel, the developer of the SB Fort Lauderdale Hotel & Condominium.[4] Plaintiffs allege that they entered into their Purchase Agreements for Unit No. 1410 at the SB Fort Lauderdale Hotel & Condominium in reasonable reliance upon marketing/sales materials that promote the SB Fort Lauderdale Hotel & Condominium as a

---

[1] The Purchase Agreement is attached to Plaintiffs' Complaint as Exhibit A and attached hereto as Exhibit 1.
[2] Complaint at ¶ 12.
[3] Complaint at ¶¶ 3-4.
[4] Complaint at ¶¶ 12.

Trump International Hotel & Tower.[5]  Plaintiffs also allege that they each entered into the Purchase Agreement for Unit No. 1410 at the SB Fort Lauderdale Hotel & Condominium in reasonable reliance upon the condominium hotel's overall investment potential and the payment stream that owners could expect from the rental of units through the hotel's reservation system.[6] In addition, Plaintiffs allege that the SB Fort Lauderdale Hotel & Condominium has not been completed by the time they anticipated the project would be.[7]

As established herein, Plaintiffs' Complaint should be dismissed for the following reasons:

➢ **Count I** [ILSA under 15 U.S.C. §§ 1703(a)] fails to state a cause of action because (a) Plaintiffs have failed to sufficiently allege and set forth any basis to plead an ILSA claim against Donald Trump and/or Roy Stillman (b) from the plain language of the Purchase Agreement, the text of the Prospectus and the Declaration, it is clear that Defendants could not have violated 15 U.S.C. § 1703(a) because Plaintiffs knew or should have known, that at the time they entered into the Purchase Agreement that there was a possibility that the SB Fort Lauderdale Hotel & Condominium would not be a Trump property (c) the factual allegations subject to Count I of Plaintiffs' Complaint completely and directly contradict the unambiguous language of the Purchase Agreement, the text of the Prospectus and the Declaration, such documentation thereby negates any allegation that Defendants engaged in a deceptive or misleading sales practice in violation of 15 U.S.C. § 1703(a), and (d) Plaintiffs failed to revoke/cancel/terminate their Purchase Agreements within 15 days of executing the Agreements pursuant to Paragraph 25.

➢ **Count II** [ILSA under 15 U.S.C. § 1703(d)] fails to state a cause of action because (a) Plaintiffs' failed to revoke their Agreements within 2 years of executing the same, and (b) [notwithstanding Count II is time barred] Plaintiffs also voluntarily "ratified" and executed the Agreement and did not revoke, cancel or terminate the Agreement 15 days thereafter.

➢ **Count III** [Florida Condominium Statute § 718] fails to state a cause of action because (a) by signing the Agreements containing acknowledgment of receipt of all necessary condominium documents, Plaintiffs are bound by contract's terms and cannot rescind the

---

[5] Complaint at ¶¶ 29-34.
[6] Complaint at ¶ 31-33 and 92 and 114.
[7] Complaint at ¶¶ 35-36.

purchase Agreements (b) Plaintiffs' right to cancel the Purchase Agreement expired 15 days after receiving the condominium documents regardless of the fact that Plaintiffs' may not have signed a receipt for the documents, and (c) Plaintiffs' claims fail to allege that the modified condominium documents "materially altered or modified the offering" in an "adverse" way to Plaintiffs, thereby triggering Plaintiffs' right to rescind the Agreements within 15 days of their notification of the same.

> **Count IV** [Florida Condominium Statute § 718.506] fails to state a cause of action because (a) a contracting party may not, as a matter of law, reasonably rely upon prior written or oral misrepresentations contradicted by a subsequent written agreement, (b) Plaintiffs' claims are predicated on alleged misrepresentations that are inconsistent with the express language of the subsequent written Purchase Agreement, and (c) Plaintiffs' claims completely and directly contradict the unambiguous language of the Purchase Agreement, the text of the Prospectus and the Declaration, and therefore, such documentation thereby negates any allegation that Defendants engaged in false and misleading advertising and promotional materials under Fla. Stat. § 718.506.

> **Count V** [15 U.S.C. § 77e] fails to state a claim because (a) it is time barred by the applicable statutes of limitations, (b) the Purchase Agreement is not an investment contract, (c) it is barred by the "bespeaks caution" doctrine, and (d) Plaintiffs' ratified Paragraph 39 of the Agreement which expressly cautioned Plaintiffs that their purchase of the condominiums were not for investment purposes.

> **Count VI** [FSIPA] fails to state a cause of action because (a) it is time barred by the applicable statute of limitations and (b) Plaintiffs' ratified Paragraph 39 of the Agreement which expressly cautioned Plaintiffs that their purchase of the condominiums were not for investment purposes.

> **Count VII** [FDUPTA] fails to state a cause of action because (a) Plaintiffs' claims [Counts I-VI] on which their FDUPTA claims are premised also fail to state a cause of action, (b) Plaintiffs' allegations fail to identify any specific deceptive acts or unfair practices, (c) Plaintiffs fail to allege ultimate facts pertaining to causation and instead, simply allege SB Hotel violated ILSA and other state and federal laws, and therefore SB Hotel must have violated FDUPTA, (d) Plaintiffs fail to allege facts pertaining to how SB Hotel actually damaged or injured Plaintiffs, and (e) Plaintiffs are barred from seeking relief pursuant to FDUTPA because

they freely signed a contract with terms that contradict the alleged misrepresentations.

   ➢ **Count VIII** [Breach of Contract] fails to state a cause of action because the plain language of the Agreement specifically states that there is <u>no</u> <u>required</u> completion date for the project.

   ➢ **Count IX** [Rescission] fails to state a cause of action because (a) Plaintiffs failed to properly allege the elements of a claim for rescission, specifically in light of the fact that Plaintiffs have an adequate remedy at law [the return of the deposit], (b) Plaintiffs have every remedy available to them except for specific performance and as a matter of law, that does <u>not</u> make the Purchase and Sale Agreement illusory or unreasonable, and (c) Plaintiffs failed to void their Agreements within 15 days of executing the same pursuant to Paragraph 25.

   ➢ **Count X** [Imposition and Foreclosure Vendees' Liens] fails to state a cause of action because (a) Plaintiffs agreed to be bound by Paragraphs 5 and 24 of the Agreement which expressly prohibit liens or lis pendens on the property, (b) there is an adequate remedy at law and therefore no claim of lien can exist, and (c) Plaintiffs' claim is time barred pursuant to the applicable statute of limitations.

   ➢ **Count XI** [Improper Use of Escrow Funds in Violation of Florida Condominium Statute § 718.202(3)] fails to state a cause of action because the allegations subject to Count XI are replete with conclusions of law, conclusions of the pleader, and clearly fail to set forth any ultimate "facts" pertaining to Defendants' [purported] Florida Statute § 718.202(3) violation.

   ➢ **Count XII** [Frustration of Purpose] fails to state a cause of action because (a) the allegations subject to Count XII of Plaintiffs' Complaint completely and directly contradict the unambiguous language of Paragraph 39 of the Purchase Agreement which expressly provides that Plaintiffs agreed that the Purchase Agreement was entered into by Plaintiffs <u>without</u> reliance upon any <u>appreciation of value</u> of the Unit, (b) Plaintiffs failed to allege that SB Hotel knew [at the time the Purchase Agreement was executed between the parties on December 19, 2005] that the real estate market in South Florida would decline 3 years later, (c) Plaintiffs failed to allege that there was no consideration between the parties for the purchase and sale of Unit 1410, and (d) Plaintiffs failed to allege that it is impossible for SB Hotel to perform under the Purchase Agreement and complete the construction of Unit 1410.

CASE NO.: 08-062209 CACE (02)

## II. ARGUMENT AND CITATION OF AUTHORITIES

### A. LEGAL STANDARD – MOTION TO DISMISS

A motion to dismiss tests whether the plaintiff has stated a legal cause of action. *Susan Fixel, Inc. v. Rosenthal & Rosenthal, Inc.*, 842 So. 2d 204, 205 (Fla. 3d DCA 2003). When analyzing a motion to dismiss for failure to state a cause of action, a court must limit its consideration to the "four corners" of the plaintiff's complaint – that is, the facts alleged in the complaint as well as any documents referred to therein or attached to the complaint. *Kohl v. Blue Cross and Blue Shield of Florida*, 988 So. 2d 654, 658 (Fla. 4th DCA 2008) ("A court may not go beyond the four corners of the complaint and exhibits attached thereto."). The pleader is bound by his or her own allegations in the complaint. *Reid v. Bradshaw*, 302 So.2d 180 (Fla. 1st DCA 1974).

Pursuant to Florida Rule of Civil Procedure 1.110(b)(2), a pleader must allege "a short and plain statement of the ultimate facts showing that the pleader is entitled to relief." The case law is clear that when analyzing a motion to dismiss for failure to state a cause of action, the Court should *not* accept as true "internally inconsistent factual claims, conclusory allegations, unwarranted deductions, or mere legal conclusions" set forth in a plaintiff's complaint. *See Higgs v. Florida Department of Corrections*, 647 So. 2d 962 (Fla. 1st DCA 1994); *Abruzzo v. Haller*, 603 So. 2d 1338 (Fla. 1st DCA 1992); *W.R. Townsend Contracting, Inc. v. Jensen Civil Constr., Inc.*, 728 So. 2d 297 (Fla. 1st DCA 1999).

To survive a motion to dismiss, a complaint must contain ultimate facts supporting each element of the cause of action, and the pleading of mere conclusions is insufficient. *Clark v. Boeing Co.*, 395 So. 2d 1226 (Fla. 3d DCA 1981); *Maiden* v. *Carter*, 234 So.2d 168 (Fla. 1st DCA 1970). A plaintiff's complaint must sufficiently allege ultimate facts which, if established by competent evidence, would support a decree granting relief sought. *Doyle v. Flex*, 210 So.2d 493 (Fla. 4th DCA 1968). *See also Barrett v. City of Margate*, 743 So.2d 1160 (Fla. 4th DCA 1999) (the complaint, whether filed by an attorney or pro se litigant, must set forth factual assertions that can be supported by evidence which gives rise to legal liability and it is insufficient to plead opinions, theories, legal conclusions, or argument).

As set forth herein, the Complaint is replete with conclusions of law and conclusions of the pleader, but is devoid of ultimate facts, which are *required* by Florida Rule of Civil Procedure 1.110(b). *See also Kreizinger v. Schlesinger*, 925 So. 2d 431 (Fla. 4th DCA 2006);

CASE NO.: 08-062209 CACE (02)

*Louie's Oyster, Inc. v. Villaggio Di Las Olas, Inc.*, 915 So. 2d 220 (Fla. 4th DCA 2005); *W.R. Townsend Contracting, Inc. v. Jensen Civil Constr., Inc.*, 728 So. 2d 297 (Fla. 1st DCA 1999) (holding that for a plaintiff to state a cause of action, a complaint *must* allege sufficient ultimate facts to show that the pleader is entitled to relief).

### B.   LEGAL STANDARD - EXHIBITS ATTACHED TO COMPLAINT CONTROL

Exhibits attached to a complaint are incorporated as part thereof, and considered as part of the complaint itself. Fla. R. Civ. P. 1.130(b); *Goodall v. Whispering Woods Center, L.L.C.*, 990 So.2d 695, (Fla. 4th DCA 2008); *Geico Gen. Ins. Co. v. Graci,* 849 So.2d 1196 (Fla. 4th DCA 2003); *Nicholas v. Ross,* 721 So.2d 1241, 1243 (Fla. 4th DCA 1998)**.**

Where there is a conflict between allegations in a pleading and exhibits thereto, it is well settled that the <u>exhibits control</u>. *See Goodall v. Whispering Woods Center, L.L.C.*, 990 So.2d 695, (Fla. 4th DCA 2008); *Geico Gen. Ins. Co. v. Graci,* 849 So.2d 1196 (Fla. 4th DCA 2003); *Hunt Ridge at Tall Pines, Inc. v. Hall,* 766 So.2d 399, 401 (Fla. 2d DCA 2000) ("Where complaint allegations are contradicted by exhibits attached to the complaint, the plain meaning of the <u>exhibits control</u> and may be the basis for a motion to dismiss."). *See also Blue Supply Corp. v. Novos Electro Mechanical, Inc.*, 990 So.2d 1157 (Fla. 3d DCA 2008) (In considering the motion to dismiss the trial court was required to consider the exhibit attached to and incorporated in the complaint); *Southeast Med. Prod., Inc. v. Williams,* 718 So.2d 306 (Fla. 2d DCA 1998): *Morales v. All Right Miami, Inc.* 755 So.2d 198 (Fla. 3d DCA 2000).

### C.   THE PURCHASE AGREEMENT & CONDOMINIUM DOCUMENTS ATTACHED TO AND/OR REFERENCED WITHIN THE COMPLAINT DIRECTLY NEGATE PLAINTIFFS' CLAIMS[8]

---

[8] The Purchase Agreement [attached hereto as **Exhibit 1**] subject to Plaintiffs' claims is attached to Plaintiff's Complaint as Exhibit A and thus, this Court can and should consider the same as part of Plaintiff's pleadings for purposes of ruling on the instant Motion to Dismiss. In addition, this Court should also consider the attached text of the Prospectus for SB Fort Lauderdale Hotel & Condominium [attached hereto as **Exhibit 2**] and the attached Declaration of SB Fort Lauderdale Hotel & Condominium [enclosed within the Prospectus and attached hereto as **Exhibit 3**], because Plaintiffs reference such condominium documentation within its Complaint. *See* Complaint ¶¶ 21, 42, 66, 81, and 110. *See In re Estate of DeLuca,* 748 So.2d 1086 (Fla. 4th DCA 2000); *Posigian v. American Reliance Ins. Co.*, 549 So.2d 751 (Fla. 3d DCA 1989); *Bickley v. Caremark RX, Inc.*, 461 F.3d 1325, 1329 (11th Cir. 2006); *Maxcess, Inc. v. Lucent Technologies, Inc.*, 433 F.3d 1337 (11th Cir. 2005); and *Brooks v. Blue Cross & Blue Shield, Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (if the Plaintiff refers to documents in the complaint that are not attached to the complaint and those documents are central to the plaintiff's claim, then the Court may consider documents outside the four corners of the complaint as part of the pleadings for purposes of a Motions to Dismiss).

As set forth above, on December 19, 2005, Plaintiffs executed and entered into a Purchase Agreement with SB Hotel to purchase condominium hotel unit No. 1410 at the "SB Fort Lauderdale Hotel & Condominium" in Fort Lauderdale, Florida. As discussed below, the provisions of the Purchase Agreement expressly establish that Plaintiffs' purported causes of action should be dismissed pursuant to Rule 1.140(b)(6), Fla. R. Civ. P., because the factual allegations contained within Plaintiffs' Complaint, directly negate and are in complete contradiction of the plain language and express terms of the Purchase Agreement and therefore, must be disregarded. *See Padgett v. First Federal Sav. & Loan Ass'n of Santa Rosa County,* 378 So. 2d 58, 65 (Fla. 1st DCA 1979); ("inconsistency between general allegations of material facts in complaint and specific facts revealed by the exhibit attached to it has the effect of neutralizing each allegation and rendering the pleading objectionable."); *Harry Pepper & Associates, Inc. v. Lasseter,* 247 So. 2d 736, 736-37 (Fla. 3d DCA 1971) (facts revealed by deposition attached to complaint were inconsistent with complaint's allegation rendered pleading objectionable and cause of action was dismissed). Because Plaintiffs' causes of action in the Complaint depend upon allegations that must be disregarded, Plaintiffs' causes of action fail to raise a right to relief to Plaintiffs and must be dismissed in their entirety.[9]

---

[9] Even though Plaintiffs' Complaint does not assert or allege that the express terms of the Purchase Agreement and Condominium Documents are ambiguous, it should be noted that a party's mere failure to read contract and thus know and understand its terms and implications is not grounds for rescission or revocation. *See Manning v. Interfuture Trading, Inc.,* 578 So.2d 842 (Fla. 4th DCA 1991). *See also Goodall v. Whispering Woods Center, L.L.C.,* 990 So.2d 695, (Fla. 4th DCA 2008) (Ordinarily, one who signs a written instrument without reading it with care is bound in accordance with its written terms. Restatement (Second) of Contracts § 157.); *Manufacturers' Leasing, Ltd. v. Florida Development & Attractions, Inc.,* 330 So.2d 171 (Fla. 4th DCA 1976) (a party has duty to learn and know contents of proposed contract before he [or she] signs and delivers it and, in absence of certain exceptions, is presumed to know and understand its contents, terms and conditions). And although Plaintiffs' Complaint does not assert or allege that SB Hotel prevented them from reading the Purchase Agreement or that SB Hotel told them not to read the Purchase Agreement, it should also be noted that one's failure to read a contract before signing it does not render the contract unenforceable unless the complaining party can demonstrate that he [or she] either is prevented from reading the documents, or is induced by statements of the other party to refrain from reading it. *See Consolidated Resources Healthcare Fund I, Ltd. v. Fenelus,* 853 So.2d 500 (Fla. 4th DCA 2003); *Manning v. Interfuture Trading, Inc.,* 578 So.2d 842 (Fla. 4th DCA 1991) (Proof that one party prevented other party from reading contract is defense to enforcement, but mere failure to read contract is not).

CASE NO.: 08-062209 CACE (02)

As established herein, the true gravamen of Plaintiffs' claims, are the following provisions contained within the Purchase Agreement,[10] Condominium Prospectus[11] and Condominium Declaration:[12]

<u>**Paragraphs 25, 39, 42 and 44 of the Purchase Agreement**</u>

Paragraph 25 of the Purchase Agreement provides that the Purchase Agreement was "voidable" by Plaintiffs within 15 days of their December 19, 2005 execution of the same and that if the Purchase Agreement was not terminated, Plaintiffs, thereby "ratified" their Purchase Agreement and agreed that the "provisions were fair and reasonable":

> 25.   <u>Buyer's Right to Cancel:</u>
>
> THIS AGREEMENT IS *VOIDABLE* BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN *15 DAYS AFTER THE DATE OF EXECUTION* OF THIS AGREEMENT BY THE BUYER . . .
>
> If Buyer does not cancel this Agreement during this 15-day period, it means that *Buyer ratifies this Agreement* and the Condominium Documents and *Buyer agrees* that their provisions are *fair and reasonable in Buyer's opinion.*

Under paragraph 39 of the Purchase Agreement, Plaintiffs each "agreed" that they entered into the contract <u>without</u> reliance upon any potential future profit, appreciation of value, rental income potential, investment potential and without reliance upon any hotel affiliation or monetary or financial advantage:

> 39.   <u>Seller's Representations:</u>
>
> Buyer acknowledges, warrants, represents and agrees that this Agreement is being entered into by Buyer *without reliance upon any representations concerning any potential for future profit, any future appreciation in value, any rental income potential, tax advantages, depreciation or investment potential and without reliance upon any hotel affiliation or any monetary or financial advantage.* Further, no statements or representations have been made by Seller, or any of its agents, employees or representatives with respect to (i) the ability or willingness of Seller or its affiliates to assist Buyer in renting or selling the Unit (except only in response to a direct

---

[10] Nos. 25, 39, 42 and 44
[11] No. 18
[12] No. 21.4

inquiry from Buyer), (ii) the economic or tax benefits to be derived from the managerial efforts of a third party as a result of renting the Unit or other units, or (iii) the economic or tax benefits to be derived from ownership of the Unit. Buyer acknowledges and agrees that no such representations, including representations as to the ability or willingness of Seller or its affiliates to assist Buyer in renting or selling the Unit, have been made by Seller, or any of its agents, employees or representatives. Buyer further represents and warrants to Seller that Buyer is entering into this Agreement with the full intention of complying with each and every of the obligations hereunder, including, without limitation, the obligation to close on the purchase of the Unit....

Paragraph 39 of the Purchase Agreement also evidences that Plaintiffs acknowledged that the promotional materials contained in the sales office and model suite were for promotional purposes <u>only</u> and that they may <u>not</u> be relied upon by Plaintiffs in entering into the agreement. Plaintiffs also warranted that they did <u>not</u> rely upon any verbal representations or promises other than as expressly contained in the Purchase Agreement and in the Condominium Documents pertaining to potential <u>appreciation</u> in or <u>resale value of the Unit</u>, or pertaining to any particular hotel affiliation or maintaining any existing hotel affiliation:

This Agreement contains the entire understanding between Buyer and Seller, and Buyer hereby acknowledges that the displays, architectural models, artist renderings and other promotional materials contained in the sales office and model suite are for promotional purposes only and may not be relied upon. Buyer warrants that *Buyer has not relied* upon any verbal representations or promises other than as expressly contained herein and in the Condominium Documents, including, specifically, but without limitation, any representations as to: (a) *potential appreciation in or resale value of the Unit*, (b) the existence of any "view" from the Unit or that any existing "view" will not be obstructed in the future, (c) traffic conditions in, near or around the Condominium Property, (d) disturbance from nearby properties, (e) disturbance from air or vehicular traffic, or (f) *any particular hotel affiliation or maintaining any existing hotel affiliation.* The provisions of this paragraph shall survive the closing.

Under paragraph 39 of the Purchase Agreement, Plaintiffs also understood and agreed that SB Hotel intended/intends (without creating any obligation) to retain Trump and further understands and agrees that in the event that any agreement between SB Hotel and Trump is terminated for any reason, all use of Trump's trade name and Trump's trademark shall cease.

*Buyer understands and agrees* that the Hotel Unit Owner *intends (without creating any obligation) to retain* Trump Florida Management LLC (including its affiliates, "Trump Management") as the initial Hotel Manager

and to obtain a limited license agreement from Donald J, Trump ("Trump") to operate the hotel under the trade name "Trump International Hotel &Tower Fort Lauderdale". *Buyer further understands and agrees* that in the event that any agreement between the Hotel Unit Owner, or the affiliates of the Hotel Unit Owner, and Trump and/or Trump Management is *terminated for any reason, whether at the expiration of the term or earlier, all use of Trump's trade name and Trump's trademark or service marks shall cease* and all indicia or connection between the Condominium and Trump and/or Trump Management, including signs or other materials bearing any of Trump's trademarks or service marks or trade names shall be removed from the Condominium. Additionally, Buyer acknowledges and agrees that any use of any of Trump's trade names and Trump's trademarks or service marks, without proper licensing from Trump, is expressly prohibited.

Paragraph 42 of the Purchase Agreement sets forth that Plaintiffs were represented (or had the opportunity to be represented) by their own independent counsel and acknowledged and agreed that they had ample opportunity to inspect other similar condominiums and condominium documents, that SB Hotel clearly disclosed to Plaintiffs the right to cancel the Purchase Agreement within fifteen days for any reason whatsoever, including any dissatisfaction, and that Plaintiffs confirmed and agreed that they entered into the Purchase Agreement of their own free will, without any duress or coercion by any party whatsoever:

42.    Interpretation: Miscellaneous:

Notwithstanding that this Agreement was prepared by one party hereto, it shall not be construed more strongly against or more favorably for either party; *it being known that both parties have had equal bargaining power, have been represented (or have had the opportunity to be represented) by their own independent counsel* and have equal business acumen such that any rule of construction that a document is to be construed against the drafting party shall not be applicable. Buyer acknowledges and agrees that Buyer has had ample opportunity to inspect other similar condominiums and condominium documents, that Seller has clearly disclosed to *Buyer the right to cancel this Agreement for any reason whatsoever, including any dissatisfaction Buyer may have with this Agreement or the Condominium Documents, within fifteen (15) days* of the date Buyer executes this Agreement or has received the Condominium Documents, whichever is later, and that although Seller's sales agents are not authorized to change the form of this Agreement, they have strict instructions from Seller to communicate any of Buyer's requests for such changes to Seller's management, which has given Buyer the opportunity to discuss and negotiate such changes. *Buyer, by executing this Agreement confirms and agrees that Buyer* is of legal age, has legal capacity to enter into binding

agreements of this nature and *has entered into this Agreement of its own free will, without any duress or coercion by any party whatsoever.*

Paragraph 44 of the Purchase Agreement establishes that Plaintiffs had full knowledge that any current or prior agreements, representations, understandings or oral statements of sales representatives or others, if not expressed in the Purchase Agreement, the Condominium Documents or in brochures for the Condominium, were/are void and had/have no effect and that Plaintiffs did not rely on them.

> 44.   Entire Agreement:
>
> This Agreement is the entire contract for sale and purchase of the Unit and once it is signed, it can only be amended by a written instrument signed by the party against whom enforcement is sought which specifically states that it is amending this Agreement. *Any current or prior agreements, representations, understandings or oral statements of sales representatives or others, if not expressed in this Agreement, the Condominium Documents or in brochures for the Condominium, are void and have no effect. Buyer has not relied on them.*

### Paragraph 18 of Prospectus for SB Fort Lauderdale Hotel & Condominium

Provision 18 of the Prospectus text also establishes that Plaintiffs understood and agreed that SB Hotel intended/intends (without creating any obligation) to retain Trump and further understood and agreed that in the event that any agreement between SB Hotel and Trump is terminated for any reason, all use of Trump's trade name and Trump's trademark shall cease.

> 18.   Disclosures:
>
> **Purchaser understands and agrees that the Hotel Unit Owner** *intends (without creating any obligation)* **to retain Trump Florida Management LLC (including its affiliates, "Trump Management") as the** *initial* **Hotel Manager and to obtain a limited license agreement from Donald J. Trump ("Trump") to operate the hotel under the trade name "Trump International Hotel &Tower Fort Lauderdale". Purchaser further understands and agrees that in the event that** *any* **agreement between the Hotel Unit Owner, or the affiliates of the Hotel Unit Owner, and Trump and/or Trump Management** *is terminated for any reason,* **whether at the expiration of the term or earlier,** *all use of Trump's trade name and Trump's trademark or service marks shall cease* **and all indicia or connection between the Condominium and Trump and/or Trump Management, including signs or other materials bearing any of Trump's trademarks or service marks or trade names shall be removed from the Condominium.** Additionally, purchaser acknowledges and agrees that any use of any of Trump's trade names and Trump's trademarks or

CASE NO.: 08-062209 CACE (02)

service marks, without proper licensing from Trump, is expressly prohibited.

### Paragraph 21.4 of the Declaration for SB Fort Lauderdale Hotel & Condominium

Provision 21.4 of the Declaration likewise evidences that Plaintiffs understood and agreed that SB Hotel intended/intends (without creating any obligation) to retain Trump and further understood and agreed that in the event that any agreement between SB Hotel and Trump is terminated for any reason, all use of Trump's trade name and Trump's trademark shall cease.

> 21.4.   Hotel Matters:
>
> **Each Unit Owner understands and agrees that the Hotel Unit Owner** *intends (without creating any obligation)* **to retain Trump Florida Management LLC (including its affiliates, "Trump Management") as the** *initial* **Hotel Manager and to obtain a limited license agreement from Donald J. Trump ("Trump") to operate the hotel under the trade name "Trump International Hotel &Tower Fort Lauderdale". Each Unit Owner further understands and agrees that in the event that** *any* **agreement between the Hotel Unit Owner, or the affiliates of the Hotel Unit Owner, and Trump and/or Trump Management** *is terminated for any reason,* **whether at the expiration of the term or earlier,** *all use of Trump's trade name and Trump's trademark or service marks shall cease* **and all indicia or connection between the Condominium and Trump and/or Trump Management, including signs or other materials bearing any of Trump's trademarks or service marks or trade names shall be removed from the Condominium.** Additionally, each Unit Owner acknowledges and agrees that any use of any of Trump's trade names and Trump's trademarks.

### D. COUNTS I-XII FAIL TO STATE A CAUSE OF ACTION AGAINST DEFENDANTS BAYROCK, TRUMP, STILLMAN AND CORUS BANK AND THEREFORE MUST BE DISMISSED

Page 1 of Plaintiffs' Purchase Agreement clearly and expressly states that "In this Agreement . . . the word "Seller" and/or "Developer" means or refers to SB Hotel Associates, LLC."[13] Despite the fact that Plaintiffs' "ratified" that all of the Purchase Agreements' terms were "fair and reasonable," Counts I-XII of Plaintiffs' Complaint allege that Defendants

---

[13] Paragraph 25 of the Purchase Agreement provides that the Agreement was "voidable" by Plaintiffs within 15 days of their December 19, 2005 execution of the same and that if the Purchase Agreement was not terminated, Plaintiffs thereby "ratified" the Purchase Agreement and agreed that the "provisions were fair and reasonable."

Bayrock, Trump, Stillman and Corus Bank are liable to Plaintiffs because they are the "sellers" or "developers" of the SB Fort Lauderdale Hotel & Condominium.

Because the allegations subject to Counts I-XII of Plaintiffs' Complaint [i.e. that Defendants Bayrock, Trump, Stillman and Corus Bank are the "developers" of the SB Fort Lauderdale Hotel & Condominium] completely and directly contradict the unambiguous language of Plaintiffs' "ratified" Purchase Agreement, such documentation thereby negates any and all allegations that Defendants Bayrock, Trump, Stillman and Corus Bank violated any state or federal laws as the "seller" or "developer" of the SB Fort Lauderdale Hotel & Condominium. Consequently, Counts I-XII against Defendants Bayrock, Trump, Stillman and Corus Bank must be dismissed for conflict between Plaintiffs' factual allegations and the controlling documents. *See* governing rules of procedure and case law subject to Sections II B and C above.

## E. COUNT I [ILSA under 15 U.S.C. §§ 1703(a)] FAILS TO STATE A CAUSE OF ACTION AND THEREFORE MUST BE DISMISSED

Congress enacted the Interstate Land Sales Full Disclosure Act ("ILSA") in 1968 "to protect purchasers from unscrupulous sales of undeveloped home sites, frequently involving out-of-state sales of land purportedly suitable for development but actually under water or useful only for grazing." *Paramo v. IMICO Brickell, LLC*, 2008 WL 4360609 (S.D.Fla.) (citing *Winter v. Hollingsworth*, 777 F.2d 1444, 1447 (11th Cir.1985). The intent of the Act is to "compensate purchasers, who may have lost their life savings by investing in fraudulent land sales." *Fitzgerald v. Century Park, Inc.*, 642 F.2d 356, 358 (9th Cir. 1981). Specifically, 15 U.S.C. § 1703(a) prohibits developers "with respect to the sale or lease, or offer to sell or lease, any lot" from "[employing] any device, scheme, or artifice to defraud; ... [or engaging] in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

As established herein, Congress clearly did NOT intend to create ILSA to protect purchasers of the condominiums at issue, such as Plaintiffs. Congress' intent was to protect the public against purchasing unsuitable property—NOT as a mechanism to allow waves of buyers who are unsatisfied with the current real estate market in South Florida to back out of their binding purchase agreements at the 11th hour before closing on the purchase. There is no fraudulent sale occurring here. Only a declining real estate market—outside of the Plaintiffs and Defendants control. Obviously, if we were in a rising market [like it was back in 2005/2006],

CASE NO.: 08-062209 CACE (02)

these lawsuits would not have been filed.

As an initial matter, individual Defendants Donald Trump and Roy Stillman must both be dismissed because Plaintiffs have failed to sufficiently allege and set forth any basis to plead an ILSA claim against Donald Trump and/or Roy Stillman, specifically as to what personal involvement they allegedly had in the allegations subject to Count I. The law is well-settled that an individual does not become personally liable under ILSA without some personal involvement in the sale or offer to sell. *See Parra v. Minto Town Park*, LLC, 2008 WL 4773272 (S.D.Fla.); *Santidrian v. Landmark Custom Ranches. Inc.*, 2008 WL 45871820, *3 (S.D.Fla. Oct. 14, 2008) (Cohn, J.), where both Courts found that ILSA defines a developer as "any person who, directly or indirectly sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision." 15 U.S.C. § 1701(5). Under this language, Plaintiffs must sufficiently set forth the basis for the claim and the individual's personal involvement in the allegations. *Abouiaoude v. Poinciana Dev. Co.*, 509 F.Supp.2d 1266, 1276 (S.D.Fla.2007). Lacking such allegations in Plaintiffs' Complaint, this Court must dismiss Donald Trump and Roy Stillman.

Plaintiffs allege that Defendants engaged in a deceptive or misleading sales practice in contravention of 15 U.S.C. §§ 1703(a) of the Interstate Land Sales Full Disclosure Act ("ILSA") – in light of Defendants' alleged misrepresentations and omissions in its advertising and promotional materials that may have eluded to the potential concept that the SB Fort Lauderdale Hotel & Condominium may be a [Donald] Trump property.[14] Plaintiffs further allege that they are permitted to rescind the Purchase Agreements for the Units because they were purportedly misled by the aforementioned advertising and promotional materials.

As outlined in Section II C above, paragraph 39 of the Purchase Agreement between Plaintiffs and SB Hotel establishes the following:

> ➢ Plaintiffs "agreed" that the Purchase Agreement was entered into by Plaintiffs **without** reliance upon any potential future profit, appreciation of value, rental income potential, investment potential and without reliance upon any hotel affiliation or monetary or financial advantage;

> ➢ Plaintiffs acknowledged that the promotional materials contained in the sales office and model suite were for promotional purposes only and that they may **not** be relied upon by Plaintiffs;

---

[14] Complaint at ¶¶ 51-53.

> Plaintiffs also warranted that they did **not** rely upon any verbal representations or promises other than as expressly contained in the Purchase Agreement and in the Condominium Documents pertaining to potential appreciation in or resale value of the Unit, or pertaining to any particular hotel affiliation or maintaining any existing hotel affiliation; and

> Plaintiffs **understood** and **agreed** that SB Hotel intended/intends (without creating any obligation) to retain Trump and further **understands** and **agrees** that in the event that any agreement between SB Hotel and Trump is terminated for any reason, all use of Trump's trade name and Trump's trademark shall cease. *See also* **Provision 18 of Prospectus Text and Provision 21.4 of the Declaration.**

On August 1, 2008, the United States District Court for the Southern District of Florida, by the Honorable Patricia A. Seitz, dismissed *with prejudice* approximately 28 cases alleging violation of 15 U.S.C. §§ 1703(a)(2)(A)-(C) of ILSA. *Barry Weaver v. Opera Tower, LLC*, 2008 WL 4145520 (S.D. Fla. Aug. 1, 2008). There, as here, the plaintiffs alleged that they were fraudulently misled by promotional materials provided before they executed a written purchase agreement. As in this case, the allegedly misleading promotional materials conflicted with the terms of the subsequent written purchase Agreement. In dismissing those cases *with prejudice*, the Southern District of Florida noted that "it is well settled that a contracting party may not, as a matter of law, reasonably rely upon prior written or oral misrepresentations contradicted by a subsequent written agreement." *Id. citing Garcia v. Santa Maria Resort, Inc.*, 528 F.Supp.2d 1283, 1295 (S.D. Fla. 2007) (Hon. James L. King); *Barnes v. Burger King Corp.*, 932 F.Supp. 1420 (S.D. Fla.1996) (Hon. Ursula Ungaro). *See also* the same holding in *Gentry v. Harborage Cottages–Stuart, LLP*, 2008 WL 1803637 (S.D. Fla. 2008) (quoting *Eclipse Med., Inc., v. Am. Hvrdo-Surgical Instruments. Inc.,* 262 F.Supp.2d 1334, 1342 (S.D. Fla. 1999); *Barnes v. Burger King Corp.,* 942 F.Supp. 1420, 1428 (S.D. Fla. 1996); *Acquisition Corp. of Am. v. FDIC*, 760 F.Supp. 1558, 1561 n. 6 (S.D. Fla.1991). "[A] party has no right to rely upon alleged oral misrepresentations that are adequately covered and expressly contradicted in a later written contract."

The case at bar is no different than the cases cited above. From the plain language of the Purchase Agreement, the text of the Prospectus and the Declaration, it is clear that Defendants could **not** have violated 15 U.S.C. § 1703(a) because Plaintiffs knew or should have known at the

time they entered into the Purchase Agreement that there was a possibility that the SB Fort Lauderdale Hotel & Condominium would not be affiliated with Trump—something which remains to this day a speculative fear at best. As such, the factual allegations subject to Count I fail to state a cause of action and therefore cannot raise a right to relief under 15 U.S.C. § 1703(a) to Plaintiffs. Thus, Count I must be dismissed pursuant to Fla. R. Civ. P. 1.140(b)(6).

In addition, and as set forth in Section II C above, because the factual allegations subject to Count I of Plaintiffs' Complaint completely and directly contradict the unambiguous language of the Purchase Agreement, the text of the Prospectus and the Declaration, such documentation thereby negates any allegation that Defendants engaged in a deceptive or misleading sales practice in contravention of 15 U.S.C. § 1703(a). As a result, Count I should be dismissed based on the conflict between Plaintiffs' factual allegations and the controlling documents.

Moreover, paragraph 25 of the Purchase Agreement provides that the Agreement was "voidable" by Plaintiffs within 15 days of their December 19, 2005 execution of the same and that if the Purchase Agreement was not terminated, Plaintiffs thereby "ratified" the Purchase Agreement and agreed that the "provisions were fair and reasonable." Because Plaintiffs do not allege that they revoked or terminated their Purchase Agreement within 15 days of their execution, Plaintiffs cannot now [approximately 3 years later] ask this Court to rescind or revoke the Agreement because of their disappointment over the course of the Florida real estate market. Accordingly, the Plaintiffs' litany of alleged violations of 15 U.S.C. § 1703(a)[15]—all of which allegedly occurred before the Purchase Agreements were executed—are fatally deficient because the Plaintiffs failed to revoke, cancel, or terminate their Purchase Agreements within 15 days after their execution. Count I should therefore be dismissed.

### F. COUNT II [ILSA under 15 U.S.C. § 1703(d)] IS TIME BARRED AND FAILS TO STATE A CAUSE OF ACTION AND THEREFORE MUST BE DISMISSED

In Count II, Plaintiffs seek to rescind their Agreement under ILSA/15 U.S.C. § 1703(d) because Defendants allegedly failed to provide Plaintiffs with a legal description of the property in recordable form and allegedly shortened the Plaintiffs' period of time to cure any defaults of the Agreement. *See* Complaint at ¶¶ 59-64. Plaintiffs executed the Agreement on December 19,

---

[15] See pages 7-11 of the Complaint.

2005. *See* Complaint at ¶ 12.  Plaintiffs' Complaint was filed on December 18, 2008—well over two years later.  *See* Complaint.

Statutes of limitation "protect defendants against unreasonable delays in filing lawsuits" and "prevent unexpected enforcement of stale claims." *Allie* v. *Ionata,* 503 So.2d 1237, 1240 (Fla. 1987).  They "bring an end to potential liability by imposing a fixed time limit on the right to assert a claim," "encourage prompt resolution of controversies," and "protect against the risk of injustice." *Hawkins* v. *Barnes,* 661 So.2d 1271, 1272 (Fla. 5th DCA 1995).  A statute of limitations defense may be raised on a motion to dismiss.  *See Hanano v. Petrou,* 683 So.2d 637, 638 (Fla. 1st DCA 1996); *Board of County Commissioners v. Aetna Casualty & Surety Co.,* 604 So.2d 850 (Fla. 2d DCA 1992), review denied, 613 So.2d 2 (Fla. 1993); *Elegele v. Harley Hotels, Inc.,* 689 So.2d 1305 (Fla. 5th DCA 1997).  If the facts supporting application of the statute of limitations are affirmatively shown, then the cause of action must be dismissed.  *See* e.g., *Hanano,* 683 So.2d at 638.

Plaintiffs' claim under § 1703(d) of ILSA is time barred because Plaintiffs failed to revoke their Agreements within two years of executing their Agreements.

15 USC § 1703(d) states as follows:

> Any contract or agreement which is for the sale or lease of a lot not exempt under section 1702 of this title and which does not provide . . .
>
> (3) . . . may be revoked at the option of the purchaser or lessee for two years from the date of the signing of such contract or agreement. [emphasis added]

*See Taylor v. Holiday Isle, LLC,* No. 07-0771-WS-M, 2008 WL 2222945 (S.D. Ala. May 30, 2008), where the United States District Court for the Southern District of Alabama explains how these provisions work.  In *Taylor,* several individuals purchased condominium apartments.  More than two years after executing the contracts, these individuals attempted to revoke their agreements.  United States District Court Judge, Honorable William Steele, dismissed the claims.  He determined the plaintiffs waited too long.  Judge Steele explained that Section 1703 clearly indicates that if a developer fails to provide a property report under ILSA and the purchaser wishes to revoke the contract for this reason, the purchaser must act "within 2 years from the date of such signing." *See id.* at *2.  Judge Steele added that ILSA's regulations and legislative

history indicate that the two year period runs from the date the buyer executes his/her purchase contract.

The United States District Court for the Southern District of Florida, the Honorable Daniel T. Hurley, recently reached the same conclusion in *Ditthardt v. North Ocean Condos, L.P.*, Case No. 08-60601, Order Granting Defendant's Motion to Dismiss, at page 6 (S.D. Fla. July 11, 2008) ("This Court finds the reasoning in *Taylor* persuasive and joins its conclusion that rescission claims pursuant to § 1703 (c) and § 1703 (d) must be brought within two years of the date of signing."). *See also Hoffman v. Harborage Cottages-Stuart, LLLP*, Case No. 432008-CA-208, Order Re: Motion for Summary Judgment, at page 2 (Fla. Cir. Ct. 19, Martin, June 23, 2008) (Sherwood Bauer, J.) ("It is clear to the Court that if the facts are established by the Defendant that the exemptions do apply under the Act or that the claim was not exercised within the 2 year statute of limitations, that the Plaintiff's claim for relief may not be supported and this establishes a genuine issue of a material fact.").

15 USC § 1703(d) and the governing case law above, requires the dismissal of Count II forthwith. Plaintiffs executed their Agreement on December 19, 2005. *See* Complaint at ¶ 12. Plaintiffs fail to allege that they revoked their Agreement within 2 years of their December 19, 2005 execution of the Purchase Agreement. *See* Complaint at ¶¶ 59-64. Consequently, Plaintiffs failed to revoke their Agreements within the required 2-year period and thus, Plaintiffs' 15 USC § 1703(d) fails and must be dismissed *with prejudice*.

Notwithstanding the fact that Count II is time barred, Plaintiffs' § 1703(d) claim should also be dismissed for the following reasons:

(1) Plaintiffs failed to revoke and/or terminate the Agreement pursuant to and/or in accordance with Paragraph 25 of the Agreement within 15 days of executing the Agreements;

(2) By not revoking the Agreement within the 15 day revocation period, Plaintiffs' "ratified" the Agreement and agreed that the "provisions are fair and reasonable;"

(3) By executing the Agreement, Plaintiffs each confirmed pursuant to Paragraph 42 of the Agreement that "both parties have had equal bargaining power, have been represented (or have had the opportunity to be represented) by their own independent counsel and . . . had ample opportunity to inspect other similar condominiums and condominium documents;" and

(4) By executing the Agreement, Plaintiffs each confirmed pursuant to Paragraph 42 of the Agreement that the "Seller has clearly disclosed to Buyer the right to cancel this Agreement

for any reason whatsoever, including any dissatisfaction Buyer may have with this Agreement or the Condominium Documents, within fifteen (15) days of the date Buyer executes this Agreement."

Accordingly, Count II should be dismissed.

### G. COUNT III [Florida Condominium Statute Ch. 718] FAILS TO STATE A CAUSE OF ACTION AND THEREFORE MUST BE DISMISSED

Count III seeks to void and cancel the Purchase Agreement because Plaintiffs allege that they did not receive modified condominium documents that were approved by the Division of Florida Land Sales, Condominiums and Mobile Homes ("Division") on September 22, 2006. *See* Complaint at ¶¶ 65-75.

Count III should be dismissed for the following reasons:

*First*, Plaintiffs fail to specifically identify the statute that the Defendants allegedly violated in this claim.

*Second,* Paragraph 1 of the Agreement expressly provides that: "Buyer acknowledges receipt of the Condominium Documents and all documents required by Section 718.503, Florida Statutes, to be furnished by a developer to a Buyer, on or before the date of this Agreement." Thus, by signing the Agreements containing acknowledgment of receipt of all necessary condominium documents, Plaintiffs are bound by the contract's terms and cannot rescind the purchase Agreements. In *Chalfonte Development Corp. v. Rosewin Coats, Inc.*, 374 So.2d 618 (Fla. 4th DCA 1979), a prospective purchaser of a condominium unit signed a contract containing an acknowledgment that he received all necessary condominium documents. The Fourth District held that he was bound by the contract's terms and could not rescind, even if the seller had not complied with statute, which required delivery of various condominium documents and which gave the buyer an absolute right to rescind the contract if the seller failed to comply. Here, Plaintiffs are bound by Paragraph 1 of the Purchase Agreement and therefore have failed to state a claim under Count III.

*Third*, Plaintiffs' allegation that they may seek to rescind the purchase agreements because they did not sign the receipt of the modified condominium documents also fails to state a cause of action under Chapter 718, Florida Statutes. In *Rustbrook--S.C.B. (U.S.), Inc. v. Sauermann*, 460 So.2d 386 (Fla. 2d DCA 1984), the Court held that a purchaser of a condominium unit could terminate the purchase contract within 15 days after he received all

documents required by this section, and that his right to cancel the contract <u>expired 15 days</u> after he received the condominium documents <u>even though</u> he never signed a receipt for the documents. Here, Plaintiffs did not rescind the contract in accordance with and pursuant to Paragraph 25 of the Agreement within 15 days of executing the agreement back on December 19, 2005. Instead, Plaintiffs did not act promptly to rescind their Purchase Agreements and in fact, waited <u>3 years</u> to bring their rescission claims.[16] As such, Count III must be dismissed.

*Fourth,* even if Plaintiffs did not receive and sign for copies of the modified condominium documents back in September 2006, Count III is deficient in that it fails to allege that the modified condominium documents "materially altered or modified the offering" in an "adverse"[17] way to Plaintiffs, thereby triggering Plaintiffs' right to rescind the Agreements within 15 days of their notification of the same. *See In re Suncoast East Associates,* 241 B.R. 476 (S.D. Fla. 1999), where the Court held that for a prospective purchaser to rescind his/her contract for the purchase of condominium unit, as authorized under Florida Statute, within 15 days of receiving amendment from developer that "materially alters or modifies the offering," prospective purchaser <u>must prove</u> that change in question is both <u>material</u> and <u>adverse</u> to the property purchased.

Based upon the foregoing, Count III of Plaintiffs' Complaint should be dismissed.

### H. COUNT IV [Rescission Based on Florida Condominium Statute § 718.506] FAILS TO STATE A CAUSE OF ACTION AND THEREFORE MUST BE DISMISSED

Count IV of Plaintiffs' Complaint alleges that Plaintiffs were misled by purportedly false and misleading advertising and promotional materials that suggested that the SB Fort Lauderdale

---

[16] The law in Florida governing Plaintiffs' request to rescind the Purchase Agreement, clearly provides that "the remedy of <u>rescission</u> [of contract] is clearly <u>not</u> favored by the courts, particularly when the complaining party has <u>failed</u> to promptly deny the contract as binding upon him and failed to follow a course of conduct manifesting a disavowal of it." *Morris Inv. Partnership v. Figueroa,* 698 So.2d 288 (Fla. 3d DCA 1997); *Steinberg v. Bay Terrace Apartment Hotel,* 375 So.2d 1089, 1092 (Fla. 3d DCA 1979); *Rood Company, Inc. v. Board of Public Instruction of Dade County,* 102 So.2d 139, at 141-142 (Fla.1958).

[17] "Adverse" change, within meaning of Florida Statute that authorizes prospective purchaser to rescind his/her contract for purchase of condominium unit within 15 days of receiving amendment from developer that "materially alters or modifies the offering," is a change that is contrary to one's interests or welfare, i.e., that is unfavorable. *In re Suncoast East Associates,* 241 B.R. 476 (S.D. Fla. 1999).

Hotel & Condominium may be a [Donald] Trump property.[18]  Pursuant to Fla. Stat. § 718.506, Plaintiffs seek rescission of the Purchase Agreements because of this purported misrepresentation.[19]

As outlined in Section II C above, paragraph 39 of the Purchase Agreement between Plaintiffs and SB Hotel establishes the following:

> ➢ Plaintiffs acknowledged that the promotional materials contained in the sales office and model suite were for promotional purposes only and that they may not be relied upon by Plaintiffs;

> ➢ Plaintiffs also warranted that they did not rely upon any verbal representations or promises other than as expressly contained in the Purchase Agreement and in the Condominium Documents pertaining to potential appreciation in or resale value of the Unit, or pertaining to any particular hotel affiliation or maintaining any existing hotel affiliation; and

> ➢ Plaintiffs understood and agreed that SB Hotel intended/intends (without creating any obligation) to retain Trump and further understands and agrees that in the event that any agreement between SB Hotel and Trump is terminated for any reason, all use of Trump's trade name and Trump's trademark shall cease. *See also* **Provision 18 of Prospectus Text and Provision 21.4 of the Declaration.**

"It is well settled that a contracting party may not, as a matter of law, reasonably rely upon prior written or oral misrepresentations contradicted by a subsequent written agreement." *See, e.g., Barry Weaver v. Opera Tower, LLC,* 2008 WL 4145520 (S.D. Fla. Aug. 1, 2008) (*citing Garcia v. Santa Maria Resort, Inc.,* 528 F.Supp. 1283, 1295 (S.D. Fla. 2007) (Hon. James L. King); *Barnes v. Burger King Corp.,* 932 F.Supp. 1420 (S.D. Fla.1996) (Hon. Ursula Ungaro).

In *Gentry v. Harborage Cottages–Stuart, LLP,* 2008 WL 1803637 (S.D. Fla. 2008), the United States District Court for the Southern District of Florida, by Hon. Paul Huck, recently held that in claims under Fla. Stat. § 718.506 "reliance on fraudulent misrepresentations is unreasonable as a matter of law where the alleged misrepresentations contradict the express terms of the ensuing written agreement." *Id* (citing *Garcia v. Santa Maria Resort, Inc.,* 528 F.Supp.2d 1283, 1295 (S.D.Fla.1999) (Hon. James L. King) (emphasis in original) (quoting

---

[18] Complaint at ¶¶ 76-90.
[19] Complaint at ¶¶ 76-90.

CASE NO.: 08-062209 CACE (02)

*Eclipse Med., Inc., v. Am. Hvrdo-Surgical Instruments. Inc.,* 262 F.Supp.2d 1334, 1342 (S.D. Fla. 1999); *Barnes v. Burger King Corp.,* 942 F.Supp. 1420, 1428 (S.D. Fla. 1996); *Acquisition Corp. of Am. v. FDIC,* 760 F.Supp. 1558, 1561 n. 6 (S.D. Fla.1991) ("[A] party has no right to rely upon alleged oral misrepresentations that are adequately covered and expressly contradicted in a later written contract.").

Count IV is predicated on alleged misrepresentations inconsistent with the express language of the subsequent written Purchase Agreement. As such, the factual allegations subject to Count IV fail to state a cause of action and therefore cannot raise a right to relief under Fla. Stat. § 718.506 to Plaintiffs. Thus, Count IV must be dismissed pursuant to Fla. R. Civ. P 1.140(b)(6).

In addition, as set forth in Section II C above, because the allegations subject to Count IV of Plaintiffs' Complaint completely and directly contradict the unambiguous language of the Purchase Agreement, the Prospectus and the Declaration, such documentation thereby negates any allegation that Defendants engaged in false and misleading advertising and promotional materials under Fla. Stat. § 718.506. As a result, Count IV must be dismissed for conflict between Plaintiffs' factual allegations and the controlling documents.

Moreover, the law in Florida governing Plaintiffs' request to rescind the Purchase Agreement, clearly provides that "the remedy of rescission [of contract] is clearly not favored by the courts, particularly when the complaining party has failed to promptly deny the contract as binding upon him and failed to follow a course of conduct manifesting a disavowal of it." *Morris Inv. Partnership v. Figueroa,* 698 So.2d 288 (Fla. 3d DCA 1997); *Steinberg v. Bay Terrace Apartment Hotel,* 375 So.2d 1089, 1092 (Fla. 3d DCA 1979); *Rood Company, Inc. v. Board of Public Instruction of Dade County,* 102 So.2d 139, at 141-142 (Fla.1958). As established herein, Plaintiffs did not act "promptly" in denying the validity of the contract. In fact, Plaintiffs' lawsuit to rescind the Purchase Agreement was brought approximately 3 years after Plaintiffs executed the Purchase Agreement back on December 19, 2005. Therefore, Plaintiffs' request to rescind the Purchase Agreement should be denied and Count IV should be dismissed.

## I.  COUNT V [15 U.S.C. § 77e – Securities Act Violation] IS BARRED BY THE APPLICABLE STATUTE OF LIMITATIONS AND FAILS TO STATE A CAUSE OF ACTION AND THEREFORE MUST BE DISMISSED

In Count V, Plaintiffs allege that the Condominium Hotel units, combined with its rental and management program, falls within the ambit of a purported "investment contract," and otherwise falls within the definition of a security under 15 U.S.C. § 77b(a)(1) – an "investment contract," because according to Plaintiffs, they each "purchased the Hotel Unit primarily and exclusively for investment purposes . . . with the expectation of profits."[20]  In light of Plaintiffs' "expectation of profits" from their purchase of the Condominium Hotel and their allegations that the Units fall within the definition of a "security," Plaintiffs allege that Defendants violated 15 U.S.C. § 77e. *See* Complaint at ¶¶ 91-101.

### (i)  Count V is Time-Barred by the Applicable Statute of Limitations

Count V is brought by Plaintiffs pursuant to Section 12(a)(l) of the Securities Act, 15 U.S.C. § 77e against all Defendants for alleged violations of 15 U.S.C. § 77*l*(a)(1).  *See* Complaint at ¶¶ 91-101.  Pursuant to 15 U.S.C. § 77m, claims brought under Section 12(a)(l) of the Securities Act, 15 U.S.C. § 77*l*(a)(l) for allegations of 15 U.S.C. § 77e violations <u>must</u> be brought "within *one [1] year* after the violation upon which it is based." *See Joyce v. Bobcat Oil & Gas, Inc.,* 2008 WL 919724 (M.D. Pa. 2008) (Court dismissed Plaintiff's Section 12(a)(l), 15 U.S.C. § 77*l* claims against a Defendant for its purported failure to register agreements as required by 15 U.S.C. § 77e because Plaintiff failed to file suit within 1 year of the alleged violation).

Here, Plaintiffs executed their Purchase Agreement on December 19, 2005.  Plaintiffs did not file this suit until December 18, 2008—far more than one year after the alleged violation. As such, this Court must dismiss Count V *with prejudice. See Yusuf Mohamed Excavation, Inc. v. Ringhaver Equip. Co.,* 793 So.2d 1127, 1128-29 (Fla. 5th DCA 2001) (affirming dismissal with prejudice when complaint's allegations revealed that the statutes of limitation had expired), *rev. denied,* 817 So.2d 853 (Fla. 2002).

The law is clear that the one year statute of limitations period applicable to claims under Section 12(a)(l) is triggered upon the alleged violation – <u>not</u> upon the injured party's discovery of the violation. *See Temple v. Gorman,* 201 F.Supp. 2d 1238, 1241-42 (S.D. Fla. 2002)

---

[20] Complaint at ¶ 92.

(holding that "the discovery rule does **not** apply to Section 12(a)(l) claims because non-registration violations are easily uncovered."). *See also McCarthy v. Barnett Bank of Polk Co.*, 750 F.Supp. 1119, 1124 (M.D.Fla.1990); *Blatt v. Merrill Lynch*, 916 F.Supp. 1343, 1352 (D.N.J.1996); *Snyder v. Newhard, Cook & Co.*, 764 F.Supp. 612, 618 (D.Colo.1991); *Farmers & Merchants Bank v. Hamilton Hotel Partners of Jacksonville Ltd. P'ship*, 702 F.Supp. 1417, 1423 (W.D.Ark.1988); *Mason v. Marshall*, 412 F.Supp. 294, 299-300 (N.D.Tex.1974), *aff'd*, 531 F.2d 1274 (5th Cir.1976) (holding that a 12(a)(1) claim was barred where plaintiffs paid for securities more than one year before filing the cause of action).

It is clear that a claim under § 77l of this title—in which a seller of a security is liable to a purchaser if the sale violates § 77e of this title—is barred by the one-year statute of limitations where the complaint was filed more than one year after the sale of the alleged security. *See Joyce v. Bobcat Oil & Gas, Inc.*, 2008 WL 919724 (M.D. Pa. 2008) (Court dismissed Plaintiff's Section 12(a)(l) of the Securities Act, 15 U.S.C. § 77l(a)(l) claims, as they were time barred by the 1-year statute of limitation); *Ballenger v. Applied Digital Solutions, Inc.*, 189 F.Supp.2d 196 (D. Del. 2002); *Dubin v. E.F. Hutton Group, Inc.*, 1990 WL 105757 (S.D.N.Y. 1990); *Seale v. Miller*, 698 F.Supp. 883 (N.D. Ga. 1988); *White v. Philatelic Leasing, Ltd.*, 1987 WL 49640 (E.D. Tenn. 1987); *Morely v Cohen*, 610 F.Supp. 789, 815 (D.Md. 1985); *Cook v. Avien, Inc.*, 573 F.2d 685 (1st Cir. 1978); *Osborne v. Mallory*, 86 F.Supp. 869 (S.D.N.Y. 1949).

Moreover, the established case law provides that neither the discovery rule nor equitable tolling applies to the one-year period of limitations for filing a section 77l (a)(1) claim. *See Joyce v. Bobcat Oil & Gas, Inc.*, 2008 WL 919724 (M.D. Pa. 2008); *Pell, supra*, 759 F.Supp. at 1111; *Blatt v. Merrill Lynch*, 916 F.Supp. 1343, 1352-53 (D.N.J.1996); *In re Elec. Data Systems Corp., supra*, 305 F.Supp.2d at 680; *Hanson v. Johnson*, 2003 WL 21639194, at *3 (D.Minn.). The statute begins to run "from the date of the violation regardless of whether the plaintiff knew of the violation." *Pell*, 759 F.Supp. at 1111.

Plaintiffs' claims as to Count V are accordingly time-barred by the applicable statute of limitation and therefore must be dismissed *with prejudice*.

(ii)    <u>The Purchase Agreement in NOT an "Investment Contract"</u>

"[F]ederal securities laws were not intended to provide a federal remedy for all fraud or misconduct arising out of a commercial transaction." *Haddad v. Rav Bahamas, Ltd.*, 431 F. Supp. 2d 1278, 1284 (S.D. Fla. 2006) (Hon. Patricia Seitz). Here, apparently dissatisfied with

the current state of the Florida condominium market, Plaintiffs seek to back out of their express Purchase Agreement commitments by asserting that the Purchase Agreement is actually an "investment contract" governed by federal securities laws.

Simply calling something a security does not make it one. *See Tcherepnin v. Knight*, 389 U.S. 332 (1967). The test for whether an agreement constitutes an "investment contract" for purposes of federal securities laws involves two inquiries: (i) whether the investor is investing in a "common enterprise" <u>and</u> (ii) whether the investor is led to expect profits "solely from the efforts of the promoter or a third party." *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 298-99, 66 S.Ct. 1100, 1103 (1946); *see also United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852, 95 S.Ct. 2051, 2060-61 (1975). Plaintiffs must plead facts sufficient to meet both prongs of the test to avoid dismissal of their purported securities claims. As set forth herein, Plaintiffs cannot meet both prongs because paragraph 39 of the Purchase Agreement between Plaintiffs and SB Hotel clearly establishes the following:

> ➤ Plaintiffs <u>agreed</u> that the Purchase Agreement was entered into by Plaintiffs <u>without</u> reliance upon any potential future profit, appreciation of value, rental income potential, investment potential and without reliance upon any hotel affiliation or monetary or financial advantage; and

> ➤ Plaintiffs also <u>warranted</u> that they did <u>not</u> rely upon any verbal representations or promises other than as expressly contained in the Purchase Agreement and in the Condominium Documents pertaining to potential appreciation in or resale value of the Unit, or pertaining to any particular hotel affiliation or maintaining any existing hotel affiliation.

As to the first prong, Plaintiffs are not investors because they agreed to purchase the units without relying on any income or investment potential or any monetary or financial advantage. Nor is there a common enterprise, as Plaintiffs agreed that they were not relying upon any income or investment potential or any monetary advantage or particular hotel affiliation. As to the second prong, and as established/provided in the Purchase Agreement, Plaintiffs expressly entered into the Purchase Agreement with no expectation of an investment or profits, and any

such investment or profits would be realized from the Plaintiffs' own actions or from appreciation in market value wholly outside of SB Hotel's control.[21]

In *Garcia v. Santa Maria Resort, Inc.*, 528 F.Supp.2d 1283 (S.D. Fla. 2007), the United States District Court for the Southern District of Florida, by the Honorable James L. King, recently presided over a similar case where Plaintiffs brought federal securities and state law claims against developer defendant and real estate agent defendant for alleged misrepresentations pertaining to a condominium project. The *Santa Maria* plaintiffs, like here, alleged the existence of an agreement with a management company to rent units for the unit owners and that common management would result in excess rentals for the units. *Id.* at 1289. The Southern District of Florida dismissed the claims after finding that the condominium purchase agreements were not "investment contracts" and as a result, federal securities laws were inapplicable in the purchasers' dispute against developer and real estate agents, where the contracts did not emphasize investment value, and each purchaser specifically confirmed that he had no expectation of profits.

Here, as in *Santa Maria Resort*, Plaintiffs' Purchase Agreement cannot be construed as an investment contract because the Purchase Agreements did <u>not</u> emphasize an investment value for the condominium unit. In addition, here, as in *Santa Maria*, Plaintiffs confirmed that they had no expectation of profits by executing the Purchase Agreement. As such, Count V must be dismissed.

(iii)     **The "Bespeaks Caution" Doctrine Mandates Dismissal of Count V**

The "bespeaks caution" doctrine was expressly adopted by the United States Court of Appeals for the Eleventh Circuit in *Saltzberg v. TM Sterling/Austin Assocs., Ltd.*, 435 F.3d 399 (11th Cir. 1995). The doctrine provides that "when an offering document's projections are accompanied by meaningful cautionary statements and specific warnings of the risks involved, the language may be sufficient to render the alleged omissions or misrepresentations immaterial

---

[21] Furthermore, "[u]nder the definition of 'investment contract' as developed by the Court in *Howey* and *Forman*, the sale of a condominium generally would <u>not</u> involve an investment contract." *Bender v. Cont'l Towers Ltd. P'ship*, 632 F. Supp. 497, 500 (S.D.N.Y. 1986). And, where the purchaser of a condominium expresses the intention of reselling at a higher price, federal securities law is not implicated. *Id.* at 501. Rather, such a purchaser is "drawn in by an expectation of appreciation in value" rather than an expectation of profits "solely from the efforts of a promoter or a third party." *Id.* (quoting *Johnson v. Nationwide Indus., Inc.*, 450 F. Supp. 948, 953 (N.D. Ill. 1978); *Howey*, 328 U.S. at 298-99, 66 S. Ct. at 1103).

as a matter of law." *Saltzberg*, 435 F.3d at 400.  In *Saltzberg*, the Eleventh Circuit recognized that the cautionary language "was not boilerplate and was not buried among too many other things, but was explicit, repetitive, and linked to the projections about which plaintiffs complain." *Id.*  Accordingly, the court held that "in light of the cautionary language in this case, plaintiffs cannot show the necessary misstatement or omission of a material fact." *Id.  See also Garcia v. Santa Maria Resort, Inc.*. 528 F.Supp.2d 1283 (S.D. Fla. 2007) where Judge King held as follows:

> Under "bespeaks caution" doctrine, when offering document's projections are accompanied by meaningful cautionary statements and specific warnings of risks involved, language may be sufficient to render alleged omissions or misrepresentations immaterial as matter of law, where such statements are not boilerplate and not buried among too many other things, but are explicit, repetitive, and linked to projections about which plaintiffs complain. Bespeaks caution" doctrine barred federal securities fraud claims asserted by purchasers of condominium units against developer and real estate agents, even if agents made predictions as to real estate market's future, where purchase agreements stated that there was no expectation of investment potential for purchaser.
>
> Further, if cautionary language is included, a defendant's state of mind is irrelevant.

*Cutsforth v. Renchsler*, 235 F. Supp. 2d 1216, 1227 (M.D. Fla. 2002).

Plaintiffs merely allege that [despite the plain language of the Purchase Agreement, Prospectus and Declaration] they "purchased the Hotel Units primarily and exclusively for investment purposes . . . with the expectation of profits."[22]

However, the cautionary language—*i.e.*, the disclaimers throughout the Purchase Agreement about expectations of profit—does not just caution Plaintiffs, but it completely contradicts the factual allegations subject to Plaintiffs' Complaint.  As noted above, paragraph 39 of the Purchase Agreement expressly provides the following:

> ➢ Plaintiffs agreed that the Purchase Agreement was entered into by Plaintiffs without reliance upon any potential future profit, appreciation of value, rental income potential, investment potential and without reliance upon any hotel affiliation or monetary or financial advantage; and
>
> ➢ Plaintiffs also warranted that they did not rely upon any verbal representations or promises other than as expressly contained in the Purchase Agreement and in the Condominium Documents pertaining to potential appreciation in or resale value

---

[22] Complaint at ¶ 92.

of the Unit, or pertaining to any particular hotel affiliation or maintaining any existing hotel affiliation.

Accordingly, any purported predictions as to the future of the real estate market would be forward-looking statements/language cautioned against explicitly in the Purchase Agreement. Therefore, any such prediction could not form the basis of a federal securities law claim. *See*, *e.g.*, *Cutsforth*, 235 F. Supp. 2d at 1238-39 (recognizing statements that an acquisition will reflect "dynamic growth" and add "enhanced value" are within the class of statements that are not actionable, as they are "vague, optimistic statements" which investors typically do not rely on in making investment decisions).

Furthermore, the cautionary language throughout the Purchase Agreement is not buried amongst other provisions and it is repetitive. Plaintiffs were expressly forewarned that they should not enter into the Purchase Agreement for investment purposes and should not expect an economic benefit from the purchase of a unit. Therefore, Count V is barred by the "bespeaks caution" doctrine and must be dismissed.

**(iv)** **Dismissal Warranted Because Factual Allegations Conflict with Exhibits, Fla. R. Civ. P. 1.140(b)(6)**

Because the allegations subject to Count V of Plaintiffs' Complaint completely and directly contradict the unambiguous language of the Purchase Agreement, such documentation thereby negates any allegation that Defendants violated 15 U.S.C. § 77e. As a result, Count V should be dismissed for conflict between Plaintiff's factual allegations and the controlling documents attached to the complaint or referenced therein. *See Goodall v. Whispering Woods Center, L.L.C.*, 990 So.2d 695, (Fla. 4th DCA 2008); *Geico Gen. Ins. Co. v. Graci*, 849 So.2d 1196 (Fla. 4th DCA 2003); *Hunt Ridge at Tall Pines, Inc. v. Hall*, 766 So.2d 399, 401 (Fla. 2d DCA 2000).

**J. COUNT VI [Chapter 517 of the Florida Statutes – Violation of the Florida Securities and Investor Protection Act (FSIPA)] IS BARRED BY THE APPLICABLE STATUTE OF LIMITATIONS AND FAILS TO STATE A CAUSE OF ACTION AND THEREFORE MUST BE DISMISSED**

Count VI of Plaintiffs' Complaint alleges[23] that the Purchase Agreement is a "security" as defined by Fla. Stat. § 517.021(21)(q) – an "investment contract." Plaintiffs also allege that pursuant to Fla. Stat. § 517.07, a security/investment contract [i.e. Purchase Agreement for

---

[23] Complaint at ¶¶ 102-116.

CASE NO.: 08-062209 CACE (02)

Condominium Hotel units] cannot be sold or offered for sale in the State of Florida unless it is exempt from Fla. Stat. §§ 517.051 or 517.061 or registered.[24]  Plaintiffs further allege that pursuant to Fla. Stat. § 517.211, they may rescind the Purchase Agreement for the Unit because Defendants should have registered the purported investment contract/security.[25]

Identical to the allegations in Count V discussed above, Plaintiffs also allege under Count VI that the Condominium Hotel Units, combined with their rental and management program falls within the ambit of a purported "investment contract," and otherwise falls within the definition of a security under 15 U.S.C. § 77b(a)(1) – an "investment contract," because according to Plaintiffs, they "purchased the Hotel Unit primarily and exclusively for investment purposes."[26]

(i)      **Count VI is Time-Barred by the Applicable Statute of Limitations**

Count VI is brought by Plaintiffs pursuant Chapter 517 of the Florida Statutes – Violation of the Florida Securities and Investor Protection Act (FSIPA).  *See* Complaint at ¶¶ 102-116. Pursuant to Fla. Stat. § 95.11(4)(e), an action founded upon a violation of any provision of Chapter 517 must be brought within *2 years* from the time the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence.  *See* Fla. Stat. § 95.11(4)(e); *Schoch v. Dade City Retirement Housing, Inc.*, 124 F.R.D. 688, 690 (M.D. Fla. 1988) (quoting Fla. Stat.§ 95.11(4)(e)); *Williams v. Bear Sterns Co.*, 725 So.2d 397 (Fla. 5th DCA 1998); *Attache Resort Motel, Ltd. v. Kaplan*, 498 So.2d 510 (Fla. 3d DCA 1986).

Plaintiffs were required to file suit by December 19, 2007.  Because Plaintiffs filed their Complaint on December 18, 2008 [1 year too late], Count VI was brought untimely – on the face of Plaintiffs' Complaint.  As such, this Court should dismiss Count VI *with prejudice*. *See Yusuf Mohamed Excavation, Inc.* v. *Ringhaver Equip. Co.*, 793 So.2d 1127, 1128-29 (Fla. 5th DCA 2001) (affirming dismissal with prejudice when complaint's allegations revealed that the statutes of limitation had expired), *rev. denied*, 817 So.2d 853 (Fla. 2002).  *See also Hanano*, 683 So.2d at 638 (If the facts supporting application of the statute of limitations are affirmatively shown, then the cause of action must be dismissed.).

---

[24] *Id.*
[25] *Id.*
[26] Complaint at ¶ 114.

**(ii)    Count VI Fails to State a Cause of Action**

In support of its Motion to Dismiss Count VI, Defendants hereby adopt and incorporate by reference their legal argument set forth above in Section II I (ii-v) pertaining to Count V.

Florida has adopted the *Howey* test for purposes of determining whether an agreement constitutes an "investment contract" under Fla. Stat. § 517.021. *See Adams v. State*, 443 So.2d 1003 (Fla. 2d DCA 1983). As set forth above, the *Howey* test is the following: (i) whether the investor is investing in a "common enterprise" and (ii) whether the investor is led to expect profits "solely from the efforts of the promoter or a third party." *See S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 298-99, 66 S.Ct. 1100, 1103 (1946).

As outlined in Section II C above, paragraph 39 of the Purchase Agreement between Plaintiffs and SB Hotel establishes the following:

> ➢ Plaintiffs <u>agreed</u> that the Purchase Agreement was entered into by Plaintiffs <u>without</u> reliance upon any potential future profit, appreciation of value, rental income potential, investment potential and without reliance upon any hotel affiliation or monetary or financial advantage; and

> ➢ Plaintiffs also <u>warranted</u> that they did <u>not</u> rely upon any verbal representations or promises other than as expressly contained in the Purchase Agreement and in the Condominium Documents pertaining to potential appreciation in or resale value of the Units, or pertaining to any particular hotel affiliation or maintaining any existing hotel affiliation.

In comparing the above to Plaintiffs' assertion that the Purchase Agreement is an "investment contract," because according to Plaintiffs, they "purchased the Hotel Unit primarily and exclusively for investment purposes . . . with the expectation of profits . . . and to achieve a return on his investment,"[27] the factual allegations subject to Count VI fail to state a cause of action and therefore cannot raise a right to relief to Plaintiffs under Fla. Stat. § 517.07 or 15 U.S.C. § 77e. As such, Count VI must be dismissed pursuant to Fla. R. Civ. P. 1.140(b)(6).

Furthermore, as set forth in Section II I (v) above, because the allegations subject to Count VI of Plaintiffs' Complaint completely and directly contradict the unambiguous language of the Purchase Agreement, such documentation thereby negates any allegation that Defendants

---

[27] Complaint at ¶¶ 114.

violated Fla. Stat. § 517.07.  As a result, Count VI should be dismissed for conflict between Plaintiffs' factual allegations and the controlling documents.

### K.  COUNT VII [Florida Statute § 501 of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")] FAILS TO STATE A CAUSE OF ACTION AND THEREFORE MUST BE DISMISSED

Count VII is brought by Plaintiffs for purported violations of Florida Statute § 501 of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").  Plaintiffs allege that SB Hotel's claimed violations of ILSA, federal and state securities laws and Chapter 718 of the Florida Statutes, combined with SB Hotel's refusal to return Plaintiffs' earnest money deposits, constitute unfair and/or deceptive trade practices. *See* Complaint at ¶¶ 134-138.  Plaintiffs also allege that such actions are likely to deceive a consumer and have deceived the Plaintiffs/consumers in this matter. *See* Complaint at ¶ 137.

Whatever the Court's view of the Plaintiffs' legal alchemy in linking ILSA, federal and state securities laws and Florida Statute § 718 to FDUTPA, one conclusion gleaned from Count VII is clear and correct: that Plaintiffs' FDUTPA claim hinges entirely upon the success of its ILSA, securities and Florida Statute 718 claims subject to Counts I-VI.  That is, if Counts I-VI are dismissed, Count VII should also be dismissed. *See Parra v. Minto Town Park, LLC,* 2008 WL 4773272 (S.D. Fla.) (Judge Graham) (Court dismissed Plaintiffs' FDUPTA claim in case seeking return of a condominium deposit after finding that Plaintiffs FDUPTA claim was premised upon other Counts that also failed at the motion to dismiss stage.) *See also Maguire v. Southern Homes of Palm Beach,* 2008 WL 2474657 (S.D. Fla.) (Magistrate Judge Torres) (Court also dismissed Plaintiffs' FDUPTA claim in case seeking return of a condominium deposit after finding that Plaintiffs FDUPTA claim was premised upon other Counts that also failed at the motion to dismiss stage.)

Furthermore, to state a FDUTPA claim a party must allege: "(1) a deceptive act or unfair practice, (2) causation, and (3) actual damages." *Lydia Sec. Monitoring, Inc. v. Alarm One, Inc.,* No. 07-80145 CIV, 2007 WL 2446889 at *5 (S.D. Fla. Aug. 23, 2007) (Hon. Kenneth Ryskamp).  To state a cause of action under FDUPTA, a plaintiff must do more than merely allege in a conclusory fashion that a defendant's actions constituted an "unfair or deceptive act" or that the defendant acted "wrongfully, unreasonably and unjustly" and for a "deceptive and improper purpose." *See Merrill Lynch Business Financial Services, Inc. v. Performance Machine*

CASE NO.: 08-062209 CACE (02)

*Systems USA, Inc.*, 2005 WL 975773, *8 (S.D.Fla. Mar.4, 2005); *Infinity Global, LLC v. Resort at Singer Island, Inc.*, 2008 WL 1711535 (S.D.Fla.) (Hon. Kenneth Ryskamp) (<u>dismissing FDUPTA claim seeking reimbursement of earnest money deposits for purchase of condominiums).</u>

As set forth below, Plaintiffs' FDUTPA claim is deficient for the following reasons:

*First,* Plaintiffs do not allege deceptive acts or unfair practices. Instead, they allege that: Defendants' claimed violations of ILSA, federal and state securities laws and Chapter 718 of the Florida Statutes, combined with SB Hotel's refusal to return Plaintiffs' earnest money deposits, constitute unfair and/or deceptive trade practices. As pled, Plaintiffs' allegations fail to identify any specific deceptive acts or unfair practices.

*Second,* Plaintiffs have also failed to allege ultimate facts pertaining to causation and instead, simply allege Defendants violated ILSA and other state and federal laws, and therefore SB Hotel must have violated FDUPTA.

*Third,* Plaintiffs have also failed to allege facts pertaining to how Defendants actually damaged or injured Plaintiffs.

*Lydia Security Monitoring* illustrates this point. In *Lydia,* the defendant merely claimed that it "suffered damages." The Court determined this allegation was deficient because it did not address causation. The Court explained that "[m]erely stating 'as a result' does not provide sufficient allegations to show causation in an FDUTPA claim." *Lydia Sec. Monitoring,* 2007 WL 2446889 at *5; *See also Dolphin, LLC v. WCI Communities, Inc.,* Case. No. 07-80241 CIVHURLEY/ JOHNSON, Order Granting Defendant's Motion for Summary Judgment, at page 8 (S.D. Fla. Feb. 20, 2008) ("there is no allegation, let alone any evidence, that plaintiff relied on the allegedly misleading statement in signing the contract. This itself is fatal to plaintiff's claim because a FDUTPA claim must allege that the deceptive act or unfair practice actually caused plaintiff's claimed damages."). Applying these principles to the allegations in Plaintiffs' Complaint, Plaintiffs fail to connect the allegedly deceptive practices to any loss they allege they suffered. Thus, Plaintiffs have failed to state a sufficient FDUPTA claim and as a result, the Court should dismiss Count VII of Plaintiffs' Complaint. *See Stires v. Carnival Corp.,* 243 F.Supp.2d 1313 (M.D. Fla 2002) (recognizing, in dismissing Plaintiff's count under FDUPTA as being insufficiently pled); *Florida Digital Network v. Northern Telecom, Inc.,* 2006 WL 2523163 (M.D.Fla. 2006) (finding that merely stating legal conclusions that defendant "acted in an